**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **BRC RUBBER & PLASTICS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:11-CV-190** |
| | ) | |
| **CONTINENTAL CARBON COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**OPINION AND ORDER**</u>

Plaintiff BRC Rubber & Plastics, Inc., and Defendant Continental Carbon Company entered into a Supply Agreement as of January 1, 2010, concerning the supply of carbon black by Continental to BRC (the "Agreement").  On June 2, 2011, BRC terminated that Agreement and filed this lawsuit against Continental, advancing claims of breach of contact and anticipatory repudiation and seeking declaratory relief.[1]

The crux of BRC's claims is that the Agreement is a requirements contract and Continental breached its terms when it missed sending a scheduled shipment of carbon black material to BRC, limited the annual quantity of carbon black it would sell, demanded higher prices for the material, and attempted to accelerate BRC's payment terms.

Continental, however, argues that it could not possibly have breached the Agreement because it is merely an open offer for orders, not a binding contract; alternatively, Continental contends that even if the Agreement is a binding contract, it is not a requirements contract, but rather an agreement to sell a specific quantity of carbon black.

---

[1] Diversity jurisdiction exists under 28 U.S.C. § 1332(a).  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (Docket # 36.)

The parties have filed cross-motions for summary judgment, which are now ripe for ruling. (Docket # 31, 32, 35, 39, 41, 42.)  Continental's summary judgment motion asserts that the Agreement is not a requirements contract and, accordingly, all of BRC's claims fail as a matter of law.  BRC, however, contends just the opposite—that the Agreement *is* a requirements contract and therefore it, not Continental, is entitled to summary judgment.  Also pending is Continental's fully-briefed motion to strike the Declarations of Thomas Nunley and Michael Cornwell. (Docket # 40, 43, 44.)

For the following reasons, the Court concludes that the Supply Agreement is a requirements contract.  Accordingly, Continental's summary judgment motion will be DENIED and its motion to strike will be DENIED in part and DENIED AS MOOT in part.  BRC's summary judgment motion will be GRANTED to the extent that the Court concludes that the Supply Agreement is a requirements contract, but the Motion will otherwise be DENIED.

## I.  FACTUAL BACKGROUND[2]

Continental manufactures furnace-grade carbon black, a raw material filler used in tires and other rubber and plastic products. (Moccia Decl. ¶ 2.)  BRC was a longtime customer of

---

[2] This factual summary does *not* include the portion of the Declarations of Thomas Nunley and Michael Cornwell that Continental seeks to strike on the basis of parol evidence, inadmissible hearsay, and conclusory statements.  Most of those statements are ultimately immaterial to the Court's ruling and thus have been disregarded; accordingly, the motion to strike will be denied with respect to the immaterial statements. *See Snyder v. Livingston*, No. 1:11-cv-77, 2012 WL 1493863, at *3 (N.D. Ind. Apr. 27, 2012) (declining to address portions of a motion to strike where such evidence was not material to the summary judgment inquiry).  The two statements in the Declarations that are subject to Continental's motion to strike and are considered in this Opinion are discussed *infra* in section IV(E) and footnote 6.

Continental also seeks to strike the two Declarations in their entirety on the basis that they do not comply with the requirement under 28 U.S.C. § 1746 that an unsworn declaration be made "under penalty of perjury" and be verified as "true and correct." (Nunley Decl. ¶ 35, Cornwell Decl. ¶ 27 ("I swear to the truth of the above statements, and if called as a witness, will so testify.").)  That argument, however, is moot since BRC submitted Revised Declarations with its response brief correcting the purported language deficiency. *See United States v. Gritz Bros. P'ship*, 155 F.R.D. 639, 644 (E.D. Wis. 1994) (dismissing the motion to strike as moot where the original declaration was timely filed and the amended declaration corrected the alleged deficiency under 28 U.S.C. § 1746).

Continental, purchasing three grades of carbon black for incorporation into the numerous rubber products it supplies to customers. (BRC's Mem. of Law 3; Nunley Decl. ¶ 4.)

Thomas Nunley worked for Continental from 1997 to May 2011, serving as its Regional Manager of Materials during the relevant period. (Nunley Decl. ¶ 3.)  In late 2009, Continental's President, Kim Pan, told Nunley that his number one goal should be to secure long-term agreements with customers. (Nunley Decl. ¶ 6.)  Accordingly, Nunley visited many customers for the purpose of securing a long-term contract, including BRC, whom he regularly called on. (Nunley Decl. ¶¶ 6, 9.)

Nunley drafted a supply agreement with a term of five years and presented it to Michael Cornwell, Vice-President of Materials for BRC, who made a few changes to it. (Nunley Decl. ¶¶ 12-13; Cornwell Decl. ¶¶ 4-5.)  Nunley then presented the draft agreement to Pan, who approved it. (Nunley Decl. ¶ 14.)  No one else from Continental or BRC was active in negotiating the agreement. (Nunley Decl. ¶ 13; Cornwell Decl. ¶ 5.)

