UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| BRC RUBBER & PLASTICS, INC.,     ) | |
|     ) | |
|     Plaintiff,     ) | |
|     ) | |
|     v.     ) | CAUSE NO.  1: 11-CV-190 |
|     ) | |
| CONTINENTAL CARBON COMPANY,     ) | |
|     ) | |
|     Defendant.     ) | |

## OPINION AND ORDER

This matter is before the Court on the Motion to Compel Production and Request for In Camera Review filed by Plaintiff BRC Rubber & Plastics, Inc., on February 13, 2013 (Docket # 60), requesting that the Court order Defendant Continental Carbon Company to produce twenty-three emails that Continental withheld from production under the attorney-client privilege and work-product doctrine. Continental filed a response on February 27, 2013 (Docket # 63); BRC, however, has failed to file a reply, and the time to do so has now passed.

The Court has completed an *in camera* review of the documents. For the following reasons, BRC's motion to compel will be DENIED.

### A.  Factual and Procedural Background

BRC and Continental entered into a Supply Agreement as of January 1, 2010, concerning Continental's supply of carbon black to BRC.[1] (Docket # 46.) On June 2, 2011, BRC terminated that Agreement and filed this lawsuit against Continental, advancing claims of breach of contract

---

[1] On June 27, 2012, the Court concluded as a matter of law that the Supply Agreement is a requirements contract. (Docket # 46.)

and anticipatory repudiation and seeking declaratory relief. (Docket # 1, 46.)  The crux of BRC's claims is that Continental breached the Agreement's terms when it missed sending a scheduled shipment of carbon black to BRC, limited the quantity of carbon black it would sell, demanded higher prices for the material, and attempted to accelerate BRC's payment terms. (Docket # 46.) Despite the termination of the Agreement and the filing of this suit, BRC continued to purchase carbon black from Continental through September 2011. (Docket # 46.)

On December 9, 2011, the Court held a scheduling conference and set a discovery deadline of June 29, 2012 (Docket # 27), which it later extended to February 15, 2013 (Docket # 47, 59).  All motions to compel were to be filed by February 13, 2013. (Docket # 59.)  On that deadline, BRC filed the instant motion to compel. (Docket # 60.)

## B.  Applicable Legal Standard

### 1.  The Attorney-Client Privilege

"The attorney-client privilege protects communications made in confidence by a client to his attorney in the attorney's professional capacity for the purpose of obtaining legal advice." *Jenkins v. Bartlett*, 487 F.3d 482, 490 (7th Cir. 2007) (citation omitted).  More particularly, the elements of the attorney-client privilege are: "(1) where legal advice was sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) except the protection may be waived." *Long v. Anderson Univ.*, 204 F.R.D. 129, 134 (S.D. Ind. 2001) (citing *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997)).

Thus, "communications made in the routine course of business, such as transmittal letters

or acknowledgment of receipt letters, which disclose no privileged matters and which are devoid of legal advice or requests for such advice are not protected." *Dometic Sales Corp. v. Intertherm, Inc.*, No. S87-81, 1988 WL 492342, at *10 (N.D. Ind. Mar. 28, 1988) (citation omitted). "Only where the document or communication is primarily concerned with legal assistance does it come within the attorney-client privilege." *Id.* (citing *Locktite Corp. v. Fel-Pro, Inc.*, 667 F.2d 577, 582 (7th Cir. 1981)).

Accordingly, "[s]imply including an attorney in a communication will not render an otherwise discoverable document protected by the privilege." *Muro v. Target Corp.*, No. 94 C 6267, 2006 WL 3422181, at *2 (N.D. Ill. Nov. 28, 2006). "[T]he courts will not permit the corporation to merely funnel papers through the attorney in order to assert the privilege." *Sneider v. Kimberly-Clark Corp.*, 91 F.R.D. 1, 4 (N.D. Ill. 1980) (citing *Radiant Burners, Inc. v. Am. Gas Assn.*, 320 F.2d 314, 324 (7th Cir. 1963)).

