# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **BRC RUBBER & PLASTICS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:11-CV-190** |
| | ) | |
| **CONTINENTAL CARBON COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff BRC Rubber & Plastics, Inc. ("BRC"), and Defendant Continental Carbon Company ("Continental") entered into a Supply Agreement as of January 1, 2010, in which Continental agreed to supply all of BRC's requirements for carbon black.[1]  On June 2, 2011, BRC terminated that Agreement and filed this lawsuit against Continental, advancing claims of breach of contact and anticipatory repudiation and seeking declaratory relief and damages.  The crux of BRC's claims is that Continental breached and repudiated the Agreement when it failed to confirm BRC's orders for carbon black, failed to ship the material to BRC, and limited the annual quantity it would supply.

Now before the Court is a motion for summary judgment filed by BRC, contending that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law on all claims.  For the following reasons, the Court finds BRC's arguments persuasive and thus will GRANT its motion for summary judgment.

---

[1] Diversity jurisdiction exists under 28 U.S.C. § 1332(a).  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (Docket # 36.)

On June 27, 2012, the Court granted BRC's first motion for summary judgment in part, concluding as a matter of law that the Supply Agreement is a requirements contract and not, as Continental contended, an open offer for orders or an agreement to sell a specific quantity of carbon black. (Docket # 46.)

# I.  FACTUAL BACKGROUND[2]

### A.  Relationship of the Parties

Continental manufactures furnace-grade carbon black, a raw material filler used in tires and other rubber and plastic products. (Moccia Decl. ¶ 3.)  BRC was a longtime customer of Continental, purchasing three grades of carbon black for incorporation into the numerous rubber products it supplies to customers. (Nunley Dep. 134; Cornwell Dep. 12.)  Continental was BRC's exclusive supplier of carbon black at least back to 1997. (Nunley Dep. 134; Cornwell Dep. 12.)  From 2005 to 2008, Continental annually supplied BRC between 1.89 and 2.43 million pounds of carbon black (Pl.'s Mem. of Law. Ex. 3), and in 2009, 1.9 million pounds (Moccia Decl. ¶ 6; Cornwell Dep. 62.)  Continental supplied about forty customers and its potential annual capacity for carbon black was approximately 500 million pounds; consequently, BRC was a "very small" customer of Continental. (Moccia Dep. 17.)

### B.  The Parties Enter Into the Supply Agreement as of January 1, 2010

Thomas Nunley, a salesperson for Continental, handled the BRC account from 1997 to May 2011. (Nunley Dep. 134.)  In 2009, Continental's President, Kim Pan, asked his sales team "to negotiate as many long-term contracts that we could convince our customer base to take" and to "get as much as we could committed long term in volume[.]" (Nunley Dep. 9.)

Accordingly, Nunley negotiated the terms of the Supply Agreement with Mike Cornwell, BRC's Vice President of Materials (Pl.'s Mem. of Law Ex. 5; Nunley Dep. 20-21, 26, 29-30), and the parties executed it as of January 1, 2010 (Pl.'s Mem. of Law Ex. 7; Moccia Decl. ¶ 4).

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Continental, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

Nunley was the sole negotiator of the Agreement for BRC. (Moccia Dep. 10). The Agreement obligated Continental to supply, and BRC to purchase, all of BRC's requirements of three grades of carbon black (N339, N550, and N762) during the five-year term of the Agreement. (Docket # 46.)

The terms of the two-page Agreement relevant to this dispute are:

Quantity of Material

It is the intent of this Agreement that Continental Carbon Company agrees to sell to BRC Rubber and Plastics approximately 1.8 million pounds of prime furnace black annually. These volumes are to be taken in approximately equal monthly quantities. BRC Rubber and Plastics, to the best of their ability, will provide accurate forecasts of the future usage of their manufacturing sites which will assist Continental Carbon Company in meeting these and additional requirements.

Carbon Black Pricing

The following baseline prices for all rubber grade carbon blacks purchased by BRC Rubber & Plastics as of January 1, 2010 are as follows and are to remain firm throughout the term of this agreement.

. . . .

Additional Volume Rebate/Penalty

An additional rebate or penalty will be applied according to the following schedule:

| Lower Limit | Upper Limit | Amount Applied |
|---|---|---|
| 1,500,000 | 2,100,000 | $.005/lb |
| 1,400,000 | 2,200,000 | An additional $.005/lb for a total of $.01/lb |

Rebates or penalty are applied to all pounds purchased during a calendar year. Rebates will be credit or invoice will be issued to make the appropriate adjustment.

Should the normal annual volume for BRC shift significantly BRC and Continental Carbon agree to establish new upper and lower limits.

(Pl.'s Mem. of Law Ex. 7.)

Thus, as long as BRC purchased between 1.5 and 2.1 million pounds of carbon black a year, the price for the material remained the same. (Cornwell Dep. 52.) But if BRC purchased

3

more than 2.1 million pounds a year, it would receive a half-cent rebate on each pound purchased that year, and if it purchased less than 1.5 million, it would pay an additional half-cent per pound penalty. (Nunley Dep. 33; Cornwell Dep. 32.)  The rebate or penalty would correspondingly increase to one cent per pound if BRC purchased more than 2.2 million pounds or less than 1.4 million pounds. (Nunley Dep. 33; Cornwell Dep. 32.)  BRC and Continental never established new upper and lower limits for the rebate/penalty during the term of the Agreement (Moccia Decl. ¶ 29), so the annual volume in the terms of the contract did not "shift significantly."

