UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| BRC RUBBER & PLASTICS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:11-cv-190 |
| ) | |
| CONTINENTAL CARBON COMPANY, ) | |
| ) | |
| Defendant, ) | |

## OPINION AND ORDER

### I. Introduction

On September 8-9, 2013, this Court held a two-day bench trial on the amount of damages due to Plaintiff BRC Rubber & Plastics, Inc. ("BRC"), as a result of Defendant Continental Carbon Company's ("Continental") breach and repudiation of a Supply Agreement between the parties.[1] (Docket # 93-94.) Under the Agreement, Continental agreed to supply all of BRC's requirements for carbon black from January 1, 2010, to December 31, 2014.[2]

At the trial, Michael Cornwell, BRC's Vice President of Materials, testified to BRC's damages resulting from Continental's breach and repudiation of the Supply Agreement, including its "future damages"–that is, what BRC would pay for its carbon black requirements from July 1, 2013, to December 31, 2014, over what it would have paid to Continental under

---

[1] Diversity jurisdiction exists under 28 U.S.C. § 1332(a). Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (Docket # 36.)
    Reference to the trial transcript is made as "(Tr. __)" and to the trial exhibits as "(Ex. __)."

[2] On June 27, 2012, the Court concluded as a matter of law that the Supply Agreement is a requirements contract and not, as Continental contended, an open offer for orders or an agreement to sell a specific quantity of carbon black. (Docket # 46.) A year later, on June 5, 2013, the Court granted BRC's motion for summary judgment, and concluded that Continental materially breached and repudiated the Supply Agreement and, as a result, BRC was entitled to immediately terminate the Agreement in June 2011 and seek damages. (Docket # 80.)

the Agreement. Continental objected to this portion of Cornwell's testimony, contending that future damages could only be proven by expert opinion testimony, and BRC never designated or qualified Cornwell as an expert under Federal Rule of Evidence 702.[3] BRC, however, contended that Cornwell was a lay witness entitled to offer opinion testimony under Federal Rule of Evidence 701. Alternatively, BRC claimed that even if Cornwell's testimony is considered expert testimony, it is still admissible because BRC's failure to identify him as an expert witness was harmless.

The Court heard argument on the matter and admitted Cornwell's testimony over Continental's objection, subject to Continental filing a post-trial motion to strike the testimony. Continental did so on November 1, 2013 (Docket # 99, 100), and the motion is now fully briefed (Docket # 104, 108).

Having considered the record and the parties' arguments, Continental's motion to strike will be GRANTED.

**II. Cornwell's Testimony Is Not Admissible as a Lay Opinion**

*A. Applicable Law*

Federal Rule of Evidence 701 allows opinion testimony from a lay witness if the opinions are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *See King v. Hartford Packing Co.*, 189 F. Supp. 2d 917, 924 (N.D. Ind. 2002). "The last requirement is

---

[3] Cornwell also testified about BRC's "actual damages" for the period preceding July 1, 2013, but Continental does not seek to strike that portion of his testimony.

intended "to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 862 (7th Cir. 2009) (quoting Fed. R. Evid. 701 advisory committee's notes).

"The advisory committee notes to Rule 701 explain, however, that a business owner or officer is allowed to testify without being qualified as an expert only because that testimony is tied to his or her personal knowledge[.]" *Compania Administradora De Recuperacion De Activos Administradora De Fondos De Inversion Sociedad Anonima v. Titan Int'l, Inc.*, 533 F.3d 555, 560 (7th Cir. 2008). More particularly, the advisory committee notes state:

> [M]ost courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. *See, e.g.*, *Lightning Lube, Inc. v. Whitco Corp.*, 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business.

*Id.* (quoting Fed. R. Evid. 701 advisory committee's notes).

### B. Cornwell's Position with BRC

Cornwell has more than twenty years of experience purchasing carbon black in the automotive industry, and has been serving as BRC's Vice President of Materials since 2000. (Tr. 18.) He negotiated the terms of the Supply Agreement for BRC (Tr. 21-22, 37), as well as BRC's purchase of carbon black from other suppliers after the Supply Agreement's termination (Tr. 43-50). Cornwell testified that the methodology he used to estimate BRC's future damages was based upon his work at BRC and his knowledge of the energy markets,

3

which he developed during his tenure at BRC and in his prior employment at Gencorp Automotive. (Tr. 109.)

