UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| BRC RUBBER & PLASTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:11-cv-190 |
| | ) | |
| CONTINENTAL CARBON COMPANY, | ) | |
| | ) | |
| Defendant, | ) | |

## OPINION AND ORDER

### I. INTRODUCTION

These Findings of Fact and Conclusions of Law follow a two-day bench trial held on September 8-9, 2013, on the amount of damages due Plaintiff BRC Rubber & Plastics, Inc. ("BRC"), as a result of Defendant Continental Carbon Company's ("Continental") breach and repudiation of a Supply Agreement between the parties.[1] (Docket # 93-94.) Under the Agreement, Continental agreed to supply all of BRC's requirements for carbon black from January 1, 2010, to December 31, 2014.[2]

Following the preparation of a transcript,[3] counsel submitted post-trial briefs and responses (Docket # 97, 102-03, 105-07), as well as proposed findings of fact and conclusions

---

[1] Diversity jurisdiction exists under 28 U.S.C. § 1332(a). Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (Docket # 36.)

[2] On June 27, 2012, the Court concluded as a matter of law that the Supply Agreement is a requirements contract and not, as Continental contended, an open offer for orders or an agreement to sell a specific quantity of carbon black. (Docket # 46.) A year later, on June 5, 2013, the Court granted BRC's motion for summary judgment, and concluded that Continental materially breached and repudiated the Agreement and, as a result, BRC was entitled to immediately terminate the Agreement in June 2011 and seek damages. (Docket # 80.)

[3] Reference to the trial transcript is made as "(Tr. __)", trial exhibits as "(Ex. __)", and deposition excerpts as "(__ Dep. __)".

of law (Docket # 98, 101).[4]  After examining the entire record, considering the arguments of counsel, and determining the credibility of the witnesses, the Court makes the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a) based upon a preponderance of the evidence.

## II.  FINDINGS OF FACT[5]

### A.  *Relationship of the Parties*

BRC is a manufacturer of rubber products for use in the automotive industry. (Tr. 149-50.)  Continental is one of only five suppliers in the United States of furnace grade carbon black, a raw material filler used in rubber products. (Tr. 18-19, 150; Nunley Dep. 4.)  Continental had supplied BRC's requirements of carbon black for at least twenty years prior to the parties entering into the Supply Agreement. (Tr. 182; Nunley Dep. 3.)  The amount of carbon black in million pounds that BRC purchased from Continental from 2003 to 2009 was: 2.01 in 2003; 2.13 in 2004; 2.12 in 2005; 1.89 in 2006; 2.30 in 2007; 2.43 in 2008; and 2.02 in 2009. (Ex. 79; Tr. 93.)  These purchases make BRC a "small carbon black user" in the market (Tr. 189), as Continental produces approximately 500 million pounds annually (Tr. 227, 251).

### B.  *The Parties Enter Into the Supply Agreement as of January 1, 2010*

In 2009, Continental's president asked his sales team to negotiate as many long-term

---

[4] At the trial, Continental objected to the testimony of Michael Cornwell, BRC's Vice President of Materials, concerning BRC's "future damages"–that is, its damages from July 1, 2013, through December 31, 2014. (Tr. 007-13.)  The Court overruled Continental's objection, but granted it leave to file a post-trial motion to strike (Tr. 014), which it did on November 1, 2013 (Docket # 99).  The Court in a separate Opinion and Order has now GRANTED Continental's motion to strike, excluding Cornwell's testimony concerning future damages. Continental did not, however, seek to exclude Cornwell's testimony of BRC's "actual damages"–that is, its damages through June 30, 2013.

[5] Any Finding of Fact deemed to be a Conclusion of Law is hereby incorporated into Section III, and any Conclusion of Law in Section III deemed to be a Finding of Fact is hereby incorporated into this Section.

contracts with its customers as possible in order to get long-term volume commitments. (Nunley Dep. 2.) Accordingly, Thomas Nunley, a salesperson for Continental who had handled BRC's account since 1997, negotiated the terms of the Supply Agreement with Mike Cornwell, BRC's Vice President of Materials. (Tr. 21-22; Nunley Dep. 1, 5-7, 11; Exs. 1-4.) Cornwell told Nunley at the time that BRC planned to grow "both organically and through acquisitions," and thus, BRC's volumes would begin to "ramp up from the doldrums [it] had seen in 2008." (Tr. 83.)

BRC was negotiating a similar agreement with Sid Richardson Carbon Company at the time, whereby Sid Richardson would become BRC's exclusive supplier. (Tr. 22-24, Ex. 2.) Cornwell credibly testified that although Sid Richardson's base prices were lower than Continental's, BRC ultimately chose to enter into the Supply Agreement with Continental because it "was a better value overall." (Tr. 27.)