BRC and Continental executed the Supply Agreement as of January 1, 2010, and the Agreement "sets forth the terms and conditions for sale of furnace grade carbon black" from that date through December 31, 2014. (Moccia Decl. ¶ 3, Ex. A-1; BRC's Mem. of Law Ex. 1.)  The terms of the two-page Agreement relevant to this dispute are:[3]

Meet or Release

If during the term of this agreement BRC receives an offer that they believe is better tha[n] the terms offered in this agreement[,] Continental Carbon will have the right to meet this agreement or release BRC from any further obligation.  Continental Carbon has the right to review the actual written offer.  Only offers made in writing will be

---

[3] A copy of the Supply Agreement in its entirety is set forth as Exhibit A to this Opinion, except that the title of the Agreement is omitted from that copy.  The parties agree that the words "Supply Agreement" appear at the top of the first page on the original Agreement. (*See* Moccia Decl. Ex. A-1.)

considered.

Quantity of Material

It is the intent of this Agreement that Continental Carbon Company agrees to sell to BRC Rubber and Plastics approximately 1.8 million pounds of prime furnace black annually. These volumes are to be taken in approximately equal monthly quantities.   BRC Rubber and Plastics, to the best of their ability, will provide accurate forecasts of the future usage of their manufacturing sites which will assist Continental Carbon Company in meeting these and additional requirements.

Carbon Black Pricing

The following baseline prices for all rubber grade carbon blacks purchased by BRC Rubber & Plastics as of January 1, 2010 are as follows and are to remain firm throughout the term of this agreement.

. . . .

Additional Volume Rebate/Penalty

An additional rebate or penalty will be applied according to the following schedule:

| **Lower Limit** | **Upper Limit** | **Amount Applied** |
| --- | --- | --- |
| 1,500,000 | 2,100,000 | $.005/lb |
| 1,400,000 | 2,200,000 | An additional $.005/lb for a total of $.01/lb |

Rebates or penalty are applied to all pounds purchased during a calendar year.  Rebates will be credit or invoice will be issued to make the appropriate adjustment.

Should the normal annual volume for BRC shift significantly BRC and Continental Carbon agree to establish new upper and lower limits.

(Moccia Decl. Ex. A-1; BRC's Mem. of Law Ex. 1.)

From January 1, 2010, until approximately mid-May 2011, the parties performed under

the Agreement without dispute. (Moccia Decl. ¶ 4.)  Whenever BRC needed carbon black from

Continental, it would fax or email a written purchase order to Continental's customer service

representative requesting the type, quantity, and shipment date needed. (Nelson Decl. ¶ 1.)  If it

could supply the requested type and quantity of material on the requested date, Continental

would confirm this with BRC by telephone, fax, or email and then enter the information into

4

Continental's order system. (Nelson Decl. ¶ 2.)  In 2010, BRC bought 2.6 million pounds of carbon black from Continental and, accordingly, received a rebate under the terms of the Agreement. (Nunley Decl. ¶ 19; Cornwell Decl. ¶¶ 11, 12.)

Beginning in March 2011, market demand for carbon black began to exceed Continental's capacity to produce it. (Moccia Decl. ¶ 4.)  Thomas Moccia, who joined Continental in 2010 as its Director of Marketing, told Nunley that Continental was losing money based on higher than anticipated manufacturing costs and inefficiencies and instructed him to approach the Continental customers that he called on to try to obtain accelerated payment terms and increased prices. (Nunley Decl. ¶¶ 21, 23.)  Accordingly, Nunley approached BRC about these issues and was successful in obtaining the accelerated payment terms, but not the increased prices. (Nunley Decl. ¶ 31; Cornwell Decl. ¶¶ 14, 15.)  BRC reminded Nunley that the Agreement required the base prices to "remain firm" and that BRC expected Continental to "hold up its end of the bargain."[4] (Cornwell Decl. ¶ 15.)

By May 2011, Continental could no longer keep up with the demand for carbon black. (Moccia Decl. ¶ 4.)  Continental's lead time for supplying its customers lengthened, and a large percentage of shipments to its customers were delayed. (Moccia Decl. ¶ 4.)  That month, Continental failed to make one of its scheduled shipments of carbon black to BRC. (Cornwell Decl. ¶ 16.)

As a result of the missed shipment, BRC's counsel sent a letter to Continental on May 16, 2011, demanding adequate assurance of Continental's continued performance under the Agreement. (Moccia Decl. ¶ 4, Ex. A-2; Cornwell Decl. ¶ 16.)  On May 20, 2011, Continental's

---

[4] Shortly thereafter, Continental terminated Nunley's employment. (Nunley Decl. ¶ 33.)

counsel sent an email to BRC's counsel, assuring BRC that Continental would continue to produce and ship carbon black at the prices stated in the Agreement. (Moccia Dec. ¶ 5, Exs. A-3, A-4; Cornwell Decl. ¶ 20.)  BRC acknowledged its receipt of Continental's assurance and inquired when the next shipments of carbon black would be scheduled. (Moccia Decl. ¶ 6, Ex. A-4.)  Continental replied that it would ship one railcar of carbon black the next week and that it would "do the best we can re[garding] future orders on our intent to supply 1.8 million pounds." (Moccia Decl. ¶ 6, Ex. A-4.)