### B.  Work-Product Doctrine

The work-product doctrine is a qualified privilege and is "distinct from and broader than the attorney-client privilege." *Caremark, Inc. v. Affiliated Computer Servs., Inc.*, 195 F.R.D. 610, 613 (N.D. Ill. 2000) (citing *United States v. Nobles*, 422 U.S. 225, 238 (1975)). A party claiming work-product protection must show that the materials sought are: (1) documents and tangible things; (2) prepared in anticipation of litigation or for trial; and (3) by or for a party or by or for a party's representative. *Boyer v. Gildea*, 257 F.R.D. 488, 490 (N.D. Ind. 2009); *Caremark*, 195 F.R.D. at 613-14.

"While litigation need not be imminent, the primary motivating purpose behind the creation of a document or investigative report must be to aid in possible future litigation." *Binks*

3

*Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1119 (7th Cir. 1983)*; accord First Fin. Bank, N.A. v. Citibank, N.A.*, No. 1:11-cv-226, 2012 WL 626272, at *2 (S.D. Ind. Feb. 24, 2012). "[D]ocuments that are created in the ordinary course of business or that would have been created irrespective of litigation are not under the protection of the work product doctrine." *Caremark*, 195 F.R.D. at 614 (citing *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998)). Thus, "whether a document is protected depends on the motivation behind its preparation, rather than on the person who prepares it." *Id*. at 615.

Once the qualified work-product privilege is established, it can still be overcome if the party seeking the materials shows: (1) a substantial need for the materials, and (2) an inability to obtain the substantial equivalent of the information without undue hardship. *Boyer*, 257 F.R.D. at 490-91; *Caremark*, 195 F.R.D. at 614. Even upon such a showing, however, "the lawyer's mental processes are required to be protected from disclosure."[2] *Caremark*, 195 F.R.D. at 614.

### C.  Analysis

Here, BRC requests that the Court compel Continental to produce twenty-three internal emails dated between May 17, 2011, and August 22, 2011, that Continental withheld from production (or redacted) by asserting the attorney-client privilege or work-product doctrine.[3] BRC contends that the materials are not privileged because "the primary purpose of the internal emails was the business with BRC and not legal advice or litigation work product." (Mot. to

---

[2] This Court articulated a more extensive discussion of these applicable legal standards in *Barton v. Zimmer*, No. 1:06-cv-208, 2008 WL 80647, at *3-7 (N.D. Ind. Jan. 7, 2008).

[3] A discrepancy exists between the privilege log submitted by BRC with its motion and the privilege log submitted by Continental with its response. The version submitted by BRC includes a Document No. 5 CCC0000275 and Document No. 9 PRIV0000151-PRIV0000153, which are not included in the version Continental submitted. Nor did Continental submit documents with these Bates numbers for the Court's review and, therefore, this ruling does not address such documents, if they do indeed exist.

Compel ¶¶ 10, 11.) And even if the emails are work product, BRC states that it has a substantial need for the materials because they are relevant to Continental's affirmative defense of commercial impracticability, which BRC contends is premised on Continental's purported inability to supply carbon black from May 2011 through September 2011. (Mot. to Compel ¶ 7.)

      1. <u>All of the withheld emails are protected by the work-product doctrine</u>.

After an *in camera* review of emails, the Court concludes that *all* of the materials are protected by the work-product doctrine, and in some instances, also the attorney-client privilege. To explain, the record reveals that BRC sent a letter to Continental on April 27, 2011, stating that it "felt that it was necessary to restate in writing that [it] intend[ed] to enforce" the Agreement and that it "hope[d] not to have [to] involve its lawyers." (Def.'s Resp. Ex. D.) BRC's lawyer then followed up with a letter on May 16, 2011, demanding that Continental provide written assurance and cure its breach of the Agreement by immediately resuming shipments of carbon black and warning that BRC would "take all necessary legal action to ensure continued supply and to recover its damages, including filing a motion for specific performance." (Def.'s Resp. Ex. E.) Thus, clearly Continental anticipated litigation from BRC prior to writing any of the emails at issue, the first of which is dated May 17, 2011.