Also, in late 2009, Continental internally classified BRC as a "Tier 1" customer who would get its orders "filled first" if Continental faced a shortage of supply. (Pl.'s Mem. of Law Ex. 9; Moccia Dep. 92; Nunley Dep. 14-15.)

   *C. The Parties Perform Under the Agreement Without Dispute Until April 2011*

Continental projected in its 2010 Forecast that it would supply BRC with 1.95 million pounds that year. (Moccia Dep. 16; Moccia Decl. ¶ 5; Nunley Dep. 37; Pl.'s Mem. of Law Ex. 10.)  But BRC's requirements increased with the rebounding automotive industry, and Continental actually supplied BRC with 2.612 million pounds in 2010. (Nunley Dep. 37; Pl.'s Mem. of Law Ex. 10.)  The monthly quantities supplied to BRC varied from 93,000 to 322,000 pounds. (Pl.'s Mem. of Law Ex. 10.)  Continental awarded BRC a rebate in the amount of $26,118.30 for its purchases in 2010. (Nunley Dep. 37-38.)

Continental's 2011 Sales Forecast, updated as of May 27, 2011, planned for BRC to order 2.68 million pounds, consisting of 339,000 pounds of N339; 1,699,000 pounds of N550; and 780,000 pounds of N762. (Pl.'s Mem. of Law. Ex. 11; Moccia Decl. ¶ 31.)  Accordingly,

4

Continental designated 2.734 million pounds for BRC in its 2011 Annual Operating Plan. (Pl.'s Mem. of Law Ex. 11.)  Continental, however, does not actually reserve quantities of carbon black based on these forecasts because they are provided by its sales personnel and are often inaccurate. (Moccia Decl. ¶ 30.)  The forecasts are merely used as a tool to predict demand and assist planning production of particular grades of carbon black throughout the year. (Moccia Decl. ¶ 30.)

### D.  Market Demand for Carbon Black Increases and Continental Seeks a Price Increase From BRC

As the economy improved during late 2010 and early 2011, demand for carbon black increased and its market price began to rise. (Moccia Dep. 25-26; Moccia Decl. ¶ 8; Scott Dep. 67.)  Despite this high demand, Continental was operating at a loss and purportedly had to choose between going out of business or seeking price increases from its customers. (Moccia Decl. ¶ 8.)  Consequently, Thomas Moccia, who had joined Continental in July 2010 as its Director of Marketing and Development, instructed Nunley to seek higher base prices from Continental's customers, including BRC. (Nunley Dep. 73; Moccia Decl. ¶¶ 2, 9.)

Nunley notified BRC on April 14, 2011, that despite their "multi-year agreement[,]" Continental was effectuating a two cents per pound base price increase to BRC effective June 1, 2011. (Pl.'s Mem. of Law Ex. 12.)  But BRC rejected Continental's request for a price increase, first by e-mail and then by letter, and insisted that Continental provide adequate assurance that it would fill BRC's orders under the Agreement and "hold up its end of the bargain."[3] (Pl.'s Mem. of Law Exs. 13, 14; Nunley Dep. 66, 73.)  All of Continental's other customers, however, agreed

---

[3] Shortly thereafter, Continental terminated Nunley's employment. (Moccia Decl. ¶ 17; Nunley Dep. 112.)

5

to a price increase, most ranging from four to five cents per pound. (Moccia Decl. ¶ 9.)

When Moccia learned of BRC's response, he told Nunley to raise the price anyway and that "if they did not like it, they could get their carbon black someplace else." (Nunley Dep. 73.) Then, on April 29th, Moccia instructed not only Nunley, but also Linda Nelson, a customer service representative for Continental, and several other Continental employees not to ship to fourteen customers, including BRC, due to a "negative GP [gross profit]." (Pl.'s Mem. of Law Ex. 16.) Shortly thereafter, Continental internally downgraded BRC from a "Tier 1" to a "Tier 3" customer. (Pl.'s Mem. of Law Ex. 17.)

On April 26, 2011, BRC sent Continental a purchase order for 110,000 pounds of N550 to be shipped on May 4; 110,000 pounds of N550 on May 11; and 140,000 pounds of N762 on June 4, requesting that Continental confirm the order.[4] (Pl.'s Mem. of Law Ex. 18; Moccia Decl. ¶ 14.) When Continental failed to do so, BRC sent several additional requests for confirmation, but Continental still did not confirm the order. (Cornwell Dep. 108; Pl.'s Mem. of Law Ex. 16, 21.) Continental only confirms a customer's purchase order if it has the capacity to fill it. (Moccia Decl. ¶ 15.)

*E. Continental Fails to Confirm and Fill BRC's Order for a May 11, 2011, Shipment*

By May 2011, Continental could no longer keep up with the demand for carbon black. (Moccia Decl. ¶ 11.) Exacerbating this problem, one of the two carbon black reactors it used to produce N550 and N762 was down for scheduled maintenance from May 7 through 24; consequently, Continental had only one reactor in operation capable of producing N550 and

---

[4] The April 26, 2011, purchase order contained a typographical error in that the shipment requested for June 4, 2011, was reflected as May 4, 2011. This error was later acknowledged by the parties in an e-mail exchange among Nunley; Sandra Haney, a customer service representative for Continental; and Don Newman, a senior buyer for BRC. (Pl.'s Mem. of Law Ex. 24.)

none capable of producing N762. (Moccia Decl. ¶ 12.)  Moreover, because of the high demand for carbon black in the preceding months, Continental had been unable to build up inventories of N762 and had only limited inventory of N550 at the time. (Moccia Decl. ¶ 13.)  Continental began to allocate its available supply among customers and notified all of its customers who purchased N762, including BRC, that N762 would be unavailable in May 2011. (Moccia Decl. ¶ 13.)