## C. Cornwell's Methodology

Cornwell explained at trial that he prepared a spreadsheet of BRC's future damages with the assistance of Don Newman, who "works for [him]." (Tr. 50-51, 111, Ex. 72.) To derive the price component of the damages, Cornwell computed an average weight per railcar of carbon black based upon BRC's purchasing data from the prior eighteen months. (Tr. 68-69, 111.) He carried these estimates, together with projections of future feedstock oil and natural gas prices published by the U.S. Energy Information Administration, into the pricing formula set out in BRC's Agreement with Sid Richardson Carbon Company, the supplier who BRC contracted with after the termination of the Supply Agreement. (Tr. 68-69, 71, 80, 111.) Cornwell then did the same with the pricing formula articulated in the Supply Agreement, arriving at a price differential between the two formulas. (Tr. 68-69, 71, 80, 111.) The differential reflects the amount that BRC paid, or will pay, for its carbon black requirements over and above what it would have paid had Continental not breached and repudiated the Agreement.

As to the volume component of the 2013 future damages, Cornwell used the quantity of carbon black that BRC ordered for July 1 to December 31, 2013, which was based on a routinely-used sales forecast compiled by BRC's accounting department in the ordinary course of business. (Tr. 111-13, 140-42 ("Accounting provides sales forecasts for all the plants for a number of reasons. They have to establish manning, they have to establish work weeks, work hours. There's a multitude of reasons accounting publishes this.").) He explained that

4

accounting's forecast "tells [the plant] how much compound they have to mix," and from that, how much carbon black is needed; thus, BRC regularly forecasts its carbon black needs to make sure it has enough on hand. (Tr. 141.) Cornwell admitted, however, that he did not know who specifically in accounting prepared the forecasts and what assumptions are generally made in that process.[4] (Tr. 112-13.) And he conceded, of course, that although BRC had placed purchase orders for its carbon black needs for the remainder of 2013, it had not, at least as of the trial date, actually received the product or the invoices for the orders, so theoretically the orders could still be delayed or altered. (Tr. 118.)

As to the 2014 damages, Cornwell emphasized that not just he, but a team of BRC employees, worked together to determine that volume projection because accounting had not yet published a 2014 forecast. (Tr. 113-15.) The team used the IHS as the predictor of automotive growth–the indicator BRC routinely uses for forecasting–resulting in a 1.2% growth in volume for two of the three grades of carbon black, but Cornwell did not know who selected that tool or why.[5] (Tr. 114-15.) In addition, Cornwell included a 25% growth in

---

[4] Cornwell testified as follows:

Q. And you don't know who [in accounting] made the forecast?
A. I do not know the specific person, no.

Q. And you don't know what assumptions they made in making the forecast?
A. Not specifically, no.

Q. And you before using that as a basis for your opinions, you didn't go back and check to see what the assumptions were for that forecast?
A. No, I did not.

(Tr. 113.)

[5] More specifically, Cornwell testified:

Q. Who picked IHS as a prediction of automotive growth?
A. I don't know who has picked that at BRC . . . for us to use as projecting what car build's going

volume based upon the difference between BRC's "actual consumption in 2012" and its "actual plus forecast in 2013." (Tr. 124-25.) He admitted, however, that BRC's projection of 2014 damages is an "estimate" or "guess" that could be off by a "wide margin." (Tr. 124-25.)

*C. Discussion*

Continental argues that Cornwell's opinion of future damages should be stricken because it was "not limited to those matters within his personal knowledge gained from his participation in the day-to-day affairs of BRC, but [was] based on hearsay and the opinions and work of others, including people who are not employed or involved with BRC." (Br. in Supp. of Def.'s Mot. to Strike Expert Op. Test. and Evid. ("Def.'s Br. in Supp.") 6-7.) More succinctly, Continental contends that Cornwell's testimony is inadmissible because it is based on "inferences and assumptions from data," rather than actual facts. (Def.'s Br. in Supp. 7.) It also argues that Rule 701 is limited to opinions by owners or officers about the value of a business and lost profits, not "BRC's claimed future damages that do not involve lost profits or the valuation of BRC." (Reply in Supp. of Mot. to Strike 6.)

---

to be. I don't know who selected that.