On January 1, 2010, BRC and Continental executed the Supply Agreement obligating Continental to supply, and BRC to purchase, all of BRC's requirements of three grades of carbon black (referred to in the industry as N339, N550, and N762) through December 31, 2014. (Exs. 1, 5; Docket # 46.) The Agreement estimated BRC's annual requirements at 1.8 million pounds and provided a pricing formula of firm, baseline prices per pound for each of the three grades of carbon black with monthly feedstock oil and natural gas adjustments. (Ex. 5; Docket # 46 at 14.) It also included a rebate/penalty program. (Ex. 5.)

The rebate/penalty program provided that as long as BRC purchased between 1.5 and 2.1 million pounds of carbon black a year, the price remained the same. (Ex. 5.) But if it purchased more than 2.1 million pounds a year, it would receive a $.005 rebate per pound, and

3

if it purchased less than 1.5 million, it would pay an additional $.005 per pound penalty. (Ex. 5.) The rebate/penalty increased to $.01 if BRC purchased more than 2.2 million pounds in a year or less than 1.4 million pounds. (Ex. 5.) The rebate/penalty program further provided: "Should the normal annual volume for BRC shift significantly BRC and Continental agree to establish new upper and lower limits." (Ex. 5.)

### C. After Continental Breaches and Repudiates the Supply Agreement, BRC Terminates It on June 2, 2011, and Files This Lawsuit

In 2010, during the first year of the Supply Agreement, Continental projected that it would supply BRC with 1.95 million pounds of carbon black, but it actually supplied 2.612 million pounds. (Tr. 92; Ex. 79.) In 2011, Continental designated 2.734 million pounds to BRC in its annual operating plan (Ex. 79); likewise, in May 2011, BRC estimated its 2011 requirements of carbon black at approximately 2.7 million pounds. (Tr. 94-95, 134; Exs. 9, 13.)

Continental failed to ship all of BRC's requested May and June 2011 orders, and in doing so, breached the terms of the Supply Agreement.[6] (Docket # 80 at 18.) Continental then repudiated the terms of the Supply Agreement by failing to provide adequate assurance of performance to BRC (Docket # 80 at 22), and BRC terminated the Supply Agreement on June 2, 2011, and filed the instant lawsuit (Ex. 17; Docket # 1).[7]

---

[6] To substitute for this missed shipment, BRC purchased 130,300 pounds of carbon black from Sid Richardson, paying $20,287.71 more than it would have paid under the Supply Agreement. (Tr. 42-43, 50; Exs. 11, 51, 72.) That is, it paid $.73 per pound to Sid Richardson, when it would have paid $.58 per pound under the Supply Agreement. (Ex. 72.)

[7] Tom Carroll, Continental's Vice President and Chief Financial Officer, credibly testified, and without dispute, that at the time BRC terminated the Supply Agreement, the price per pound that BRC was paying to Continental was $.0225 above the "Notch" market data price for N550; $.0326 above for N762; and $.0233 below for N339. (Tr. 218-19, 223-24; Ex. 89.) The Notch report is the only industry standard available for carbon black market pricing, tracking data on a monthly or quarterly basis from medium to large customers who buy carbon black in bulk, meaning by rail or truck under annual contracts. (Tr. 228, 252-53, 261; Ex. 70.)

### D. BRC Purchases Carbon Black From
### Cabot for the Remainder of 2011

Cornwell, whose job involved purchasing BRC's raw materials, credibly testified that based upon first-hand knowledge the carbon black market was "tight" when BRC terminated the Supply Agreement (Nunley Dep. 9-11; Tr. 229, 250), and thus, he knew it would be difficult to obtain the product on the open market. (Tr. 44.) The only supplier who would commit to supplying BRC with any substantial quantity of carbon black at the time was Cabot Corporation. (Tr. 46-50.) BRC was able to negotiate an agreement with Cabot to supply carbon black for the remainder of 2011, but Cabot refused to enter into a longer-term contract. (Tr. 46-50.)

BRC purchased 810,000 pounds of carbon black from Cabot in 2011, paying $116,066.56 over what it would have paid to Continental under the Supply Agreement, prior to any rebate. (Exs. 27, 72.) The price per pound that BRC paid to Cabot ranged from $.70 to $.73, while the price under the Supply Agreement prior to any rebate would have been $.56 to $.57.[8] (Ex. 72.) In total, BRC purchased 2,951,350 pounds of carbon black in 2011 from Continental, Sid Richardson, and Cabot. (Exs. 27, 72.) The Court finds Cornwell's largely unchallenged testimony and the related spreadsheet he prepared (Ex. 72) about BRC's purchase of carbon black in 2011 to be credible and supported by the evidence.