But later that same day, Continental's customer service representative stated in an email to BRC that it would only ship at higher prices. (Cornwell Decl. ¶ 20.)  Cornwell responded via email that BRC refused the demand for higher prices because it was not in accordance with the Agreement. (Cornwell Decl. ¶ 21.)  Moccia of Continental then replied to Cornwell: "I suggest you call another supplier Mike . . . ." (Cornwell Decl. ¶ 22.)

Three days later, on May 23, 2011, BRC asked Continental when the next three rail shipments of carbon black would ship. (Moccia Decl. ¶ 7, Ex. A-5.)  Continental informed BRC that it could only ship one car at the moment, that it would not "short" other customers, and that Continental would supply BRC based on the terms of the Agreement. (Moccia Decl. ¶ 7, Ex. A-5.)  The next day, in response to yet another inquiry from BRC, Continental told BRC that it would ship a railcar of carbon black the next day and reminded BRC that it had already shipped 1.2 million pounds to BRC year to date. (Moccia Decl. ¶ 7, Ex. A-5.)  Continental further emphasized that the Agreement reflects its intent to ship 1.8 million pounds in approximately equal monthly quantities—150,000 pounds a month—and that year to date BRC had already purchased *twice* that amount each month, that is, 300,000 pounds. (Moccia Decl. ¶ 7, Ex. A-5.)

6

Continental reiterated that it would do its best to supply BRC and would advise it when another railcar would be shipped. (Moccia Decl. ¶ 7, Ex. A-5.)  The next day, Continental sent a shipment of carbon black to BRC. (Moccia Decl. ¶ 8.)

On June 2, 2011, BRC sent a letter to Continental, asserting that the Agreement was a requirements contract, that Continental had failed to adequately respond to BRC's demand for assurance, and that Continental was in breach of the Agreement. (Moccia Decl. ¶ 8, Ex. A-6.) BRC further informed Continental that it was terminating the Agreement "effective immediately" and that BRC had filed the instant lawsuit against Continental. (Moccia Decl. ¶ 8, Ex. A-6.)

On June 10, 2011, BRC rescinded its order for a railcar of carbon black scheduled to ship on June 22, 2011. (Moccia Decl. ¶ 8.)  At the time BRC terminated the Agreement, Continental had sold and delivered 1.642 million pounds of carbon black to BRC in 2011. (Moccia Decl.  ¶ 10, Ex. A-7.)  Continental sold and delivered another six railcar shipments of carbon black to BRC after terminating the Agreement, and thus the total amount of carbon black sold and delivered by Continental to BRC in 2011 was 1.971 million pounds. (Moccia Decl. ¶ 10, Ex. A-7.)  The parties never discussed or established new upper and lower limits under the Agreement before BRC terminated the Agreement. (Moccia Decl. ¶ 9.)

## II.  STANDARD OF REVIEW ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task

in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 (7th Cir. 2008) (quoting *Payne*, 337 F.3d at 770). If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771.

"When cross-motions for summary judgment are filed, 'courts look to the burden of proof that each party would bear on an issue of trial; [courts] then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact.'" *M.O. v. Ind. Dep't of Educ.*, No. 2:07-CV-175-TS, 2009 WL 857548, at *3 (N.D. Ind. Mar. 31, 2009) (alteration in original) (citing *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)). "The contention of one party that there are no issues of material fact sufficient to prevent the entry of judgment in its favor does not bar that party from asserting that there are issues of material fact sufficient to prevent the entry of judgment as a matter of law against it." *Id.* (citation omitted); *see Zook v. Brown*, 748 F.2d 1161, 1166 (7th Cir. 1984). "[C]ross-motions for summary judgment do . . . not alter the respective burdens on cross-motions for summary judgment—more particularly here, the responsive burden of a plaintiff who moves for summary judgment and is confronted with a cross-motion for summary judgment. The motions are treated separately."

8

*McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 (7th Cir. 2008) (citations omitted); *M.O.*, 2009 WL 857548, at *3.

### III.  RULES OF CONTRACT INTERPRETATION[5]

"[T]he goal of contract interpretation is to ascertain the parties' intent." *BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 359 (7th Cir. 2009) (applying Indiana law); *Nikish Software Corp. v. Manatron, Inc.*, 801 F. Supp. 2d 791, 800 (S.D. Ind. 2011); *Trustcorp Mortg. Co. v. Metro Mortg. Co.*, 867 N.E.2d 203, 212-13 (Ind. Ct. App. 2007).  "In the case of a written contract, the parties' intent is determined by looking first to the plain and ordinary meaning of the contract language." *BKCAP, LLC*, 572 F.3d at 359 (citing *USA Life One Ins. Co. v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997)).