As BRC emphasizes, however, materials created in the ordinary course of business or that would have been created regardless of the threat of litigation are not protected by the work-product doctrine. *Binks*, 709 F.2d at 1119; *First Financial Bank,* 2012 WL 626272, at *2. BRC contends that although Continental may have anticipated or was already involved in litigation at the time, the primary purpose of the disputed emails relates to the orders placed by BRC between May and August 2011 and Continental's ability to fill them—that is, Continental's ordinary

business with BRC—*not* the anticipated litigation.

But BRC's assertions are belied by the Court's *in camera* review of the unredacted documents. Although the emails do pertain to Continental's ability to fill BRC's orders between May and August 2011, it is clear that the primary purpose of the withheld or redacted emails was to aid in the anticipated or current litigation. That is, the emails or portions of the emails that Continental withheld would likely *not* have been created absent BRC's threat of litigation. Accordingly, the Court concludes that *all* of the emails submitted for its review constitute protected work product.[4]

2. <u>BRC does not overcome the work-product doctrine</u>.

BRC argues that even if the emails are determined to be work product, it has a substantial need for these materials and thus the Court should compel their disclosure. As recited earlier, with respect to ordinary work product, the doctrine can be overcome if BRC establishes a substantial need for the materials and an inability to obtain the substantial equivalent of the information without undue hardship. *Boyer*, 257 F.R.D. at 490-91; *Caremark*, 195 F.R.D. at 614.

BRC explains that because Continental asserted the affirmative defense of commercial impracticability under the Uniform Commercial Code § 2-615, BRC has conducted "[e]xtensive discovery . . . regarding the availability of carbon black during the May 2011 to June 2011 time period and how Continental handled BRC's orders." (Mem. in Supp. 6.) During that discovery, Continental's representatives "could not recall if there was a shortage or whether the customer service representatives were instructed not to supply BRC." (Mem. in Supp. 6.)

---

[4] In addition, the following emails are also protected by the attorney-client privilege: CCC0000077, PRIV-0000009-PRIV0000011, PRIV0000012-PRIV0000015, PRIV0000117-PRIV0000120, PRIV0000247-PRIV0000249, PRIV0000344, PRIV0000422-PRIV0000425, PRIV0000478-PRIV0000479, and PRIV0000489-PRIV0000492.

Specifically, BRC cites to the testimony of Thomas Moccia, Continental's vice president, who could not recall whether he discussed the status of the May 11th shipment internally with customer service representatives or whether Continental had the capacity to ship to BRC. (Moccia Dep. 66-67, 75.)  Similarly, David Word, the Continental customer service representative assigned to BRC, testified that he also could not recall whether there was carbon black available on May 18th for shipment to BRC or whether he discussed its availability with Moccia. (Word Dep. 20, 23.)  BRC emphasizes that Continental withheld or redacted emails directly on these points: (1) an email string dated May 17, 2011, that involved Moccia and customers service representatives; and (2) an email exchange between Moccia and Word dated May 26, 2011, on the subject of "BRC Shipment Status." (PRIV0000373-PRIV0000374, PRIV0000375, PRIV0000465-PRIV0000467, CCC0000230-CCC0000231, CCC0000318-CCC0000319.)

BRC's assertions, however, fall short of establishing a "substantial need" for the emails. First, Continental clarifies in its response that it is asserting the defense of commercial impracticability for May 2011 *only*, not May through September 2011 as BRC represents. Continental emphasizes that there is no dispute that BRC terminated the Supply Agreement on June 2, 2011, and characterizes its dealings with BRC after that date as "settlement negotiations."  BRC apparently does not dispute this point, as it declined to reply to Continental's argument.

Indeed, unless the communications after June 2, 2011, addressed prior conduct, they would not appear relevant to any claim stated in BRC's complaint or any defense in Continental's answer.  The Court has, in fact, confirmed in its *in camera* review that the emails

dated after June 2, 2011, do not retrospectively address the availability of carbon black or Continental's fulfillment of BRC's orders prior to the termination of the Supply Agreement. Accordingly, BRC has not established a substantial need for the emails created after June 2, 2011.