Continental never confirmed BRC's April 26, 2011, order and did not send BRC the shipment of 110,000 pounds of N550 it requested for May 11, 2011. (Moccia Decl. ¶¶ 15, 16; Pl.'s Mem. of Law Ex. 22.)  Moreover, several days later, Nelson attempted to recall a shipment she had released to BRC in April, instructing Continental's plant manager that "[w]e quickly want to arrange to have this car returned to [Continental's plant] due to the failed negotiations regarding pricing increase and payment terms." (Pl.'s Reply Ex. 7.)  When Moccia saw Nelson's e-mail, he told her to "call all rail 550 customers and see if anyone will take it." (Pl.'s Reply Ex. 7.)

### F.  BRC Demands Adequate Assurance from Continental

In reaction to Continental's failure to confirm orders and the missed shipment, BRC's counsel on May 16, 2011, sent a letter to Continental, demanding that it provide adequate assurance of performance under § 2-609 of the Uniform Commercial Code ("UCC") by the close of business on May 18, 2011. (Pl.'s Mem. of Law Ex. 22; Moccia Decl. ¶ 19.)  E-mails were exchanged over the next two days in which BRC continued to seek assurance, informing Continental that BRC had a limited opportunity to buy a railcar of carbon black from another supplier as "cover" under UCC § 2-712 and would hold Continental accountable for BRC's

damages unless Continental provided adequate assurance that it would perform. (Pl.'s Mem. of Law Exs. 24-26; Newman Dep. 38-39; Moccia Decl. ¶ 20.)

But Continental did not confirm the shipment; instead, Moccia responded: "We do not have N762 available at the moment." (Pl.'s Mem. of Law Ex. 27; Moccia Decl. ¶ 20.) Consequently, BRC ordered the N762 from the other supplier. (Cornwell Dep. 128; Pl.'s Mem. of Law Ex. 25.) Yet, Continental's own sales records show that it supplied 1.8 million pounds of N762 to its customers in May 2011 and 2.485 million pounds in June 2011. (Reply Ex. 9; Pl.'s Mem. of Law Ex. 28.)

### G. Continental Fails to Confirm and Fill BRC's Order for a May 18, 2011, Shipment

Continental also failed to confirm and send the shipment of 110,000 pounds of N550 that BRC requested for May 18, 2011. (Moccia Dep. 74, 102-03.) Nevertheless, on the morning of May 20, Moccia called Newman of BRC and told him that Continental would continue to ship to BRC at the prices set forth in the Agreement. (Moccia Decl. ¶ 21.)

But later that same morning, Nelson of Continental communicated conflicting information to BRC, advising Newman that the two requested shipments would be available on May 25 and June 2 but with a two-cents per pound price increase. (Moccia Dep. 105-06; Moccia Decl. ¶ 21; Pl.'s Mem. of Law Ex. 29.) When Newman informed Cornwell of BRC about the price increase, Cornwell e-mailed Moccia, stating that the offer was "unacceptable" because it was "not in accordance with the terms and conditions set forth in our agreement." (Pl.'s Mem. of Law Ex. 30.) Moccia, not realizing that Nelson had quoted BRC the price increase, thought that BRC wanted more material or needed it sooner (Moccia Decl. ¶ 22); thus, he responded: "I suggest you call another supplier, Mike" (Pl.'s Mem. of Law Ex. 30; Moccia Decl. ¶ 22).

8

Moccia admits that he did instruct Nelson to offer the shipments to BRC with the price increase, but that "after internal discussions it was decided that we were going to stay with the contract prices of the [A]greement." (Moccia Dep. 106.)

Later that same day—May 20, 2011—Continental's inhouse counsel, Russell Guttshall, confirmed to BRC's counsel that Continental would "continue producing and shipping timely at the contract prices, and w[ould] not cut off supply to BRC." (Pl.'s Mem. of Law. Ex. 31.) Cornwell then e-mailed Moccia to confirm what he heard from BRC's counsel—that Continental would supply the two missed May shipments and the June 4 shipment. (Pl.'s Mem. of Law Ex. 32.)  But Moccia responded that only *one* of the three shipments would be sent: "[W]e will ship one car next week and do the best we can re[garding] future orders based on our intent to supply 1.8 million lbs[.]" (Pl.'s Mem. of Law. Ex. 32.)

On May 23, the next business day, Newman of BRC sought clarification from Moccia whether Continental was supplying just one shipment or three. (Pl.'s Mem. of Law Ex. 33.) Moccia responded: "That is what I said[.]  [W]e intend to ship you 1.8 million lbs and we are ahead of schedule[.]  [C]arbon black is in very short supply[.]" (Pl.'s Mem. of Law Ex. 33.) Newman replied that Nelson had told him on May 20 that Continental would supply all three shipments. (Pl.'s Mem. of Law Ex. 34.)  Moccia reiterated: "[A]ll we can ship is one car at the moment[.]  [W]e will do the best we can[.]  I will not short other customers as we are supplying you based on our agreement[.]" (Pl.'s Mem. of Law Ex. 34.)  When Newman emphasized that the ship dates have an "enormous impact" on BRC's ability to complete its customer orders, Moccia repeated Continental's position:

> As I stated[,] we have shipped BRC 1.2 million lbs YTD.  We have a car of N 550 which will be shipped on 5-25.