Q. But you did not select that?
A. No, I did not select that.

Q. Do you know if there are any other projections of what car builds are going to be in the U.S.?
A. I'm sure there are, yes, but I'm not aware of them specifically.

. . . .

Q. And you don't know as you sit here today whether or not there were projections that were higher or lower than IHS's projections?
A. Personally I do not know that, no.

(Tr. 114-15.)

Continental's arguments have merit, as some of the facts and opinions set forth by Cornwell during his testimony and in the spreadsheet of BRC's future damages (Ex. 72) lack the proper foundation, are speculative in nature, and amount to a proffer by BRC of "an expert in lay witness clothing." Fed. R. Evid. 701 advisory committee's notes. As a result, Cornwell's conclusions about future damages, which are derived from these excluded factors, are inadmissible.

With respect to pricing, although Cornwell's computation of an average weight of railcar was based on his personal knowledge of BRC's past orders, his reliance on extraneous published projections of future natural gas and feedstock oil prices was not. (Tr. 68); *see, e.g.*, *In re Gen. Instrument Corp. Sec. Litig.*, No. 96 C 1129, 2000 WL 1741937, at *4 (N.D. Ill. Nov. 22, 2000) (concluding that plaintiff's testimony of damages–which he calculated by simply aggregating another expert's damages figure–was not proper lay opinion testimony because he neither was personally involved in generating the data nor had first-hand knowledge of the information underlying the data); *Allbritton v. Colonial Life & Accident Ins. Co.*, No. 3-98-cv-0645, 2000 WL 769225, at *6 (N.D. Tex. June 13, 2000) (opining that plaintiff's reliance upon the consumer price index clearly "was not within [plaintiff's] personal knowledge, and he was not qualified to offer an opinion based on it").

Likewise, although Cornwell had personal knowledge of BRC's past growth rate, he did not have personal knowledge of the projected growth of the automobile industry for 2014 as published by IHS, which he relied on in his 2014 volume projections. (Tr. 142-43); *cf. Autoforge, Inc. v. Am. Axle & Mfg., Inc.*, No. 02-01265, 2008 WL 65603, at *11 (W.D. Pa. Jan. 4, 2008) (allowing business owner to offer a "straightforward opinion as to lost profits, using

conventional methods based on [the company's] actual operating history" (alteration in original) (quoting *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 930 (10th Cir. 2004))); *R.I. Spiece Sales Co. v. Bank One, N.A.*, No. 1:03-cv-175, 2005 WL 3005484, at *1 (N.D. Ind. Nov. 9, 2005) (allowing owner's testimony about future lost profits where it was based on the company's actual past performance). In fact, he did not even know who at BRC picked IHS as a predictor of automotive growth, or why, or what other projections for car builds were available in the United States. (Tr. 115.)

Cornwell's reliance on this extraneous evidence of future gas and oil prices and automotive industry growth caused him to engage in an economic analysis, which is fatal to his lay opinion testimony. Indeed, this fine line between lay and expert testimony is aptly articulated as follows:

> [L]ay witnesses could testify where lost profits arose from an impairment to the existing operations of the business. They would be doing nothing more than describing the normal workings of the enterprise. Their testimony was, in essence, a reconstruction of what would have transpired, based upon the existing level of acting, "but for" the wrongful conduct.
>
> Where, however, lay witnesses seek to go beyond the existing business and opine upon future sales, they are no longer supplying particularized knowledge derived from their positions in the business. Instead, they are engaging in an economic analysis. Their testimony must consider comparable products or services, the activities of competitors, pricing, demand for the product or service, and the ability to meet that demand. In contrast to testimony that is a snap-shot of a business at the time of an injury, an opinion that incorporates future sales assumptions is an assessment of a relevant market. Evaluating conditions in a market is not based upon knowledge of the internal workings of a business; it is analysis requiring specialized knowledge. This should be the exclusive province of expert testimony.

Martin G. Gilbert, *Proving Lost Profits Through Lay Opinion Testimony–Is the Back Door Still Open?*, 22 Franchise L.J. 19 (Summer 2002).