### E. BRC Solicits Bids for a Three-Year
### Supply Agreement Beginning in 2012

In mid-2011, BRC solicited bids from all five domestic carbon black suppliers–Evonik, Columbia, Cabot, Continental, and Sid Richardson–to enter into a new supply agreement

---

[8] As stated earlier, Continental does not challenge the price that BRC paid Cabot in 2011 for substitute carbon black.

beginning in 2012. (Tr. 54-57, 97, 134-35.) Charles Chaffee, BRC's Chief Executive Officer and someone with a global view of the industry, credibly testified that BRC had already bid business in reliance on the five-year Supply Agreement, and thus, he wanted reasonable assurance that BRC would have the carbon black necessary to meet those outstanding customer contracts. (Tr. 189, 200.) Also, BRC told Cabot that BRC's lawyers recommended a three-year term for ease of computing damages for this lawsuit.[9] (Ex. 28; Tr. 106-08.)

Evonik initially made an offer to BRC, but withdrew when it was informed its pricing was higher than the other suppliers. (Tr. 57.) Columbia simply informed BRC that it could not supply any carbon black. (Tr. 134-35.) Cabot offered to enter into a three-year agreement, but only if it incorporated adjustable pricing on a quarterly basis. (Tr. 54-56.) BRC rejected Cabot's offer because it lacked pricing stability. (Tr. 54-56.)

BRC proposed contract terms to Continental that included a three-year term through December 2014, the same base pricing as in the terminated Supply Agreement, and a "supply cap" of 2.7 million pounds per year. (Ex. 87; Tr. 97.) BRC also asked Continental to reimburse it for $10,000 in legal fees; $20,287 for the shipment it had purchased from Sid Richardson in May or June 2011; and to pay Cabot up to $90,000 as a "break up fee." (Ex. 87.)

Continental counter-offered to BRC with a sixteen-month term ending December 2012, base pricing increased by $.03 for N550 and $.04 for N762, an annual maximum volume of 2.9 million pounds, and BRC's release of its right to litigate Continental's breach of the Supply

---

[9] In a tight market, it is generally in a buyer's best interest to seek a shorter-term agreement to avoid locking in high market prices for a long term. (Tr. 250.)

6

Agreement.[10] (Ex. 88; Tr. 58, 135-38, 146, 246, 249-50, 268.) Daryl Huntley, Continental's new sales manager at the time, told Cornwell that he had a significant amount of flexibility in what he could offer in negotiating the agreement, and that Continental's proposal would save BRC well over a million dollars in the next three years compared to the other suppliers BRC was considering.[11] (Tr. 246-47.) But Cornwell declared that BRC was firm in its proposal. (Tr. 102-03, 246-47, 278-79.) By this time, both Cornwell and Chaffee understandably doubted Continental's trustworthiness and reliability, and feared that it would simply raise its prices again–fears exacerbated by the termination of Nunley, BRC's long-standing and sole contact at Continental. (Tr. 136-38, 148, 183-87, 198, 205-06.)

After BRC's negotiations failed with Evonik, Columbia, Cabot, and Continental, BRC's only remaining alternative supplier was Sid Richardson, and it ultimately entered into a three-year requirements contract with BRC. (Tr. 54-56, 60-61; Ex. 34.)

### F. *In September 2011, BRC and Sid Richardson Executed a Pricing and Supply Agreement for 2012 Through 2014*

In September 2011, BRC and Sid Richardson executed a Pricing and Supply Agreement with a term of January 1, 2012, to December 31, 2014 (the "Sid Richardson Agreement"), in which Sid Richardson would supply all of BRC's requirements of carbon black "to a maximum of 3.0 million pounds per calendar year." (Ex. 34; Tr. 61, 96-97, 134-35.) The Sid Richardson Agreement, like the Supply Agreement, provided for fixed base prices of carbon black, as adjusted on a monthly basis by feedstock oil and natural gas factors.

---

[10] During the summer of 2011, while attempting to settle this dispute, Continental sold another six railcars of carbon black to BRC. (Tr. 59.) But after September 2, 2011, Continental refused to sell any more carbon black to BRC unless BRC entered into a new contract with Continental that included a price increase. (Tr. 59.)

[11] Continental had terminated Nunley's employment in May 2011. (Nunley Dep. 1; Tr. 257.)

7

(Exs. 5, 34.) BRC's annual requirements of carbon black were forecasted at 2.65 million pounds in the Agreement, but the Agreement provided that "[q]uantities may exceed the maximum amount if mutually agreed upon." (Ex. 34; Tr. 96-97.)