"If the contract language is clear and unambiguous, the document is interpreted as a matter of law without looking to extrinsic evidence." *Id.*  "The Court must read the contract as a whole, construing language to give meaning to all of the contract's words, terms, and phrases." *Id.*; *see Trustcorp Mortg.*, 867 N.E.2d at 213.  "If, however, the contract language is ambiguous, an examination of relevant extrinsic evidence is appropriate in order to ascertain the parties' intent." *BKCAP, LLC*, 572 F.3d at 359.

---

[5] "When a federal court hears a case in diversity, it does not necessarily apply the substantive law of the forum state; rather, it applies the choice-of-law rules of the forum state to determine which state's substantive law applies." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  The choice of law rule for Indiana "calls for applying the law of the forum with the most intimate contacts to the facts." *Emp'rs Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1024 (Ind. Ct. App. 1999).  Here, the Supply Agreement involved the sale of goods from Continental, which has its principal place of business in Texas, to BRC, which has its principal place of business in Indiana. (Def.'s Mem. of Law 6.)  The parties do not dispute that both Texas and Indiana have adopted the Uniform Commercial Code ("UCC") and that no substantive differences exist between the two states' enactments of the provisions relevant to this case (Def.'s Mem. of Law 6); accordingly, the parties rely primarily on Indiana law in their briefs. Therefore, the Court will apply the UCC as adopted in Indiana and look to interpretations of the UCC from Indiana and other jurisdictions.

"A controversy between the parties concerning the proper interpretation of contract terms does not necessarily indicate that the terms are ambiguous." *Bowman v. Int'l Bus. Machs. Corp.*, __ F. Supp. 2d __ 2012 WL 566258, at *4 (S.D. Ind. Feb. 21, 2012) (citing *Kiltz v. Kiltz*, 708 N.E.2d 600, 602 (Ind. Ct. App. 1999)). "Rather, language is ambiguous only if reasonable people could come to different conclusions about its meaning." *Felker v. Sw. Emergency Med. Serv., Inc.*, 521 F. Supp. 2d 857, (S.D. Ind. 2007) (citing *Roy A. Miller & Sons, Inc. v. Indus. Hardwoods, Corp.*, 775 N.E.2d 1168, 1173 (Ind. Ct. App. 2002)); *accord Nikish Software*, 801 F. Supp. 2d at 800; *Ind. Dep't of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d 1063, 1069 (Ind. Ct. App. 2001).

"Generally, the construction of a written contract is a question of law for which summary judgment is particular appropriate." *Automation By Design, Inc. v. Raybestos Prods. Co.*, 463 F.3d 749, 753 (7th Cir. 2006) (quoting *Orthodontic Affiliates, P.C. v. Long*, 841 N.E.2d 219, 222 (Ind. Ct. App. 2006)). However, if the terms of a written contract are ambiguous, it "must be set before a trier of fact to ascertain the facts necessary to construe the contract." *Id.* (citing *Orthodontic Affiliates*, 841 N.E.2d at 222); *accord Freiburger v. Bishop Dwenger High Sch.*, 569 N.E.2d 755, 758 (Ind. App. 1991). Consequently, "[w]hen a court grants summary judgment it has necessarily determined that the contract is not ambiguous or that any existing ambiguity can be resolved without the aid of a factual determination." *Automation By Design*, 463 F.3d at 753 (citing *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 687 (Ind. Ct. App. 2006)); *accord City of Lawrenceburg v. Milestone Contractors, L.P.*, 809 N.E.2d 879, 883 (Ind. Ct. App. 2004).

## IV.  DISCUSSION

The basis of BRC's breach of contract claims against Continental is that the Supply Agreement between the parties is a requirements contract that obligates Continental to supply all of BRC's needs for carbon black.  Continental disagrees, contending that the plain language of the Agreement unambiguously indicates that there is no binding contract between the parties—only an open offer for orders—and thus there was no breach.  Continental alternatively argues that even if there was a binding contract, it is an agreement to sell 1.8 million pounds of carbon black to BRC per year, *not* to supply all of BRC's requirements.

For the following reasons, the Court finds that the language of the Agreement unambiguously establishes that it is a requirements contract.