Remaining then are just four email strings predating June 2, 2011—two dated May 17, 2011, and two dated May 26, 2011. (PRIV0000373-PRIV0000374, PRIV0000375, PRIV0000465-PRIV0000467, CCC0000230-CCC0000231, CCC0000318-CCC0000319.)  But regardless of need, BRC has failed to show that it is unable to obtain the substantial equivalent of the information without undue hardship—the second element necessary to overcome the work-product doctrine. *Boyer*, 257 F.R.D. at 490-91; *Caremark*, 195 F.R.D. at 614.

In that regard, although Moccia did not recall whether Continental had the capacity to supply BRC with carbon black in May 2011, he did tell BRC where that information could be located.  That is, he testified that certain plant documents would supply some of the information that he could not recall:

>   A. I do not know.  I would have to check the proper documents in production.
>
>   . . . .
>
>   A. We would have to obtain data.
>
>   Q. And who . . . would have that data or that information?
>
>   A. The plant.
>
>   Q. And N550 is produced in Sunray?
>
>   A. Yes.
>
>   Q. So, that information would have to come from the Sunray plant documents?

  A. Yes.

(Moccia Dep. 75-76.) Apparently, BRC did indeed request and receive certain documents from Continental about its production capacity in May 2011. BRC, however, makes no attempt to explain why such information is insufficient.

  Moccia also provided the names of two other Continental employees who had knowledge of the plant's maintenance and inventory:

  Q. What caused the shortage of the N700 series?

  A. The reactors were turned off.

  Q. Were they turned off for normal maintenance, or was there –

  A. Yeah, it's a maintenance program.

. . . .

  Q. Who is in charge of determining what reactors need maintenance and at what times?

  A. The plant manager.

  Q. Do you know who the plant manager at Phoenix City was in 2011?

  A. Yes.

  Q. Who was that?

  A. Greg Johnstone.

. . . .

  Q. Do you have any involvement with planning supply to customers during the downtime?

  A. Ms. Liau does.

  Q. So, she would be the one that I need to talk to regarding whether or not there was

> something set aside for the N700 and what the plan was for supplying –
>
> A. Yes. To get specific inventory measurements, that's a plant issue and we would have to obtain those documents.

(Moccia Dep. 86, 88.) BRC, however, never attempted to depose the two individuals Moccia identified as having knowledge of Continental's supply—Johnstone and Liau. *See, e.g., Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 190 F.R.D. 532, 538-39 (S.D. Ind. 1999) (declining to overcome the protection of the work-product doctrine where the witnesses were known, but plaintiff failed to interview them).

Moreover, Continental represents on its privilege log that even though its attorney was not an author or recipient of the four May 2011 emails, three of the four emails convey the substance of his instructions or legal advice regarding BRC's threatened lawsuit. (*See* Defs.' Resp. Ex. K at 4, 15, CCC0000230-CCCC0000231, CCC0000318-CCC0000319, PRIV0000467.) This assertion is indeed consistent with the substance of at least two other emails dated June 15, 2011, and June 22, 2011, that specifically refer to Continental's counsel's legal advice. (PRIV0000011, PRIV0000015, CCC0000783-CCC0000784.) Of course, courts are "cautioned to give even greater protection to attorney opinions which include mental impressions, conclusions, or legal theories concerning the prospective litigation." *Hollinger Int'l, Inc. v. Hollinger, Inc.*, 230 F.R.D. 508, 511-12 (N.D. Ill. 2005) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 399 (1981); *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 976 n.4 (7th Cir. 1996)).

Therefore, since BRC has not made the necessary showing to overcome the protection of the work-product doctrine, its motion to compel will be DENIED.

### D.  Conclusion

For the reasons set forth herein, BRC's Motion to Compel Production and Request for In Camera Review (Docket # 60) is DENIED.

SO ORDERED.

Enter for March 26, 2013.

S/Roger B. Cosbey<br>
Roger B. Cosbey,<br>
United States Magistrate Judge