9

> The contract states that it is the intent of Continental [C]arbon Company to ship 1.8 M lbs in approximately equal monthly quantities. That amounts to 150K per month. BRC has purchased 300K lbs per month YTD.
>
> We will continue to do our best to supply BRC and I will advise when another car of N 550 will be shipped.

(Pl.'s Mem. of Law Ex. 35.)

Continental sent a single shipment of carbon black N550 to BRC on May 25. (Moccia Decl. ¶ 16.) Continental's sales records reflect that it shipped more than 1.472 million pounds of N550 to twenty-two customers in June 2011 and that several customers received much more than their designated amount in Continental's Annual Operating Plan. (Pl.'s Mem. of Law Ex. 28; Reply Exs. 9-10.)

### H.  BRC Terminates the Agreement and Files the Instant Suit

On June 2, 2011, BRC sent a letter to Continental, asserting that the Agreement was a requirements contract, that Continental had failed to adequately respond to BRC's demand for assurance, and that Continental was in breach of the Agreement. (Moccia Decl. ¶ 26; Pl.'s Mem. of Law Ex. 36.) BRC informed Continental that it was terminating the Agreement "effective immediately" and, in fact, had just filed this lawsuit. (Moccia Decl. ¶ 26; Pl.'s Mem. of Law Ex. 36.) Shortly thereafter, BRC rescinded its order for a railcar of carbon black scheduled to ship on June 22, 2011. (Moccia Decl. ¶ 26.)

Although Moccia states in his Declaration, without citing any supporting documents, that Continental had sold and shipped 1.642 million pounds of carbon black to BRC in 2011 by the time BRC terminated the Agreement (Moccia Decl. ¶ 28), Continental's sales documents and its answer to BRC's Interrogatory No. 6 reflect that Continental supplied just 1.39 million pounds as of May 25, 2011. (Reply Exs. 4, 5.) And as recited earlier, Moccia's May 23, 2011, e-mail to

Newman remarked that Continental had shipped 1.2 million as of that date. (Pl.'s Mem. of Law Ex. 35.)

In any event, in an effort to settle the dispute, Continental sold and delivered another six railcar shipments of carbon black to BRC after June 2, 2011, and thus the total amount of carbon black sold and delivered by Continental to BRC in 2011 was 1.971 million pounds. (Moccia Decl. ¶¶ 28, 33.)  The parties ultimately could not settle the dispute, however, and BRC ceased ordering from Continental in September 2011. (Moccia Decl. ¶ 33; Pl.'s Mem. of Law Ex. 37.)

## II.  STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770.  When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.*  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 688 (7th Cir. 2008) (quoting *Payne*, 337 F.3d at 770).  If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id*. at 771.

11

## III.  DISCUSSION[5]

In a requirements contract, "the purchaser agrees to buy all of its needs of a specified material exclusively from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract." *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 186 F.3d 815, 817 (7th Cir. 1999) (quoting *Ind.-Am. Water Co. v. Town of Seelyville*, 698 N.E.2d 1255, 1259 (Ind. Ct. App. 1998)).  Requirement contracts are governed by UCC § 2-306, which provides: "A term which measures the quantity by the . . . requirements of the buyer means such actual . . . requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior . . . requirements may be . . . demanded." IND. CODE § 26-1-2-306(1).

BRC argues that on this record there is no material factual dispute that it ordered carbon black in good faith during the relevant period and that the quantity of such orders was not unreasonably disproportionate to the stated estimate and, therefore, Continental breached the Agreement when it failed to fill BRC's April 26 order.  The Court will discuss these two conditions in turn.

---

[5] "When a federal court hears a case in diversity, it does not necessarily apply the substantive law of the forum state; rather, it applies the choice-of-law rules of the forum state to determine which state's substantive law applies." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  The choice of law rule for Indiana "calls for applying the law of the forum with the most intimate contacts to the facts." *Emp'rs Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1024 (Ind. Ct. App. 1999).  Here, the Supply Agreement involved the sale of goods from Continental, which has its principal place of business in Texas, to BRC, which has its principal place of business in Indiana. (Docket # 46 at 9 n.5.) As the Court explained in its June 27, 2012, Opinion and Order, the parties do not dispute that both Texas and Indiana have adopted the UCC and that no substantive differences exist between the two states' enactments of the provisions relevant to this case, and they rely primarily on Indiana law in their briefs. (Docket # 46 at 9 n.5.)  Therefore, the Court will apply the UCC as adopted in Indiana and look to interpretations of the UCC from Indiana and other jurisdictions.

### A.  BRC Placed Its April 26 Order in Good Faith.

In a requirements contract, "[t]he seller assumes the risk of all good faith variations in the buyer's requirements . . . ." *Empire Gas Corp. v. Am. Bakeries Co.*, 840 F.2d 1333, 1337-38 (7th Cir. 1988); *accord Ind.-Am. Water Co.*, 698 N.E.2d at 1260.  "[G]ood faith variations from prior requirements are permitted even when the variation may be such as to result in discontinuance . . . ." IND. CODE § 26-1-2-306 cmt. 2.