Cornwell also lacked personal knowledge about the forecast from BRC's accounting department that he relied upon for his 2013 volume projections. Although he testified that the accounting department routinely prepares forecasts, he could not articulate what assumptions it made in doing so, responding that he simply "took [the] number accounting provided to the plant." (Tr. 113); *see KW Plastics v. U.S. Can Co.*, 131 F. Supp. 2d 1265, 1274 (M.D. Ala. 2001) ("A Rule 701 witness cannot simply assert conclusions; his testimony must rest upon an antecedent predicate and foundation."). When asked whether BRC typically orders six months in advance as it did in 2013, Cornwell could not answer, merely responding that he "do[es]n't do the ordering" (Tr. 112); he also did not know whether BRC had sales booked for that six-month period. (Tr. 112-13.) Without the appropriate foundation, the 2013 volume projection fails to be rationally based on Cornwell's perception, and therefore is not admissible as lay opinion testimony. *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, No. 2:04-cv-08, 2006 WL 524377, at *9 (D. Nev. Mar. 6, 2006) (disallowing owner's testimony about accountant's calculations of forward losses where owner lacked personal knowledge of the factors the accountant used to make the present value calculations); *KW Plastics*, 131 F. Supp. 2d at 1274-75 (precluding general manager's lay opinion about damages calculations using discount factors supplied by his law firm where he had no ability to explain or apply it himself).

And Cornwell's testimony concerning the 2014 volume projections revealed additional gaps in personal knowledge. He explained that not he alone, but a "team" of BRC people, came up with the 2014 volume projections "based upon book sales, based upon future sales." (Tr. 114.) He added that the 2014 volume projections were based, in part, on BRC's forecast for July through December 2013 (Tr. 124-25); as a result, the 2014 projections are "not based

9

on raw data, but rather on inferences drawn from raw data." *Macy's, Inc. v. Johnson Controls World Servs., Inc.*, 670 F. Supp. 2d 790, 799 (N.D. Ill. 2009) (stating that "internally derived goals . . . are frequently optimistic and therefore unreliable as a basis for the calculation of actual lost profits"); *see Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (articulating that Rule 701 could not assist the defendant where its claimed losses depended on inferences to be drawn from raw data, rather than the actual underlying data). Moreover, as stated earlier, Cornwell did not know why the IHS automotive growth was selected, and he could not place *any* degree of certainty on the future projections, admitting they "could be off by a wide margin . . . either way." (Tr. 125).

Ultimately, Cornwell characterized BRC's 2014 volume projection as follows: "It's a projection. It's an estimate. It's a guess." (Tr. 124.) But "damages cannot be based on mere speculation and conjecture. Rather, a plaintiff must have adequate evidence to allow a [factfinder] to determine with sufficient certainty that damages in fact occurred, and, if so, to quantify such damages with some degree of precision." *Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 745 (7th Cir. 2006) (applying Indiana law in a breach of contract case); *see Zenith Elecs. Corp.*, 395 F.3d at 420 ("Reliable inferences depend on more than say-so, whether the person doing the saying is a corporate manager or a putative expert.").

Finally, the exception to Rule 701 on which BRC relies permits an officer or owner of a business to testify as a lay witness about the "value or projected profits of the business," Fed. R. Evid. 701 advisory committee's notes; and the cases cited by BRC pertain to testimony concerning business valuation or lost profits (*see* BRC's Resp. to Continental's Mot. to Strike 7). But Cornwell's testimony involved future damages arising from a breach of contract, *not*

business valuation or lost profits. The distinction between the two is addressed in *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, No. 01 C 4366, 2003 WL 2284326, at *3 (N.D. Ill. Oct. 2, 2003), *aff'd*, 395 F.3d 416 (7th Cir. 2005), a breach of contract action:

> WH-TV's business managers may well have sufficient personal knowledge of the existing operations of the business to allow them to offer opinions as to losses of existing customers, and the corresponding loss of profits. However, any opinions as to future sales to future customers are necessarily based on market analysis. Such an analysis would not be based on the business managers' perception or personal knowledge, and would require specialized knowledge. Allowing WH-TV's business managers to offer their projections relating to future subscribers would permit WH-TV to evade the reliability requirements of expert witnesses "through the simple expedient of proffering an expert in lay witness clothing," a strategy that Rule 701 was designed to eliminate.

(citations omitted). Accordingly, the Court declines BRC's invitation to broaden Rule 701's exception to include BRC's future damages in this circumstance.