*G. BRC's Request for "Actual Damages" Through June 30, 2013*[12]

The Court finds Cornwell's testimony and the spreadsheet he prepared (Ex. 72) about BRC's damages in 2012 and from January through June of 2013 to be both credible and logically compelling. In 2012, BRC purchased 3,036,050 pounds of carbon black under the Sid Richardson Agreement, paying $478,650.25 more than it would have under the Supply Agreement, prior to any rebate. (Tr. 62-65; Exs. 40, 55-63, 72.) The price per pound that BRC paid to Sid Richardson in 2012 ranged from $.68 to $.82, while the price under the Supply Agreement prior to any rebate was $.54 to $.65. (Ex. 72.)

For January through June of 2013, BRC purchased 2,145,450 pounds of carbon black under the Sid Richardson Agreement, paying $337,949.59 more than it would have under the Supply Agreement. (Ex. 72.) The price per pound that BRC paid to Sid Richardson during this period ranged from $.69 to $.78, while the price under the Supply Agreement prior to any rebate was $.55 to $.61. (Ex. 72.)

Carroll, who compared the data, noted that the prices BRC paid to alternative suppliers from May 2011 through June 2013 averaged above the Notch marketing data by $.0534 per pound for N339, $.0817 for N550, and $.0869 for N762. (Exs. 18, 40, 41; Tr. 220-21.)

---

[12] Continental does not object to BRC's method of calculating its actual damages through June 30, 2013, "or the numbers that are behind it." (Tr. 65.) Rather, as will be discussed *infra*, Continental simply contends that the volume BRC ordered was unreasonably disproportionate to the stated estimate in the Supply Agreement, and that the price BRC paid under the Sid Richardson Agreement was unreasonable. (Tr. 65.)

8

## III. CONCLUSIONS OF LAW[13]

*A. BRC's Orders in Excess of 2.90 Million Pounds Annually Are "Unreasonably Disproportionate" to the Stated Estimate in the Supply Agreement, and Thus, Are Not a Basis for Damages*

BRC seeks to recover as damages the cost of the carbon black it purchased from May 2011 through June 2013 from Cabot and Sid Richardson, less the price it would have paid to Continental for such quantities under the Supply Agreement.[14] As stated earlier, in total, BRC ordered 2,951,350 pounds of carbon black in 2011; 3,036,050 in 2012; and 2,145,450 in 2013.

Continental contends, however, that under Indiana Code § 26-1-2-306(1) BRC cannot recover damages for orders that are "unreasonably disproportionate" to the stated estimate of 1.8 million pounds articulated in the Supply Agreement. Continental emphasizes that it never supplied, or forecasted to supply, BRC with an annual quantity of carbon black greater than the 2.734 million pounds it forecasted to supply in 2011. As Continental sees it, any amount in excess of 2.734 million pounds is "unreasonably disproportionate" to the stated estimate, and

---

[13] "When a federal court hears a case in diversity, it does not necessarily apply the substantive law of the forum state; rather, it applies the choice-of-law rules of the forum state to determine which state's substantive law applies." *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). The choice of law rule for Indiana "calls for applying the law of the forum with the most intimate contacts to the facts." *Emp'rs Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1024 (Ind. Ct. App. 1999). Here, as explained in the Court's June 27, 2012, and June 5, 2013, Orders (Docket # 46 at 9 n.5; Docket # 80 at 12 n.5), the Supply Agreement involved the sale of goods from Continental, which has its principal place of business in Texas, to BRC, which has its principal place of business in Indiana; and the parties do not dispute that both Texas and Indiana have adopted the Uniform Commercial Code ("UCC") and that no substantive differences exist between the two states' enactments of the provisions relevant to this case. "If the purposes and policies of two potential rules are the same, the forum should apply the forum law." *Hartford Acc. & Indem. Co. v. Dana Corp.*, 690 N.E.2d 285, 291 (Ind. Ct. App. 1997); *see Int'l Adm'rs v. Life Ins. Co.*, 753 F.2d 1373, 1376 n.4 (7th Cir. 1985). Accordingly, the Court will apply the UCC as adopted in Indiana and look to interpretations of the UCC from Indiana and other jurisdictions.

[14] As explained earlier, BRC also sought to recover "future damages" for the period of July 1, 2013, through December 31, 2014. But since BRC's future damages theory depended on Cornwell's testimony, which has been stricken, BRC has not proven its entitlement to future damages. *See, e.g., Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 866 (7th Cir. 2009) (articulating that plaintiff could not prove its entitlement to lost profit damages where it rested upon inadmissible lay opinion testimony).

thus, is not a basis for damages.