### A.  Elements of a Requirements Contract

"A requirements contract is one in which the purchaser agrees to buy all of its needs of a specified material exclusively from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract." *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 186 F.3d 815, 817 (7th Cir. 1999) (quoting *Ind.-Am. Water Co. v. Town of Seelyville*, 698 N.E.2d 1255, 1259 (Ind. Ct. App. 1998)).  This definition establishes that a requirements contract exists only when the contract (1) "obligates the buyer to buy goods," (2) "obligates the buyer to buy all of its requirements for goods of a particular kind from the seller," and (3) "obligates the buyer to buy goods exclusively from the seller." *Id*.  Requirement contracts are governed by the UCC § 2-306, which provides: "A term which measures the quantity by the . . . requirements of the buyer means such actual . . . requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in

the absence of a stated estimate to any normal or otherwise comparable prior . . . requirements

may be . . . demanded." IND. CODE 26-1-2-306(1).

### B.  The Agreement Obligates BRC to Buy Carbon Black From Continental

Continental first argues that although the plain language of the Agreement states that it

"agrees to sell" carbon black to BRC at specified prices, nowhere does it indicate that BRC

agrees to *buy* it, negating the first of the three required elements of a requirements contract.

*Zemco Mfg.*, 186 F.3d at 817.  It further emphasizes that because BRC ultimately promised

nothing in the Agreement, the consideration and mutuality required to form a valid contract is

lacking, and therefore the Agreement amounts to nothing more than a "buyer's option" or an

open invitation for orders. *See Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough

Prods., Inc*., 212 F.3d 373, 378 (7th Cir. 2000) (rejecting plaintiff's contention that the

agreement was a requirements contract and concluding that it was merely a "buyer's option"

where plaintiff "clearly had no obligation to buy all, let alone any quantity, of its bagel

requirements" from defendant); *Propane Indus., Inc. v. Gen. Motors Corp*., 429 F. Supp. 214,

221 (W.D. Mo. 1977) (concluding that where the buyer did not promise to purchase any amount

of propane, buyer proffered no consideration and incurred no detriment in exchange for the

seller's promise and thus no binding contract was formed).

Continental is correct that the Agreement does not explicitly state that BRC will

purchase carbon black from Continental.  But when interpreting a contract, the Court "must read

all of the contractual provisions as a whole to accept an interpretation which harmonizes the

contract's words and phrases and gives effect to the parties' intentions as established at the time

they entered the contract." *Fellows v. Bd. of Trs. of Welborn Clinic*, 63 F. Supp. 2d 942, 945

(S.D. Ind. 1998) (quoting *Ryan v. Ryan*, 659 N.E.2d 1088, 1092 (Ind. Ct. App. 1996)); *see Ind.-Am. Water Co.*, 698 N.E.2d at 1260 (explaining that when interpreting a contract, a court must "strive to interpret a contract as valid rather than void").

BRC's obligation to purchase carbon black from Continental arises from the language in the "Meet or Release" section that states Continental has a right to meet the terms of any offers that BRC receives "or release BRC *from any further obligation*." (Emphasis added.)  This language indicates that the parties intended BRC to be obligated to purchase carbon black from Continental. *See Brooklyn Bagel Boys*, 212 F.3d at 378 (acknowledging that a buyer's obligation to purchase from the seller can be implicit); *cf. In re Modern Dairy of Champaign, Inc*., 171 F.3d 1106, 1108 (7th Cir. 1999) (declining to find a requirements contract where the buyer could not point to *any* contractual language indicating that it would be a breach of contract for buyer to obtain its product elsewhere).

Similarly, the language in the "Quantity of Material" section providing that the "volumes are to be *taken* in approximately equal monthly quantities" (emphasis added) and that BRC must provide accurate forecasts to assist Continental "in meeting these and additional requirements" also leads to the same inescapable conclusion. *See BKCAP, LLC*, 572 F.3d at 359 (instructing that the court must construe a contract's language "to give meaning to all of the contract's words, terms, and phrases").  Thus, the more reasonable reading of the language of the Agreement that harmonizes and gives meaning to these phrases indicates that BRC has an obligation under the Agreement to purchase carbon black from Continental.

**C.  The Agreement Obligates BRC to Buy *All* of Its Carbon Black From Continental**

Next, Continental contends that even if the Agreement obligates BRC to buy *some*

13

quantity of carbon black from Continental, it still is not a requirements contract, but rather, at most, is a contract for the sale of a stated quantity of carbon black per year—specifically, 1.8 million pounds.  Continental argues that the language in the Agreement specifying a quantity of "approximately 1.8 million pounds of prime furnace black annually" negates the need for UCC § 2-306 to serve as a "gap filler" for a missing quantity term. *See Zemco*, 186 F.3d at 818 (noting that "in the absence of any explicit agreement as to quantity, the section of the Code authorizing requirements contracts is the primary 'gap filler' in the Code for quantity terms" (citations and internal quotation marks omitted)).  This eliminates, Continental suggests, another element of a requirements contract—that the purchaser agrees to purchase *all* of its requirements from the seller.