Generally, to be considered in good faith, the buyer must be motivated by considerations "independent of the terms of the contract or any other aspect of [the buyer's] relationship with [the seller]." *M & G Polymers USA, LLC v. USA, LLC v. Carestream Health, Inc.*, No. 07C-11-242 PLA, 2009 WL 3535465, at *6 (Del. Super. Ct. Oct. 23, 2009).  "It is well settled that a buyer in a rising market cannot use a fixed price in a requirements contract for speculation." *Orange & Rockland Utils., Inc. v. Amerada Hess Corp.*, 59 A.D.2d 110, 115 (N.Y.A.D. 1977); *see Empire Gas*, 840 F.2d at 1338 ("If the buyer saw an opportunity to increase his profits by reselling the seller's goods because the market price had risen above the contract price, the exploitation of that opportunity" is not an example of a good faith variation.).

Continental does not argue that BRC was inflating the quantities of carbon black it ordered so it could speculate on the carbon black market. *See generally Ind.-Am. Water Co.*, 698 N.E.2d at 1260 ("The most common problem arising out of a requirements contract is the situation where the price of the commodity is advantageous to the buyer who then demands a quantity unreasonably in excess of his needs in order to resell the excess at a profit, placing himself in competition with the seller.").  Altogether Continental's abandonment of this potential defense is wise as there is no evidence that BRC was involved in inflating quantities of carbon

black or speculating in the market.

Instead, Continental contends that "[w]hether or not BRC's increased demands were intended to take advantage of the low Agreement pricing in a tight market, . . . BRC did not need the amounts it demanded in May 2011 before it terminated the Agreement." (Resp. Br. 17.)  It asserts that at the time BRC placed its order for shipments in May and June 2011, BRC had "more than enough supply on hand" in that it had approximately 2.1 months supply of N550 (290,005 pounds) and 1.8 months supply of N762 (264,000 pounds). (Resp. Br. 18, Ex. 6.)

But BRC primarily manufactures products for the automotive industry, and the market's fluctuations for vehicles, in turn, controls BRC's need for carbon black.  Continental does not dispute BRC's assertion that the automotive industry was rebounding in late 2010 and early 2011, which correspondingly increased BRC's requirements.  Indeed, BRC's Chief Executive Officer explained its "purchasing philosophy":

> We are debt free.  We have adequate supplies at all times of all commodities to protect against a hurricane or tornado or whatever. . . .  We do not live hand to mouth.  We make sure our inventories, our raw materials are there for our needs because the cost of money is nothing compared to shutting down a customer. . . . [W]e are never in an expedite position unless we make a mistake.  To cover ourselves, there's always enough material to go without any material for . . . at least 30 days.  Because of our financial strength, that's the way we do business."

(Chaffee Dep. 77-78.)

"[I]n a requirements contract the buyer cannot unduly increase its requirements by changing the way it does business[,]" *N. Ind. Pub. Serv. Co. v. Colo. Westmoreland, Inc*., 667 F. Supp. 613, 636 (N.D. Ind. 1987); *see Orange*, 59 A.D.2d at 115 ("[A] buyer [cannot] arbitrarily and unilaterally change certain conditions prevailing at the time of the contract so as to take advantage of market conditions at the seller's expense.").  But here there is no evidence upon

which a reasonable factfinder could find, or even infer, that BRC's purchasing methods changed in any way due to a shift in the carbon black market.

Without more, BRC's purchasing philosophy—essentially, to have adequate supplies on hand at all times—cannot amount to a lack of good faith. *See generally Westmoreland*, 667 F. Supp. at 636 ("The whole idea of a requirements contract is that a buyer takes no more than it requires; if it determines these requirements in commercial good faith . . ., the fact that the requirements turn out to be unexpectedly small is of no moment.  The legally relevant restriction is that [the buyer] sets its requirements in commercial good faith . . . ." (emphasis omitted)).

### B.  BRC's April 26 Order Was Not "Unreasonably Disproportionate" to the Stated Estimate

As explained above, in addition to good faith, § 2-306 requires that a quantity ordered under a requirements contract must not be "unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior . . . requirements . . . ." IND. CODE § 26-1-2-306(1).  Here, Continental argues that BRC's orders in 2011 were "unreasonably disproportionate" to the estimate of 1.8 million pounds in the Agreement and thus that it did not breach the Agreement when it failed to fill the April 26 order.

Comment 3 to § 2-306 directly addresses stated estimates:

> If an estimate of . . . requirements is included in the agreement, no quantity unreasonably disproportionate to it may be . . . demanded.  Any minimum or maximum set by the agreement shows a clear limit on the intended elasticity.  In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur.

IND. CODE § 26-1-2-306(1) cmt. 3; *see Westmoreland*, 667 F. Supp. at 636 (explaining that § 2-306 and comment 3 "constrains the range of variance when the parties do not do so themselves").  Some courts consider a variety of factors when determining whether a quantity is

unreasonably disproportionate to a stated estimate, including the amount of the increase, whether the seller had a reasonable basis upon which to forecast the increase, the amount by which the market price exceeds the contract price, whether the increase in market price was fortuitous, and the reason for the increase in requirements. *See Orange*, 59 A.D.2d at 115-16 ("It would be unwise to attempt to define the phrase 'unreasonably disproportionate' in terms of rigid quantities."); *see also McLouth Steel Corp. v. Jewell Coal & Coke Co.*, 570 F.2d 594, 606 (6th Cir. 1978) (articulating that the "critical feature" of the dispute was whether the conduct of the parties in the prior years interpreted the contract as calling for additional tonnage up to 26,643 tons where the stated estimate was 18,000 tons).