In short, because Cornwell's testimony about BRC's future damages was based, at least in part, upon information outside of his personal knowledge–that is, future oil and gas price projections, automotive industry growth projections, forecasts from BRC's accounting department, and BRC's projections of future sales–it is inadmissible as a lay opinion under Rule 701.

### III. BRC's Failure to Disclose Cornwell as an Expert Witness Is Not Harmless

Alternatively, BRC argues that Cornwell's testimony can still be considered as coming from an expert even though it failed to identify him as one, because that failure was harmless. For the following reasons, BRC's alternative argument is also unpersuasive.

*A. Applicable Law*

Federal Rule of Civil Procedure 26 requires a party to disclose the identity of any expert witness it intends to use at trial and to submit a written report prepared and signed by

the expert. Fed. R. Civ. P. 26(a)(2); *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 785 (7th Cir. 2000). This disclosure must be made "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). "The expert witness discovery rules are designed to aid the court in its fact-finding mission by allowing both sides to prepare their case adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case." *Spearman Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1093-94 (N.D. Ill. 2001) (citing *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000)); *see Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757 (7th Cir. 2004) ("Formal disclosure of experts is not pointless. Knowing the identity of the opponent's expert witnesses allows a party to properly prepare for trial.").

Consequently, Rule 37 states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Thus, "[t]he sanction of exclusion under Rule 37(c)(1) is 'automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.'" *Mid-Am. Tablewares, Inc. v. Mogi Trading Co., Ltd.*, 100 F.3d 1353, 1363 (7th Cir. 1996) (quoting *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996)). In making the determination whether a particular violation of Rule 26(a) is justified or harmless, the district court should consider "the surprise or prejudice to the blameless party, the ability of the offender to cure any resulting prejudice, the amount of disruption to the trial that would result from permitting the use of the evidence, and the bad faith involved in not producing the evidence at an earlier

date." *Spearman Indus.*, 138 F. Supp. 2d at 1094 (citing *Bronk v. Ineichen*, 54 F.3d 425, 432 (7th Cir. 1995)).

Notwithstanding the foregoing, the Seventh Circuit Court of Appeals has recognized that in a case "where exclusion necessarily entails dismissal of the case, the sanction 'must be one that a reasonable jurist, apprised of all the circumstances, would have chosen as proportionate to the infraction.'" *Sherrod*, 223 F.3d at 612 (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 739 (7th Cir. 1998)). Thus, a district court must "carefully consider Rule 37(c), including the alternate sanctions available, when imposing exclusionary sanctions that are outcome determinative." *Musser*, 356 F.3d at 760.

*B. Discussion*

Here, to avoid the sanction of exclusion, BRC bears the burden of showing that its violation of Rule 26(a) was either "justified" or "harmless." Fed. R. Civ. P. 37(c)(1). BRC does not argue, and there is no evidence to suggest, that its failure to disclose Cornwell as an expert by the November 15, 2012, deadline for expert witness disclosure was "justified." *See, e.g.*, *Uhrick v. United States*, No. 1:04-cv-99, 2006 WL 2623285, at *3 (N.D. Ind. Sept. 12, 2006) (excluding plaintiff's proffered expert where the "necessity of expert testimony was known and the identity and opinions of [the expert] were also known to the [p]laintiff well before the deadline for disclosure"). Rather, BRC argues that its omission was harmless since Continental deposed Cornwell about his methodology in December 2012, and BRC continually provided Continental with spreadsheets of updated calculations thereafter.

But BRC's disclosing Cornwell as a fact witness and not an expert witness denied Continental an opportunity to take certain countermeasures "that are not applicable to fact

13

witnesses, such as attempting to disqualify the expert testimony on grounds set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 . . . (1993), retaining rebuttal experts, and holding additional depositions . . . ." *Musser*, 356 F.3d at 757-58; *see Uhrick*, 2006 WL 2623285, at *4 (concluding that defendant was harmed when plaintiff designated its expert after the deadline, as defendant had been denied the opportunity to challenge his opinion under Rule 702, obtain rebuttal experts, and take depositions). Although Continental deposed Cornwell, it did not do so with the knowledge that BRC might try to use him as an expert witness, which results in prejudice to Continental. *See Musser*, 356 F.3d at 757-58 (acknowledging that a party is prejudiced when it is forced to rely upon a deposition conducted without the knowledge that the witness would be used as an expert).