As this Court explained in its June 5, 2013, Order (Docket # 80), in a requirements contract, "[t]he seller assumes the risk of all good faith variations in the buyer's requirements . . . ."[15] *Empire Gas Corp. v. Am. Bakeries Co.*, 840 F.2d 1333, 1337-38 (7th Cir. 1988); *accord Seelyville*, 698 N.E.2d at 1260. But as Continental emphasizes, § 2-306 *also* states that a quantity ordered under a requirements contract must not be "unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior . . . requirements . . . ." Ind. Code § 26-1-2-306(1).

Comment 3 to § 2-306 directly addresses stated estimates:

If an estimate of . . . requirements is included in the agreement, no quantity unreasonably disproportionate to it may be . . . demanded. Any minimum or maximum set by the agreement shows a clear limit on the intended elasticity. In similar fashion, the agreed estimate is to be regarded as a center around which the parties intend the variation to occur.

Ind. Code § 26-1-2-306(1) cmt. 3; *see N. Ind. Pub. Serv. Co. v. Colo. Westmoreland, Inc.*, 667 F. Supp. 613, 636 (N.D. Ind. 1987) (explaining that § 2-306 and comment 3 "constrains the range of variance when the parties do not do so themselves"). Some courts consider a variety of factors when determining whether a quantity is unreasonably disproportionate to a stated estimate, including the amount of the increase, whether the seller had a reasonable basis upon which to forecast the increase, the amount by which the market price exceeds the contract price, whether the increase in market price was fortuitous, and the reason for the increase in

---

[15] There is no evidence of bad faith on the part of BRC; that is, that its purchases of carbon black were for stockpiling or resale in the open market. (Tr. 86-86); *see generally Ind.-Am. Water Co. v. Town of Seelyville*, 698 N.E.2d 1255, 1260 (Ind. Ct. App. 1998) ("The most common problem arising out of a requirements contract is the situation where the price of the commodity is advantageous to the buyer who then demands a quantity unseasonably in excess of his needs in order to resell the excess at a profit, placing himself in competition with the seller.").

requirements. *See Orange & Rockland Util. v. Hess Corp.*, 397 N.Y.S.2d 814, 819 (N.Y. App. Div. 1977) ("It would be unwise to attempt to define the phrase 'unreasonably disproportionate' in terms of rigid quantities."); *see also McLouth Steel Corp. v. Jewell Coal & Coke Co.*, 570 F.2d 594, 606 (6th Cir. 1978) (identifying the "critical feature" of the dispute as whether the conduct of the parties in the prior years interpreted the contract as calling for additional tonnage up to 26,643 tons where the stated estimate was 18,000 tons).

As the Court observed in its June 5, 2013, Order, although the stated estimate in the Supply Agreement was 1.8 million pounds, the rebate program, by design, created an incentive for BRC to purchase at least 2.2 million pounds annually.[16] (Docket # 80 at 17.) And, in fact, BRC's course of performance under the Supply Agreement reflects exactly that, as it purchased 2.6 million pounds in 2010. Further, Continental's 2011 operational plan designated 2.734 million pounds to BRC. Therefore, although the quantity of 2.734 million pounds significantly exceeds the 1.8 stated estimate in the Supply Agreement, the parties' course of performance under the Supply Agreement makes the annual quantity of 2.734 million pounds not "unreasonably disproportionate" under § 2-306(1). *See Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 583 (Tex. 1996) ("[I]t is not enough that a demand for requirements be disproportionate to the stated estimate; it must be unreasonably so in view of the expectation of the parties." (emphasis omitted) (quoting *Orange*, 397 N.Y.S.2d at 819)).

Having said that, the Court must determine what quantity above 2.734 million pounds,

---

[16] BRC rehashes its prior argument that the 1.8 million pounds in the Supply Agreement was included for purposes of the rebate, *not* as a stated estimate of its requirements. (Pl.'s Post-Trial Br. 8-9.) But the Court has already held in its June 27, 2012, Order that "the only reasonable meaning is that the 1.8 million pounds was an estimate of BRC's annual requirements." (Docket # 46 at 14.) Therefore, this issue has already been determined as a matter of law and will not be revisited here.

if any, *is* "unreasonably disproportionate" under § 2-306(1). *Compare Westmoreland*, 667 F. Supp. at 636 (stating in a contractual dispute governed by Indiana law that there was no reason to conclude that a 45% variance from a stated estimate was "too much"), *with A & A Mech. v. Thermal Equip. Sales*, 998 S.W.2d 505, 512 (Ky. Ct. App. 1999) (determining that a 29% increase over the stated estimate was unreasonably disproportionate), *and Shea-Kaiser-Lockheed-Healy v. Dep't of Water & Power*, 140 Cal. Rptr. 884, 890 (Cal. Ct. App. 1977) (finding a 20% increase was unreasonably disproportionate), *and Orange*, 397 N.Y.S.2d at 821-22 (concluding that an order for more than twice the stated estimate in a requirements contract was unreasonably disproportionate).