When reading the Agreement as a whole, however, the only reasonable meaning is that the 1.8 million pounds was an estimate of BRC's annual requirements.  To that end, the language of the Agreement refers to "*approximately* 1.8 million pounds of prime furnace black annually" and that BRC would "provide accurate forecasts of the future usage at their manufacturing sites which will assist Continental . . . *in meeting these and additional requirements*." (Emphasis added.)  Furthermore, the Agreement includes a rebate if BRC purchases more than 2.1 million pounds annually and a penalty if it purchases less than 1.5 million pounds.  Thus, the language in the Agreement referring to 1.8 million pounds is more consistent with an estimate in a requirements contract than a contract for a specific quantity of goods. *See Noble Roman's, Inc. v. Pizza Boxes, Inc*., 835 N.E.2d 1094, 1098 (Ind. Ct. App. 2005) (concluding that the parties entered into a requirements contract despite inclusion of an estimate of quantity where there was no meeting of the minds on how many pizza boxes would ultimately be supplied under the

14

contract); *see also Empire Gas Corp. v. Am. Bakeries Co.*, 840 F.2d 1333, 1336 (7th Cir. 1988)

(finding that the parties intended to enter into a requirements contract where a specific estimate

of quantity was included but the parties contemplated purchasing "more or less" of the product);

*Dienes Corp. v. Long Island R.R. Co.*, No. 01-cv-4272, 2002 WL 603043, at *3 (E.D.N.Y. Mar.

19, 2002) ("Providing an estimate does not transform a requirements contract in to a fixed

quantity contract.").

### D.  The Agreement Obligates BRC to Buy Carbon Black Exclusively From Continental

Continental also contends that the plain language of the Agreement lacks the final

essential element of a requirements contract—that the buyer must agree to purchase all goods of

a particular type exclusively from the seller. *Zemco Mfg.*, 186 F.3d at 817.  "Without exclusivity,

the buyer in a requirements contract has effectively promised nothing of value to the seller: 'The

promise [in a requirements contract] contains one very definite element that specifically limits

the promisor's future liberty of action; he definitely promises that he will buy of no one else.'"

*Torres v. City of Chicago*, 632 N.E.2d 54, 58 (Ill. App. Ct. 1994) (quoting 1A CORBIN ON

CONTRACTS § 156 at 33).  If the buyer does not promise to buy exclusively from the seller, the

requisite mutuality and consideration for a requirements contact is lacking and the seller's

promise amounts to nothing more than an invitation for orders. *See Propane Indus.*, 429 F. Supp.

at 219.

Continental emphasizes that the Agreement does not explicitly require BRC to purchase

exclusively from Continental and argues, therefore, that it cannot be a requirements contract

governed by UCC § 2-306. *See, e.g.*, *Arrotin Plastic Materials of Ind. v. Wilmington Paper

Corp.*, 865 N.E.2d 1039, 1042 (Ind. Ct. App. 2007) (concluding that an output contract was

illusory where seller could sell to buyer as much or as little of the product as it wanted); *see also Harvey v. Fearless Farris Wholesale, Inc*., 589 F.2d 451, 459 (9th Cir. 1979) (concluding that the agreement lacked mutuality of obligation and was not a requirements contract where the purchaser was free to buy elsewhere).  It contends that the only reasonable meaning of the Agreement is that BRC is free to purchase as much carbon black from other sources as it desires, evidenced by the "Meet and Release" provision in the Agreement enabling BRC to continually search the market for lower prices.

But, as BRC emphasizes, a requirements contract need not expressly state a promise of exclusivity.  "[W]here it is apparent that a binding exclusive requirements contract was intended, the buyer's promise to purchase from the seller will be implied." *Ind.-Am. Water Co.*, 698 N.E.2d at 1260; *see Cyril Bath Co. v. Winters Indus.*, 892 F.2d 465, 467 (6th Cir. 1989) ("A promise to purchase exclusively from one supplier may be either implicit or explicit."); *Propane Indus.*, 429 F. Supp. at 219 ("[A]n express promise by the buyer to purchase exclusively from the seller is not always required.  In construing a contract in which only the seller has agreed to sell, a court may find an implied reciprocal promise on the part of the buyer to purchase exclusively from the seller, at least when it is apparent that a binding contract was intended.").

Although Continental contends the "Meet or Release" provision is evidence that the Agreement was not intended to be exclusive, the more apparent meaning is just the opposite—it *supports* an implicit exclusivity obligation.  Indeed, that provision specifically states that if Continental chose not to exercise its right of first refusal, it must "release BRC from any further obligation."  This explicit reference to BRC's "obligation" reasonably implies that BRC was indeed obligated under the Agreement to purchase carbon black exclusively from Continental.