The Agreement reflects that its "intent" was that Continental would sell to BRC "approximately 1.8 million pounds . . . annually" and that such volumes would "be taken in approximately equal monthly quantities."  The Agreement also provides that BRC would receive a rebate if it purchased more than 2.1 or 2.2 million pounds or pay a penalty if it purchased less than 1.5 or 1.4 million pounds.  Continental proposes that these rebate thresholds limit the elasticity of the estimate of 1.8 million pounds in that "the maximum deviation would be no more than approximately 400,000 pounds in either direction." (Resp. Br. 12.)  It believes this is evidenced by the fact that the parties agreed to establish new upper and lower limits for the rebate/penalty if BRC's normal annual volume shifted significantly. (Resp. Br. 12.)

In that vein, Continental argues that in January through April 2011, BRC's quantities increased in that it was purchasing on average almost *twice* the stated estimate per month, that is, 300,000 pounds in comparison to a stated estimate of 150,000 pounds, which put it on pace to order 3.3 million pounds in 2011.  It characterizes this as an increase of 53 percent from its

perceived upper limit of the stated estimate (2.2 million), citing two cases in which the courts from other jurisdictions found that increases of 29 percent and 20 percent were unreasonably disproportionate. (Resp. Br. 13 (citing *A & A Mech. v. Thermal Equip. Sales*, 998 S.W.2d 505, 512 (Ky. Ct. App. 1999) (finding a 29 percent increase over the stated estimate was unreasonably disproportionate); *Shea-Kaiser-Lockheed-Healy v. Dep't of Water & Power*, 140 Cal. Rptr. 884, 890 (1977) (finding a 20 percent increase was unreasonably disproportionate)).)

But the April 26 order that Continental refused to fill was for 220,000 pounds in May and 140,000 pounds in June. Thus, the May quantity was actually less than 20 percent above the purported ceiling of the stated estimate, and the June quantity was well within the range of the estimate. And in *Westmoreland*, 667 F. Supp. at 636, the District Court found in a contractual dispute governed by Indiana law that there was no reason to conclude that a 45 percent variance from a stated estimate was "too much."

In any event, Continental's view of the 2.2 million rebate threshold as a maximum quantity is far from compelling. The rebate program, by design, created an incentive for BRC to purchase *at least* 2.2 million pounds annually to get the lower pricing for all of its purchases that year. And, in fact, BRC's purchase history under the Agreement reflects exactly that, as it bought 2.6 million pounds in 2010 and was awarded a rebate of more than $26,000. Moreover, the amount BRC purchased each month in 2010 varied from a low of 93,000 pounds in June to a high of 322,000 pounds in December, and thus Continental was familiar with a variance among the orders placed by BRC each month. *See Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 583 (Tex. 1996) ("[I]t is not enough that a demand for requirements be disproportionate to the stated estimate; it must be unreasonably so in view of the expectation of

the parties." (quoting *Orange*, 397 N.Y.S.2d at 819)).

Furthermore, Continental's own records reflect that it forecasted BRC would purchase 2.68 million pounds in 2011.  In order to supply the 2.68 million, Continental reserved 2.734 million for BRC in its Annual Operating Plan.  As stated above, the April 26 order that Continental failed to fill was for 220,000 pounds in May and 140,000 pounds in June 2011, well within the 2011 forecast and the average quantity shipped per month in 2010. *Cf. G.D. Searle & Co. v. Fisons Corp.*, No. 91 C 4782, 1993 WL 54535, at *5 (N.D. Ill. Mar. 1, 1993) (finding an order unreasonably disproportionate to any prior order placed by the plaintiff where it was over eight times larger than the previous order and would result in an inventory stock more than ten times the plaintiff's normal levels).

For these reasons, BRC's April 26, 2011, order was not as a matter of law "unreasonably disproportionate" to the stated estimate of its requirements.  As a result, Continental was obligated to fill the order for the shipment of 220,000 pounds in May 2011 and 140,000 pounds in June 2011, and thus breached the terms of the Agreement when it did not do so.

### C.  Continental Repudiated the Agreement by Refusing to Provide Adequate Assurance and Refusing to Ship More Than 1.8 Million Pounds

On May 16, 2011, after Continental failed to confirm BRC's April 26 order and failed to send the May 11 shipment, BRC's counsel sent a letter to Continental, demanding that it provide adequate assurance of performance pursuant to UCC § 2-609.  "A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired." IND. CODE § 26-1-2-609(1).  "When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance . . . ." IND. CODE § 26-1-2-609(1).  Here, Continental failed to provide BRC

18

with adequate assurance of performance and, in doing so, repudiated the Agreement.

More to the point, on May 18, 2011, Moccia told BRC that it did "not have N762 available at the moment" (Pl.'s Mem. of Law Ex. 27), which caused BRC to effect cover by purchasing the carbon black from another supplier.  On May 20, Continental advised BRC that the two requested shipments would be available on May 25 and June 2 but only with a two-cents per pound price increase.  When BRC pointed out that a price increase violated the terms of the Agreement, Continental suggested that BRC "call another supplier." (Pl.'s Mem. of Law Ex. 30.)