Moreover, "[t]his is not a case where the disclosure was late by a trivial amount of time." *Musser*, 356 F.3d at 758-59. BRC *never* disclosed Cornwell as an expert before trial, and only seeks to qualify him as one now in a last ditch effort to save part of his testimony. While the Court is indeed mindful of the warning from the Seventh Circuit that "[i]n the normal course of events, justice is dispensed by the hearing of cases on their merits," *id*. (quoting *Salgado*, 150 F.3d at 740), it is also "the court's prerogative–indeed, its duty–to manage its caseload and enforce deadlines." *Finwall v. City of Chicago*, 239 F.R.D. 494, 500-01 (N.D. Ill. 2006) (quoting *Reales v. Consol. Rail Corp*., 84 F.3d 993, 996 (7th Cir. 1996)). "Deadlines such as those envisioned by Rule 26(a)(2)(B) and 37(c)(1) are essential to the maintenance of a smooth and orderly flow of cases." *Id*. at 503. "It is not the right of a party who chooses not to comply with those deadlines to be able to restructure them at will." *Id*.

The Court suspects that BRC's choice not to disclose Cornwell as an expert witness

was strategic. In doing so, BRC dodged producing an expert report from Cornwell and delayed providing his underlying supporting materials until approximately five weeks before trial. These late disclosures presumably hindered Continental's ability to cross-examine Cornwell at trial, and since BRC did not designate Cornwell as an expert on future damages, Continental did not have an opportunity (or at least did not see the need) to designate a rebuttal expert in response. *See* Fed. R. Civ. P. 26(a)(2)(D)(ii); *see, e.g.*, *G & S Metal Consultants, Inc. v. Cont'l Gas Co.*, No. 3:09-cv-493, 2013 WL 6047574, at *6 (N.D. Ind. Nov. 15, 2013) (rejecting plaintiff's argument that its failure to provide an expert report was harmless, noting that defendant was denied the opportunity to discover the sources the expert relied upon). Therefore, although Continental learned that Cornwell created the damages spreadsheet and questioned him about his methodology at his deposition in December 2012, BRC's failure to designate him as a expert witness was *not* harmless.

Moreover, excluding Cornwell's testimony about future damages is not "outcome determinative" concerning BRC's request for damages. *Musser*, 356 F.3d at 760. Continental does not seek to strike Cornwell's testimony concerning BRC's actual damages, that is, its damages from May 2011 through June 2013, and thus, BRC is still entitled to substantial relief.

In sum, BRC has not shown that its failure to designate Cornwell as an expert was harmless, *see Spearman Indus.*, 138 F. Supp. 2d at 1094 (citing *Bronk*, 54 F.3d at 432), and the sanction of precluding Cornwell from serving as an expert witness for BRC is proportionate to the circumstances presented. *Musser,* 356 F.3d at 758; *cf. Sherrod*, 223 F.3d at 613 (reversing the exclusion of expert testimony because a trial date had not been set and "appeared a long way off," and there was therefore "no harm" or "unfair surprise" in allowing the testimony).

Consequently, Continental's motion to strike Cornwell's opinion testimony and related evidence of future damages will be GRANTED.[6]

## IV. Conclusion

For the foregoing reasons, Continental's Motion to Strike the Opinion Testimony of Michael Cornwell and Related Evidence (Docket # 99) is GRANTED. The portion of Cornwell's trial testimony concerning future damages–that is, the period of July 1, 2013, through December 31, 2014–and the evidence related thereto are STRICKEN.

SO ORDERED.

Enter for the 11th day of February, 2014.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[6] Accordingly, the Court does not need to reach whether Cornwell would actually be qualified under Federal Rule of Civil Procedure 702 to serve as an expert witness and whether his methodology is reliable. *See Daubert*, 509 U.S. 579; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). But as explained earlier, Cornwell was unaware of how BRC's accounting department arrived at its forecasts (Tr. 112-13); admitted BRC's 2014 volume projections were based, at least in part, not on raw data, but rather on inferences drawn from raw data (Tr. 124-25); did not know who selected IHS as an indicator of automotive growth or why (Tr. 114); could not assign any degree of certainty to his projections, admitting that they could be off "by a wide margin" (Tr. 124-25); and referred to his projections at one point as simply a "guess" (Tr. 124). Thus, the reliability of Cornwell's methodology is certainly questionable.