BRC, of course, asserts that all of its annual quantities–2.95 million pounds in 2011, 3.04 in 2012, 2.15 in 2013–are reasonable since Continental had always supplied its requirements, suggesting, in essence, that BRC was entitled to an unlimited quantity under the stated pricing terms of the Supply Agreement. But the parties agreed to establish new upper and lower limits for the rebate/penalty "should the normal annual volume for BRC shift significantly." (Ex. 5.) Thus, although BRC had mentioned to Continental its plan to grow both organically and by acquisition, the rebate structure reflects that the parties placed some limits on the elasticity of the stated estimate under the pricing formula in the Supply Agreement.

Moreover, when BRC sought a new three-year supply agreement in 2012, it proposed to Continental a "supply cap" of 2.7 million pounds annually, and Continental counter-offered with an annual maximum of 2.9 million pounds. (Exs. 87-88.) This provides additional insight into the reasonable expectations of the parties with respect to the quantity of BRC's

12

requirements under the Supply Agreement. And in the Sid Richardson Agreement, BRC agreed to an annual maximum of 3.0 million pounds, which could only be exceeded if mutually agreed upon by the parties. *See Orange*, 397 N.Y.S.2d at 821-22 (holding that an order for more than double the contract estimate was unreasonably disproportionate as a matter of law, but cautioning that it was not creating a rigid yardstick and emphasizing that the analysis should be flexible, based on the reasonable expectations of the parties).

Furthermore, when the parties entered into the Supply Agreement in January 2010, the parties' course of dealing reflected seven years of annual quantities ranging from 1.89 to 2.43 million pounds. BRC's rather sudden expansion in demand occurred in 2010 *after* the Supply Agreement was executed, with its requirements jumping in a single year from a forecasted 1.9 million pounds to an actual demand of 2.6. *See* Ind. Code § 26-1-2-306 cmt. 2 ("[A] sudden expansion of the plant by which requirements are to be measured would not be included within the scope of the contract as made but normal expansion undertaken in good faith would be within the scope . . . . One of the factors in an expansion situation would be whether the market price had risen greatly in a case in which the requirements contract contained a fixed price."). Cornwell admitted that although BRC had expected in 2009 to grow in its business and conveyed that expectation to Continental, it "certainly didn't know at what rate." (Tr. 133; *see also* Tr. 33-34.)

Accordingly, the Court concludes that an annual quantity in excess of 2.90 million pounds (Continental's proposed annual "supply cap" for 2012 through 2014)–that is, an overage of 62% from the stated estimate of 1.8 million pounds–is, as a matter law, particularly in the tight market conditions then prevalent, "unreasonably disproportionate" to the stated

estimate of 1.8 million pounds in the Supply Agreement. *See, e.g.*, *State, Dep't of Fisheries v. J-Z Sales Corp.*, 610 P.2d 390, 394 (Wash. Ct. App. 1980) (finding that a demand for nearly two-thirds over the estimate for salmon carcasses, together with a demand for three times the estimate of salmon eggs, particularly in the falling market conditions then prevalent, was "unreasonably disproportionate"). As such, BRC is not entitled to damages for purchases of carbon black in excess of 2.90 million pounds in any given year under the Supply Agreement.

### B. BRC Is Entitled to Actual Damages Based on the "Cover" It Purchased Through June 30, 2013

BRC seeks damages for the "cover" it obtained because of Continental's breach and repudiation of the Supply Agreement. "'Cover' is the UCC term for purchasing substitute goods when the seller fails to deliver acceptable goods." *Rexnord Indus., LLC v. Bigge Power Constructors*, 947 F. Supp. 2d. 951, 955 n.1 (E.D. Wis. 2013) (citation omitted). After such a breach, "the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." Ind. Code § 26-1-2-712(1); *see Rash Ranco Corp. v. B.L.B., Inc.*, 762 F. Supp. 1339, 1340-41 (N.D. Ill. 1991). The buyer may then recover from the seller as damages, "the difference between the cost of cover and the contract price together with any incidental or consequential damages . . . , but less expenses saved in consequence of the seller's breach." Ind. Code § 26-1-2-712(2).