16

Furthermore, contrary to Continental's suggestion, the inclusion of a right of first refusal clause does not, in and of itself, negate exclusivity.  In *Structural Polymer Group, Ltd. v. Zoltek Corp.*, 543 F.3d 987, 993 (8th Cir. 2008), the Eighth Circuit Court of Appeals upheld the validity of a requirements contract containing a similar right of first refusal clause, articulating that "[i]f Zoltek offered to match the price offered by another supplier, then SP was obligated to purchase from Zoltek."  It then clarified that "an *unfettered* option to purchase from another supplier during the term of the contract . . . would destroy the exclusivity arrangement, and demonstrate lack of consideration," but the "inclusion in the Supply Agreement of a right of first refusal for Zoltek to retain its exclusive right to supply SP, so long as it matched a market price offered by another supplier, is sufficient to create mutuality of obligation and consideration." *Id*. (emphasis in original).

Here, similarly, the "Meet or Release" provision does not provide BRC with an "unfettered option" to purchase carbon black from another supplier.  Rather, BRC would only be released from its contractual obligations if Continental chose not to exercise its right of first refusal to match the terms of another supplier's written offer.  Therefore, the right of first refusal clause is not inconsistent with BRC's implicit exclusivity obligation.

In the end, BRC's proffered interpretation of the Agreement as a requirements contract serves to "harmonize" the provisions of the Agreement.  Continental's interpretation as a "buyer's option" or agreement to sell a fixed quantity, however, causes discord among the Agreement's provisions. *See Allen v. Cedar Real Estate Group, LLC*, 236 F.3d 374, 381 (7th Cir. 2001) ("[C]ontracts are to be read as a whole to harmonize all provisions."); *Shapiro v. Valmont Indus., Inc.*, No. S90-102(RLM), 1991 WL 472593, at *6 (N.D. Ind. Aug. 16, 1991); *Four*

*Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 501 (Ind. Ct. App. 2007).

Therefore, when reading the Agreement as a whole and applying meaning to all of its words,

terms, and phrases, *BKCAP, LLC*, 572 F.3d at 359, the Court concludes as a matter of law that

the plain language of the Agreement unambiguously indicates that the parties intended to enter

into a requirements contract.

### E.  A Requirements Contract Harmonizes With the Parties' Course of Performance and Course of Dealing

Moreover, the UCC makes clear that the provisions of a contract ought to be harmonized

with the parties' course of performance, course of dealing, and the usage of trade. *Zemco*, 186

F.3d at 818.  Here, there is no indication that a requirements contract is inconsistent with the

evidence of record concerning the parties' course of performance and course of dealing, which is

undisputed; rather, the conclusion that the Agreement is a requirements contract harmonizes with

this evidence. *See generally Allen*, 236 F.3d at 381 ("[W]here there is no dispute about the

extrinsic evidence, any ambiguity is a result of the language used in the contract.  Thus, the

determination of the existence of a contract is a matter for the court."); *Digitech Computer, Inc.

v. Trans-Care, Inc.,* 583 F. Supp. 2d 984, 991 (S.D. Ind. 2008) (explaining that the question for

the court on summary judgment is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter

of law" (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)); *Keating v. Burton*,

617 N.E.2d 588, 592 (Ind. Ct. App. 1993) ("The question of whether a certain or undisputed set

of facts establishes a contract is one of law for the trial court.").

Section 1-205(4) of the UCC provides: "A course of dealing or course of performance

between parties and any usage of trade . . . give particular meaning to and supplement or qualify

terms of an agreement."  Likewise, § 2-202 of the UCC states: "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement . . . may be explained or supplemented (a) by course of dealing or usage of trade . . . or by course of performance . . . ." *See Noble Roman's, Inc.*, 835 N.E.2d at 1099 ("[W]hen contracting parties reduce their understandings to written form and intend that writing as the final expression of their contract, evidence of course of performance is properly admitted to supplement the otherwise integrated agreement of the parties only when such evidence does not contradict the agreement.").

As to the parties' course of performance, BRC purchased all of its requirements from Continental after the Agreement was executed in January 2010 until May 2011.[6] (Cornwell Decl. ¶ 6.)  More specifically, BRC purchased approximately 270,000 pounds of carbon black per month in 2010 and 300,000 pounds per month in 2012, significantly exceeding the maximum of 150,000 pounds per month that Continental's constrained interpretation urges.  Likewise, with

---

[6] Continental seeks to strike paragraph 34 of the Nunley Declaration and paragraph 6 of the Cornwell Declaration, which state that BRC obtained all of its carbon black requirements from Continental for at least ten years preceding the date of the Agreement through May 2011, on the basis that they are "conclusory statements" that "lack a proper evidentiary foundation." (Mot. to Strike 5-6.)  Continental, however, makes no attempt to elaborate about its broad assertion or address these provisions with particularity.