Then, later on May 20, although Continental's counsel had advised BRC's counsel earlier that day that Continental *would* continue to ship the requested carbon black at the prices stated in the Agreement, Moccia told BRC that Continental would supply only one of BRC's three requested shipments and would "do the best we can re[garding] future orders based on our intent to supply 1.8 million lbs[.]" (Pl.'s Mem. of Law. Ex. 32.)  Moccia then reiterated Continental's position—that it would limit BRC to 1.8 million pounds annually—in two more e-mails to BRC on May 23 and 24.[6] (*See* Pl.'s Mem. of Law Exs. 34, 35.)  Thus, although Continental's lawyer stated that it would "continue producing and shipping timely at the contract prices, and [would] not cut off supply" (Pl.'s Mem. of Law Ex. 31), Moccia's later statements indicated that Continental intended to limit its supply to BRC under the Agreement to 1.8 million pounds,

---

[6] Moccia's e-mails to Cornwell on May 20 and Newman on May 23 and 24 directly belie his later representation in his Declaration that he "never stated that Continental would supply BRC with only 1.8 million pounds per year." (Moccia Decl. ¶ 27.)  As a result, his retrospective statement in his Declaration fails to create a triable issue of fact on this point. *See Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004) ("It is true that self-serving statements in affidavits *without factual support in the record* carry no weight on summary judgment." (emphasis in original)); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) ("It is well settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact."); *Hadley v. Cnty. of Du Page*, 715 F.2d 1238, 1243 (7th Cir. 1983) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

which obviously left BRC without adequate assurance that Continental would supply all of its requirements.  Under the UCC, a failure to timely provide adequate assurance of performance under the circumstances of the particular case is a repudiation of the contract.[7] IND. CODE § 26-1-2-609(4); *see AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167, 1171 (7th Cir. 1976); *Hawa v. Moore*, 947 N.E.2d 421, 426 (Ind. Ct. App. 2011) ("[T]he failure of the obligor to give adequate assurance may be treated as a repudiation.").

But Continental urges that its communications expressing an intent to supply 1.8 million pounds under the Agreement was not a repudiation because it was merely expressing that it would perform in accordance with *its own* interpretation of the Agreement, not that it would cease performing altogether.  Indeed, at least in cases outside the scope of the UCC, "[w]hen two contracting parties differ as to the interpretation of a contract or as to its legal effects, an offer to perform in accordance with its own interpretation made by one of the parties is not in itself an anticipatory breach." *Eden United, Inc. v. Short*, 573 N.E.2d 920, 929 (Ind. Ct. App. 1991) (quoting A. CORBIN, CORBIN ON CONTRACTS § 973 at 961-62 (1952)).

But even there, disagreement as to the proper interpretation of the contract "may in fact constitute an anticipatory repudiation if the erring party indicates that no performance other than

---

[7] Comment 1 to § 2-609 explains the policy concerns behind the section:

The section rests on the recognition of fact that the essential purpose of a contract between commercial men is actual performance and they do not bargain merely for a promise, or for a promise plus the right to win a lawsuit and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain.  If either the willingness or the ability of a party to perform declines materially between the time of contracting and the time for performance, the other party is threatened with the loss of a substantial part of what he has bargained for. . . .  [A] buyer who believes that the seller's deliveries have become uncertain cannot safely wait for the due date of performance when he has been buying to assure himself of materials for his current manufacturing or to replenish his stock of merchandise.

IND. CODE § 26-1-2-609 cmt. 1.

that demanded will be accepted." *Farwell Constr. Co. v. Ticktin*, 405 N.E.2d 1051, 1059 (Ill. Ct. App. 1980); *see Eden United*, 573 N.E.2d at 929 ("In order to constitute such a breach, the offer must be accompanied by a clear manifestation of intention not to perform in accordance with any other interpretation."). That is, "[a] party that briefly errs in interpreting a contract while manifesting an intention to abide by its terms cannot be said to have clearly and unequivocally repudiated the contract." *Commonwealth Edison Co. v. Decker Coal Co.*, 612 F. Supp. 978, 982 (D.C. Ill. 1985). "Repudiation only occurs when a party with an accurate understanding of its contractual obligations indicates clearly that it will not honor those obligations or, perhaps, refuses to recognize what the contact requires when its erroneous interpretation is called to its attention." *Id*.

Here, Moccia's communications show that Continental chose to reject BRC's understanding that the Agreement required Continental to supply all of BRC's requirements. Continental instead emphasized three times that it would perform only in accordance with its own interpretation of the Agreement—that it was obligated to supply only 1.8 million pounds per year—even though that was contrary to how it had obviously performed in prior years. In addition, Continental's conduct—its failure to confirm BRC's April 26 order and its supply of just 110,000 pounds in May 2011—evidenced its rejection of BRC's interpretation of the Agreement. *See City of Fairfax, Va. v. Wash. Metro. Area Transit Auth.*, 582 F.2d 1321, 1327 (C.A. Va. Sept. 19, 1978) ("[T]he repudiation, though it must be unconditional and total, need not be express or dependent on spoken words alone; it may rest on a defendant's conduct evidencing a clear intention to refuse performance in the future . . . ." (internal quotation marks omitted)).

In sum, Continental's failure to provide adequate assurance of performance to BRC was a repudiation of the Agreement under UCC § 2-609.  Accordingly, BRC was entitled to immediately terminate the Agreement and seek damages. *See* IND. CODE §§ 26-1-2-609, 2-610(b), 2-711(1); *see also Jay Cnty. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc*., 692 N.E.2d 906, 910-11 (Ind. Ct. App. 1998); *Scott-Reitz Ltd. v. Rein Warsaw Assocs.*, 658 N.E.2d 98, 103-04 (Ind. Ct. App. 1995) ("When one party repudiates the contract, the injured party . . . may treat the repudiation as putting an end to the contract and sue to recover the damages caused by refusing to carry out the contract.").

### D.  Continental Fails to Prove Its Affirmative Defense of Commercial Impracticability

Finally, Continental contends that summary judgment in BRC's favor is inappropriate because "commercial impracticability" prevented it from filling BRC's order for shipments in May and June 2011.  Continental bears the burden of proving this affirmative defense. *See Alexander v. Unlimited Progress Corp*., No. 02 C 2063, 2004 WL 2384645, at *4 (N.D. Ill. Oct. 20, 2004) ("A summary judgment on a plaintiff's claims for liability encompasses all affirmative defenses and implicitly challenges the non-movant to establish a basis for finding that the defenses are both applicable and supported by sufficient facts." (citations omitted)); *Pantry, Inc. v. Stop-N-Go Foods, Inc*., 796 F. Supp. 1164, 1167 (S.D. Ind. 1992) ("At any stage of a proceeding, the defendant bears the burden of raising and proving its affirmative defenses.").

Commercial impracticability is governed by UCC § 2-615:

(a)  Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be

22

invalid.

(b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

(c) The seller must notify the buyer seasonably that there will be delay or non-delivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer.

IND. CODE § 26-1-2-615; *see also Waldinger Corp. v. Ashbrook-Simon-Hartley, Inc.*, 775 F.2d 781, 786 (7th Cir. 1985) ("The applicability of the defense of commercial impracticability . . . turns largely on foreseeability. The relevant inquiry is whether the risk of the occurrence of the contingency was so unusual or unforeseen and the consequences of the occurrence of the contingency so severe that to require performance is to grant the buyer an advantage he did not bargain for in the contract.").

Continental argues that even if it did breach the Agreement by failing to confirm and ship BRC's order, its breach should be excused because beginning in March 2011 demand for carbon black began to exceed Continental's ability to produce it. In addition, one of the two carbon black reactors that Continental used to produce the N550 and N762 was down for maintenance for several weeks and Continental had been unable to build up inventories to supply N762 and had only limited quantities of N550 on hand. Continental contends that, as a result, it was forced to allocate its available supply among customers in May 2011, including BRC.

But commercial impracticability provides a defense to non-performance for "only the kind of impossibility that the parties could not have anticipated." *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 727 (7th Cir. 2009). Here,

23

Continental bases its defense, at least in significant part, on an alleged shortage of carbon black due to routine annual maintenance, which rings the death knell for the defense. In that regard, Moccia testified that "the reactors were turned off" as part of the "maintenance program." (Moccia Dep. 86.) In addition, Jimmie Scott of Continental testified that the shortage of N700 series in May 2011 was the result of "normal annual maintenance" and that Continental "budgeted those." (Scott Dep. 70-71 ("[I]t's planned. It's part of our [Annual Operating Plan].").) Therefore, even if the annual maintenance caused Continental a shortage of carbon black, that cannot constitute commercial impracticability as a matter of law.

Moreover, § 2-615 provides that when a contingency affects a part of a seller's capacity to perform, it must allocate its production and deliveries "in any manner which is fair and reasonable." IND. CODE § 26-1-2-615(b). In fact, "good faith requires, when prices have advanced, that the seller exercise real care in making his allocations, and in case of doubt his contract customers should be favored and supplies prorated evenly among *them regardless of price*." IND. CODE § 26-1-2-615 cmt. 11 (emphasis added).

The record contains a plethora of evidence that Continental did not allocate among its customers in a fair and reasonable manner, but rather, based on its own profit margins. First, it was only after BRC refused Continental's request for a price increase that Continental stopped confirming and filling BRC's orders. (*See* Pl.'s Mem. of Law Ex. 16.) Then, on April 29, 2011, Moccia directed his staff not to ship to BRC and thirteen other customers due to a "negative [gross profit]." (Pl.'s Mem. of Law Ex. 16.) Third, Continental re-categorized BRC from a Tier 1 to a Tier 3 customer on May 2, 2011. (Pl.'s Mem. of Law Ex. 17.) And on May 16, 2011, Nelson of Continental attempted to recall a shipment she had already released to BRC "due to

24

failed negotiations regarding pricing increase and payment terms," and Moccia instructed her to "see if anyone else will take it." (Reply Ex. 7.)

Moreover, during the alleged shortage period in May 2011, Continental's sales records reflect that it supplied 1.472 million pounds of N550 to twenty-two different customers. (Reply Exs. 9, 10.)  In fact, several customers received quantities of N550 significantly in excess of the amount designated for them on Continental's Annual Operating Plan.  And although Moccia told BRC on May 18 that Continental did not have any N762 "available at the moment," Continental supplied its customers with 1.8 million pounds of N762 in May 2011 and 2.4 million pounds in June. (Reply Ex. 9; Pl.'s Mem. of Law Ex. 28.)

For these reasons, no reasonable factfinder could excuse Continental's breach of the Agreement based on its affirmative defense of commercial impracticability.

## IV.  CONCLUSION

Plaintiff BRC Rubber & Plastics, Inc.'s Motion for Summary Judgment (Docket # 69) is GRANTED.

SO ORDERED.  Enter for the 5th of June, 2013.

S/Roger B. Cosbey_____
Roger B. Cosbey,
United States Magistrate Judge

25