"The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." Ind. Code § 26-1-2-712 cmt. 2; *see Fortney v. Tennekoon*, No. 95-4685, 1998 WL 159047, at *12 (E.D. Pa. Mar. 13, 1998) ("That

14

in hindsight this choice was not the most economical does not make the plaintiff's choice, at the time it was made, unreasonable."). "The critical time to examine is the time of the breach." *Rockland Indus., Inc. v. E+E (US), Inc.*, 991 F. Supp. 468, 474 (D. Md. 1998). "The burden of proof rests with the seller to establish that the buyer acted unreasonably in failing to prevent his own loss." *Simeone v. First Bank Nat'l Ass'n*, 73 F.3d 184, 189 (8th Cir. 1996).

Here, Continental asserts that BRC acted unreasonably when it obtained cover under the Sid Richardson Agreement for 2012 through 2014.[17] Continental first contends that BRC's refusal to consider anything less than a three-year term was not commercially reasonable in light of the tight carbon black market and high prices at the time. As Continental sees it, BRC was primarily motivated by its lawyers' recommendation of a three-year term for purposes of calculating its damages in this lawsuit.

Second, Continental argues that the Sid Richardson Agreement was commercially unreasonable because it provided carbon black pricing at least $.08 above the Notch market, and $.11 to $.15 above the pricing that Continental was offering at the time. According to Continental, BRC's refusal of prices just $.03 to $.04 higher than those in the Supply Agreement and its failure to engage in negotiations with Continental was not in good faith, and instead may have been to "punish Continental" or "maximize its damages in this lawsuit." (Def.'s Proposed Findings of Fact and Conclusions of Law 12); *see* 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 7:13, p. 553 (6th ed.) (explaining that the UCC "has established both a subjective standard for measuring good faith (honesty in fact) and an objective one (observance of commercial standards of fair dealing in the trade)").

---

[17] Continental does not challenge the cover BRC obtained from Cabot and Sid Richardson in 2011.

But Continental has a heavy burden to carry, as BRC's cover from Sid Richardson "is presumed to be proper." *Dakota Gasification Co. v. Didion*, No. 1:10-cv-015, 2011 WL 2848524, at *6 (D.N.D. July 15, 2011); *accord Red River Commodities, Inc. v. Eidsness*, 459 N.W.2d 811, 817 (N.D. 1990). Although Continental argues that BRC acted unreasonably by not purchasing the carbon black from Continental at just $.04 higher than the prices in the Supply Agreement, "the Court will not force a buyer to continue performing its contract with a seller who was unable to meet its contractual obligations." *Dakota Gasification*, 2011 WL 2848524, at *6*; see Eberspaecher N. Am., Inc. v. Nelson Global Prods., Inc.*, No. 12-11045, 2012 WL 1247174, at *6 (E.D. Mich. Apr. 13, 2012) (reasoning that "cover" must mean that "a buyer is obligated to search for an alternative source of supply other than the breaching seller," otherwise "the obligation to cover would reward a breaching seller's efforts at extorting a price increase by mandating that the buyer pay that price"). "There is an understandable reluctance among courts to require parties, under the duty to mitigate, to deal further with the breaching party, especially if the breaching party's alternative terms differ substantially from the terms of the original contract." *Dakota Gasification*, 2011 WL 2848524, at *6.

At bottom, the remedy of "cover" should put BRC "in as good a position as if the other party had fully performed." Ind. Code § 26-1-1-106(1). BRC's preference for a three-year term provides BRC with supply and pricing stability through December 31, 2014–the date the five-year Supply Agreement would have expired–and thus, is consistent with the remedy's purpose. Both Cornwell and Chaffee credibly expressed that although Continental was initially offering lower pricing, BRC feared that Continental would seek another price increase

16

at the end of the shorter term it was proposing, if not before. (Tr. 137-38, 205 ("At the end of the one-year duration to the 2012, they might have wanted 10 cents, 20 cents, 50 cents, a dollar.").) Cornwell and Chaffee further testified that by this time, and for good reason, BRC had lost trust in Continental's reliability due to its demand for a price increase in 2009, and because it had fired Nunley, BRC's long-time, and trusted, contact at Continental. (Tr. 136-37, 183-87, 198, 205.) Chaffee persuasively explained that after all that had transpired, he wanted reasonable assurance that BRC would receive the necessary carbon black to meet its customers' needs and at the price negotiated, and (given the already limited universe of suppliers) the only way he could get that assurance was through Sid Richardson. (*See* Tr. 189 ("I knew I signed a contract [with Sid Richardson] for more money. I knew . . . that's the only thing I could do to assure myself of getting carbon black.").)

Furthermore, Continental conveniently ignores that in order for BRC to receive Continental's lower pricing, it would have had to not only reduce from a three-year to a sixteen-month term, but also release its right to litigate the damages caused by Continental's breach of the Supply Agreement. As such, a comparison of purely pennies per pound does not fairly represent Continental's counter-offer.

And that BRC's cover ultimately was not the least expensive is not fatal to its claim for damages under § 2-712. "Presumably, the covering buyer acts in good faith unless it knowingly *and without reason* avoids a less expensive market in favor of a more expensive one." White & Summers, *supra*, at 553 (emphasis added). "If the cover remedy is to work to the benefit of an aggrieved buyer, the court should give [the] buyer wide latitude to reject the least expensive cover when there is any reasonable basis for choosing a more expensive cover

17

(for instance, the goods are of better quality or the seller more reliable)." *Id*.

When considering a new supply agreement, BRC invited bids and received quotes or responses from the only five domestic suppliers in the market. Ultimately, both Cornwell and Chaffee credibly testified that although Sid Richardson's offer was not the least expensive, it was, overall, the most attractive package to BRC based on a variety of factors, including contract term, price stability, and reliability. (Tr. 60-61, 103-04, 136, 148, 200 ("I had assurances I would have carbon black and I made the best business decision I could make. . . . [W]e went out and bid business based on this five-year contract. So I quoted customers based on a contract that I had for supply, and . . . I couldn't change those contracts.").) Thus, the evidence fails to show that Continental was "without good reason" when choosing to contract with Sid Richardson rather than Continental.[18] White & Summers, *supra*, at 553.

In sum, Continental has not established that BRC's decision to enter into the Sid Richardson Agreement was commercially unreasonable or made in bad faith. As a result, the cover that BRC obtained under the Sid Richardson Agreement is a proper basis for the computation of BRC's actual damages.

### IV. CALCULATION OF DAMAGES[19]

For 2011, the difference between the cost of BRC's cover of 940,300 pounds of carbon black and the price under the Supply Agreement was $136,354.27. BRC's December 27, 2011, cover purchase, however, caused it to exceed the 2.90 million pounds annual maximum

---

[18] In fact, that Continental now faults BRC for failing to choose the least expensive alternative for cover is somewhat ironic. In 2009, BRC chose to enter into the Supply Agreement with Continental because it "was a better value overall," even though it had a lower-priced proposal from Sid Richardson at the time. (Tr. 26-27.)

[19] The difference between BRC's cost of cover and the price under the Supply Agreement is taken from Ex. 72.

by 51,350 pounds, and thus $7,255.75 (51,350 x $.1413, the applicable cost differential) must be deducted, reducing BRC's cover damages to $129,098.52. Since BRC purchased 2.90 million pounds in 2011, it would have been entitled to a $29,000 rebate (2,900,000 x $.01) under the Supply Agreement, so that amount must be added ($129,098.52 + $29,000). This brings BRC's total damages for 2011 to $158,098.52.

For 2012, the difference between the cost of BRC's cover of 3,036,050 pounds and the price under the Supply Agreement was $478,650.25. BRC's November 30, 2012, and December 12, 2012, cover purchases, however, caused it to exceed the 2.90 million pounds annual maximum by 136,050 pounds, and thus $21,782.50 ((117,975 x $.1638) + (18,075 x $.1360)) must be deducted, reducing BRC's cover damages to $456,867.75.[20] Since BRC purchased 2.90 million pounds in 2012, it would have been entitled to a $29,000 rebate (2,900,000 x $.01) under the Supply Agreement, so that amount must be added ($456,867.75 + $29,000). This brings BRC's total damages for 2012 to $485,867.75.

For 2013, the difference between the cost of BRC's cover of 2,145,450 pounds and the price under the Supply Agreement was $337,949.59. Since BRC purchased 2,145,450 pounds in 2013, it would have been entitled to a $727.25 rebate (145,450 x $.005) under the Supply Agreement, so that amount must be added ($337,949.59 + $727.25). This brings BRC's total damages for 2013 to $338,676.84.

Therefore, the total damages that BRC will be awarded is $982,643.11 ($158,098.52 + 485,867.75 + 338,676.84).

---

[20] Because BRC's November 30, 2012, purchase included two different grades of carbon black that are priced a little differently, the balance of the overage was split evenly between the two grades.

## V. CONCLUSION

BRC is entitled to damages from Continental in the amount of $982,643.11. The Clerk is DIRECTED to enter a judgment in favor of BRC and against Continental in the amount of $982,643.11.[21]

SO ORDERED.

Enter for the 11th day of February, 2014.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge

---

[21] The Court wishes to once again compliment counsel on the capable and professional manner in which this case was litigated.