The Court finds Continental's vague, cursory challenge to these paragraphs unpersuasive.  Federal Rule of Civil Procedure 56(c)(4) states that affidavits filed in support of summary judgment "must be made on personal knowledge . . . ." *See Payne*, 337 F.3d at 772.  Nunley was Continental's Regional Manager and Cornwell was BRC's Vice President of Materials at the time they negotiated the Supply Agreement.  "Common sense dictates that if an affiant is an employee of a company, [he] has personal knowledge of events and circumstances that occurred at the company within [his] sphere of observation." *Westchester Fire Ins. Co. v. Am. Wood Fibers, Inc.*, No. 2:03-CV-178, 2006 WL 752584, at *4 (N.D. Ind. Mar. 21, 2006) (citation omitted); *see Elmotec Statomat, Inc. v. Lowry Haywood & Assocs., Inc.*, No. 1:08-cv-76, 2011 WL 4435674, at *4 (N.D. Ind. Sept. 23, 2011) ("Personal knowledge is not a rigid requirement; it also 'includes opinions and inferences grounded in observations or other first-hand experience.'" (quoting *United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999))).  Consequently, Continental's motion to strike these two statements will be DENIED. *See, e.g.*, *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, No. 07-cv-186, 2010 WL 2738969, at *4 (S.D. Ill. July 12, 2010) (denying motion to strike affidavit of individual who negotiated terms of the agreement at issue).

19

respect to the course of dealing between the parties, BRC purchased all of its carbon black requirements from Continental for at least ten years prior to the execution of the Agreement. (Cornwell Decl. ¶ 6.)  Thus, the parties' course of performance and course of dealing harmonizes with a requirements contract but conflicts with Continental's proffered interpretation, affirming the Court's conclusion that the Agreement is a requirements contract. *See Noble Roman's, Inc.*, 835 N.E.2d at 1099 (considering the parties' course of performance when interpreting the agreement as a requirements contract).

### F.  BRC's Motion for Summary Judgment Will Otherwise Be Denied

The sole basis for Continental's motion for summary judgment is that the Supply Agreement is not a requirements agreement and this causes all of BRC's claims to collapse as a matter of law.  Accordingly, because the Court has concluded that the Agreement is a requirements contract, Continental's summary judgment motion will be denied.

BRC's motion for summary judgment, in turn, focuses on that same issue—whether the Agreement is a requirements contract.  To that extent, BRC's arguments are successful, and its motion will be granted.  BRC, however, also summarily suggests that if the Court concludes the Agreement is a requirements contract, it should grant summary judgment in BRC's favor on all claims because Continental breached the Agreement by cutting off its supply of carbon black to BRC and refusing to supply the material at the agreed-upon pricing.

But BRC does not develop its arguments concerning Continental's purported breach and anticipatory repudiation. *See Boyd v. Owen*, 481 F.3d 520, 524-25 (7th Cir. 2007) (explaining that any undeveloped arguments are deemed waived).  For example, the record indicates that at the time of the purported breach by Continental, BRC was ordering *twice* the amount of the

estimate articulated in the Agreement.  With respect to requirement contracts, § 2-306 of the

UCC provides that "no quantity unreasonably disproportionate to any stated estimate . . . may be

. . . demanded." IND. CODE § 26-1-2-306(1).  Thus, BRC fails to show how, as a matter of law,

Continental's limitation of quantity to BRC was inconsistent with § 2-306 such that it constitutes

a breach of the Agreement. *See, e.g., Orange & Rockland Utils., Inc. v. Amerada Hess Corp*.,

397 N.Y.S. 2d 814, 821 (N.Y.A.D. 1977) (concluding that under the circumstances of the case

buyer's demand for more than double the stated estimate in a requirements agreement was

"unreasonably disproportionate" to that estimate as a matter of law, and thus seller's refusal to

fill the order was not a breach of the agreement).

Likewise, BRC does not address the standard of law for anticipatory repudiation and

show how Continental's purported repudiation was "positive, absolute, and unconditional" such

that it satisfies that standard. *Jay Cnty. Rural Elec. Membership Corp. v. Wabash Valley Power

Ass'n, Inc*., 692 N.E.2d 905, 911 (Ind. Ct. App. 1998) ("Because the doctrine of anticipatory

repudiation represents a harsh remedy, the requirement that the repudiating statement be clear

and absolute is a strict one.").  As a result, BRC's summary request for judgment as a matter of

law on its claims of breach of contract and anticipatory repudiation, as well as its request for

declaratory relief, will be denied.

## V.  CONCLUSION

Defendant Continental Carbon Company's Motion for Summary Judgment (Docket # 31)

is DENIED, and its Motion to Strike the Declarations of Thomas Nunley and Michael Cornwell

(Docket # 40) is DENIED in part and DENIED AS MOOT in part in accordance with this

Opinion.  Plaintiff BRC Rubber & Plastics, Inc.'s Motion for Summary Judgment (Docket # 35)

is GRANTED to the extent that the Court concludes that the Supply Agreement is a requirements

contract, but the Motion is OTHERWISE DENIED.

This matter is set for a further telephonic scheduling conference on July 25, 2012, at

11:00 a.m.

SO ORDERED.

Enter for the 27th day of June, 2012.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge