UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| **BRC RUBBER & PLASTICS, INC.,** *an Indiana Corporation*, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) )   No. 1:11-cv-00190-SLC ) |
| **CONTINENTAL CARBON COMPANY,** *a Delaware Corporation*, | ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

This is an action for breach of contract, in which Plaintiff BRC Rubber & Plastics, Inc. ("BRC"), alleges that Defendant Continental Carbon Company ("Continental") breached an agreement between the parties regarding the sale of carbon black.[1] (DE 6). In the parties' cross motions for summary judgment (DE 156; DE 167), Continental claims that the agreement between the parties was not a contract at all, but rather was an agreed pricing formula between the parties regarding Continental's sales of carbon black to BRC. In the alternative, Continental argues that it did not anticipatorily breach, even if the agreement was a contract between the parties. BRC, on the other hand, claims that the agreement between the parties was a contract for the sale of at least 1.8 million pounds of carbon black annually, and BRC argues that Continental anticipatorily breached the contract. The cross motions have been fully briefed (DE 156-1; DE 168; DE 169; DE 170; DE 171; DE 172), and this matter is now ripe for ruling.

For the reasons explained herein, Continental's motion for summary judgment will be

---

[1] Diversity jurisdiction exists under 28 U.S.C. § 1332(a). Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (DE 36; DE 147; DE 152; DE 155).

GRANTED and BRC's motion for summary judgment will be DENIED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Continental manufactures furnace-grade carbon black, a material used in tires and other rubber and plastic goods.  (DE 156-2 ¶ 2).  BRC uses carbon black to manufacture rubber products for the automotive industry.  (DE 127 at 3; DE 167-1 ¶ 5).  BRC was a longtime customer of Continental since 1997.  (DE 169-1 ¶¶ 4, 17).  On January 1, 2010, BRC and Continental entered into a "Supply Agreement," which "set[] forth the terms and conditions for sale of furnace grade carbon black" for a five-year period beginning January 1, 2010, and ending December 31, 2014.  (DE 156-2 at 5-6).[2]

Under the Supply Agreement, payment terms were set for 45 days from the date of delivery.  (DE 156-2 at 5).  The Supply Agreement contained a "Meet or Release" provision, which gave Continental the right to meet the terms of any better written offer to BRC from another supplier of carbon black, or alternatively to release BRC from any further obligations under the Supply Agreement.  (DE 156-2 at 5).  The Supply Agreement also included a pricing table for carbon black purchased by BRC from Continental, stating that N339-grade carbon black had a baseline price of $0.4600 per pound, N550-grade carbon black had a baseline price of $0.4300 per pound, and N762-grade carbon black had a baseline price of $0.4300 per pound.  (DE 156-2 at 5).  The Supply Agreement makes it clear that these prices "are to remain firm throughout the term of this agreement."  (DE 156-2 at 5).  The Supply Agreement includes an "Additional Volume Rebate/Penalty," which set out the additional rebate or penalty to be applied

---

[2]  A clearer and more legible copy of the Supply Agreement is found in the record as an exhibit to BRC's amended complaint.  (DE 6-1).

according to this schedule:

| Lower Limit | Upper Limit | Amount Applied |
|---|---|---|
| 1,500,000 | 2,100,000 | $.005/lb |
| 1,400,000 | 2,200,000 | An additional $.005/lb for a total of $.01/lb |

(DE 156-2 at 6). The Supply Agreement states that the "[r]ebates or penalty are applied to all pounds purchased during a calendar year. Rebates will be credit[ed] or invoice will be issued to make the appropriate adjustment." (DE 156-2 at 6). Additionally, the Supply Agreement includes a provision that the parties "agree to establish new upper and lower limits" "[s]hould the normal annual volume for BRC shift significantly." (DE 156-2 at 6).

From January 1, 2010, through mid-May 2011, the parties engaged in transactions for carbon black pursuant to the Supply Agreement, without any dispute. (DE 156-2 at 1 ¶ 4). When BRC needed carbon black from Continental, BRC sent purchase orders to Continental by fax or email, which specified the type, quantity, and shipment date requested. (DE 156-3 ¶ 2). Continental's customer service representative would confirm that Continental was able to supply the requested type and quantity of carbon black on the date requested, before confirming with BRC by phone, fax, or email. (DE 156-3 ¶ 2). Continental's customer service representative would then enter the order into Continental's system so that the applicable plant could fill BRC's order. (DE 156-3 ¶ 2). In 2010, BRC purchased 2.6 million pounds of carbon black from Continental, and thus BRC received a rebate under the Supply Agreement. (DE 167-1 ¶ 19; DE 167-10 ¶¶ 11-12).

In March 2011, the demand for carbon black began to exceed Continental's ability to produce it; as a result, Continental had difficulty supplying its customers. (DE 156-2 ¶ 4).

3

Continental's agent, Thomas Nunley, who had drafted the Supply Agreement, approached BRC to ask if BRC would agree to accelerated payment terms and increased prices. (DE 169-1 ¶¶ 29-31). BRC refused to agree to increased prices, but BRC did agree to a 30-day payment term instead of the 45 days provided in the Supply Agreement. (DE 169-1 ¶¶ 30, 32). BRC informed Nunley that BRC expected Continental to "hold up its end of the bargain" under the Supply Agreement, which required that prices would "remain firm." (DE 169-8 ¶ 15).

By May 2011, Continental could no longer keep up with the demand for carbon black, and its lead time to supply its customers had lengthened, causing a large percentage of shipments to customers to be delayed. (DE 169-4 ¶ 4). Continental failed to make one of its scheduled shipments of carbon black to BRC on May 11, 2011. (DE 169-8 ¶ 16). On May 16, 2011, BRC's counsel sent a letter to Continental demanding adequate assurances of Continental's continued performance under the Supply Agreement. (DE 169-4 ¶ 4; DE 169-4 at 7; DE 169-8 ¶ 19; DE 169-15). After BRC's counsel spoke with Continental's counsel by telephone, Continental's counsel "confirmed" on May 20, 2011, that Continental would "continue producing and shipping timely at the contract prices, and will not cut off supply to BRC." (DE 169-4 at 10; DE 169-15).

Later that same day, on May 20, 2011, BRC reached out to Continental to inquire regarding "when the rail car of N550 scheduled to ship 5/11/2011 and the rail car of N550 scheduled to ship 5/18/2011 will be shipping to BRC," and further requested confirmation that "the rail car of N762 [BRC had] requested shipment of 6/1/2011 remain[ed] on schedule." (DE 169-4 at 11). Continental responded that "we will ship one car next week and do the best we can re[garding] future orders based on our intent to supply 1.8 million lbs." (DE 169-4 at 11).

Even later that same day, however, Continental stated by email to BRC that it would ship carbon black to BRC at higher prices. (DE 169-8 ¶ 20; DE 169-14). BRC responded to Continental with an email refusing the higher prices because they were not in accordance with the Supply Agreement. (DE 169-8 ¶ 21; DE 169-14). In response, Continental's Vice President of Marketing wrote that he "suggest[ed BRC] call another supplier." (DE 169-8 ¶ 22; DE 169-14).

On May 23, 2011, BRC asked Continental when the next three rail cars of carbon black would ship. (DE 169-4 ¶ 6; DE 169-4 at 12-13). Continental responded by stating that it could only ship "one car at the moment," but it would do the best it could, as it would "not short other customers." (DE 169-4 at 12). On May 24, 2011, when BRC further pressed the issue of when Continental would be shipping carbon black to BRC, Continental responded that it had already shipped 1.2 million pounds of carbon black to BRC, year-to-date; that the "contract states that it is the intent of Continental carbon Company to ship 1.8 M lbs in approximately equal monthly quantities"; that equal quantities would amount to 150,000 pounds of carbon black per month, but BRC had purchased 300,000 pounds per month year-to-date; that Continental would ship a car of N550 to BRC on May 25, 2011; and that Continental would "continue to do [its] best to supply BRC" and would "advise when another car of N550 will be shipped." (DE 169-4 at 12). Continental sent a rail shipment of carbon black to BRC on May 25, 2011. (DE 169-4 ¶ 8).

On June 2, 2011, BRC sent a letter to Continental which stated that Continental had "repeatedly, and continually, made it clear to BRC that [Continental would] not supply BRC with BRC's actual quantity requirements of the three listed grades of carbon black in the Agreement," but instead "indicated it [would] only supply BRC with 1.8 million pounds this year," which was

5

not the agreement.  (DE 169-4 at 14).  BRC stated that it had purchased 2.6 million pounds of carbon black from Continental during the previous year, and that it would need at least that much during 2011.  (DE 169-4 at 14).  BRC wrote that although it had "repeatedly sought reasonable assurances from [Continental] that it [would] meet its continuing obligations under the Agreement," Continental had "failed to respond appropriately," and Continental's breach of the Supply Agreement left BRC with "no choice but to terminate."  (DE 169-4 at 14).  BRC informed Continental that the termination was "effective immediately" and that BRC had filed a lawsuit against Continental in this Court.[3]  (DE 169-4 at 14).

As of June 2, 2011, Continental had sold and delivered 1.642 million pounds of carbon black to BRC in the 2011 calendar year.  (DE 169-4 ¶ 10; DE 169-4 at 15).  Thereafter, Continental sold and delivered six additional rail cars of carbon black to BRC at the prices provided in the Supply Agreement, bringing the total amount of carbon black sold to BRC in 2011 to 1.971 million pounds.  (DE 169-4 ¶ 10).

On June 27, 2012, Magistrate Judge Cosbey issued an Opinion and Order regarding the parties' first set of cross motions for summary judgment.  (DE 46).  In his Order, Judge Cosbey concluded that the Supply Agreement was a requirements contract and not, as Continental contended, an open offer for orders or an agreement to sell a specific quantity of carbon black.

---

[3] BRC filed its complaint in this Court against Continental on June 2, 2011.  (DE 1). BRC amended its complaint on June 6, 2011.  (DE 6).  BRC's amended complaint makes three claims:  (1) that the Supply Agreement is a requirements contract, which Continental breached by refusing to supply BRC with its requirements of carbon black at the prices set out in the Supply Agreement; (2) that BRC is entitled to a declaratory judgment stating that Continental must supply BRC with its requirements of carbon black under the Supply Agreement; and (3) that Continental's anticipatory repudiation of the requirements contract entitles BRC to recover the cost of cover, together with any incidental or consequential damages caused by Continental's repudiation.  (DE 6).

(DE 46). Judge Cosbey accordingly denied Continental's first motion for summary judgment while granting BRC's motion for summary judgment to the extent it asked the Court to find that the Supply Agreement was a requirements contract. (DE 46 at 19-22). On June 5, 2013, Judge Cosbey issued another Opinion and Order, which granted BRC's second motion for summary judgment after finding that BRC had placed orders for carbon black in good faith, that BRC's orders in 2011 were not unreasonably disproportionate to the stated estimate in the requirements contract, that Continental repudiated the Supply Agreement by refusing to provide adequate assurance and refusing to ship more than 1.8 million pounds of carbon black annually to BRC, and that Continental had failed to prove its affirmative defense of commercial impracticability. (DE 80). The only issue remaining in the case at that point was damages, and Judge Cosbey held a bench trial to determine damages on September 12-13, 2013. (DE 93; DE 94). After post-trial briefing concluded, Judge Cosbey issued an Opinion and Order on February 11, 2014, finding that BRC was entitled to $982,643.11 in damages from Continental. (DE 110).

Continental then appealed the case to the Seventh Circuit Court of Appeals. (DE 112). On November 5, 2015, the Seventh Circuit issued a decision finding that the Supply Agreement was not a requirements contract because it did not require BRC to buy any, much less all, of its carbon black from Continental. *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 804 F.3d 1229 (2015). As a result, the Seventh Circuit vacated the judgment in this case and remanded the case back to this Court. *Id.*

## II. LEGAL STANDARD

On a motion for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

7

to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). When ruling on a motion for summary judgment, a court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770 (citation omitted). A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* (citation omitted). However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

"When cross-motions for summary judgment are filed, courts 'look to the burden of proof that each party would bear on an issue of trial: [courts] then require that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact.'" *M.O. v. Ind. Dept. of Educ.*, 635 F. Supp. 2d 847, 850 (N.D. Ind. 2009) (alteration in original) (quoting *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)). "The contention of one party that there are no issues of material fact sufficient to prevent the entry of judgment in its favor does not bar that party from asserting that there are issues of material fact sufficient to prevent the entry of

judgment as a matter of law against it." *Id.* (quoting *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 313 (2d Cir. 1981)); *see Zook v. Brown*, 748 F.2d 1161, 1166 (7th Cir. 1984). "It is true that cross-motions for summary judgment do not waive the right to a trial, but this rule does not alter the respective burdens on cross-motions for summary judgment—more particularly here, the responsive burden of a plaintiff who moves for summary judgment and is confronted with a cross-motion for summary judgment. The motions are treated separately." *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008) (citations omitted).

### III. ANALYSIS

#### A. BRC's Claims—Which Are All Premised on the Supply Agreement Being a Requirements Contract—Fail as a Matter of Law

As an initial matter, the Court notes that each of the three claims made by BRC in its amended complaint is premised entirely on the Supply Agreement being a requirements contract. The general allegations in BRC's amended complaint specifically state that the Supply Agreement is a requirements contract, under which Continental is required to supply BRC with its requirements of the three specific grades of carbon black. (DE 6 ¶¶ 6, 10). BRC alleges that the parties initially met their obligations under the requirements contract, but Continental eventually repudiated the requirements contract. (DE 6 ¶¶ 12, 32-33). BRC's first claim is for breach of contract, alleging that Continental breached the Supply Agreement by refusing to supply BRC with its requirements of carbon black. (DE 6 ¶¶ 38-45). BRC's second claim is for declaratory relief, claiming that it is entitled to a declaratory judgment that Continental must supply BRC with its requirements of carbon black under the Supply Agreement for the duration of the Supply Agreement. (DE 6 ¶¶ 46-50). BRC's third and final claim in its amended

9

complaint is that Continental's anticipatory repudiation of the requirements contract entitles BRC to recover from Continental the difference between the cost of cover and the Supply Agreement's prices over the term of the agreement, together with any incidental or consequential damages caused by Continental's repudiation.  (DE 6 ¶¶ 51-56).

Given the Seventh Circuit's holding that the Supply Agreement is *not* a requirements contract, it appears that all of BRC's claims must fail as a matter of law.  *See BRC Rubber & Plastics, Inc.*, 804 F.3d at 1230 (holding "that the agreement was not a requirements contract").  BRC's claims in its amended complaint do not allege any alternative theory of the contract under which it could recover any damages from Continental, even if the Supply Agreement was another form of contract that was enforceable.  Accordingly, Continental will be granted summary judgment on all three of BRC's claims.

### B.  The Supply Agreement Is Not Enforceable

Because BRC's claims are premised entirely on the Supply Agreement being a requirements contract, the Court could stop here in its analysis.  However, even if the Court were to consider the parties' arguments regarding the form and enforceability of the Supply Agreement, it is not enforceable, as explained below.

Continental, in its briefing on the cross motions for summary judgment, claims that because the Supply Agreement is not a requirements contract, it is not an enforceable contract at all, given that it lacks the mutuality and consideration required for a binding contract, and given that it does not specify the quantity of carbon black to be sold, the quantity of each grade to be sold, and when those unstated quantities are to be delivered.  Additionally, Continental argues that even if the Supply Agreement were found to be an enforceable contract, Continental did not

10

anticipatorily repudiate as a matter of law. BRC, on the other hand, claims that if the Supply Agreement is not a requirements contract, it is still an enforceable contract for the sale of at least 1.8 million pounds of carbon black annually. BRC further claims that Continental breached the Supply Agreement by repudiation when it refused to provide adequate assurances to BRC, and thus BRC contends that it is entitled to damages in the amount of $842,683.37. The parties are in agreement that the Supply Agreement is unambiguous and that the interpretation of the Supply Agreement is a question of law for the Court. (DE 156-1 at 9-10); *see also BRC Rubber & Plastics, Inc.*, 804 F.3d at 1231.

"The parties' agreement is governed by Indiana law, under which an unambiguous contract is interpreted as a matter of law by reading the contract as a whole." *BRC Rubber & Plastics, Inc.*, 804 F.3d at 1231 (citing *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 762 (7th Cir. 2015); *Brockmann v. Brockmann*, 938 N.E.2d 831, 834-35 (Ind. Ct. App. 2010)). "Contract terms are given their ordinary meanings, with the ultimate goal of determining the parties' intent." *Id.* (citing *Brockmann*, 938 N.E.2d at 834-35). "An agreement is *not* a requirements contract unless it: '(1) obligates the buyer to buy goods, (2) obligates the buyer to buy goods exclusively from the seller, and (3) obligates the buyer to buy all of its requirements for goods of a particular kind from the seller.'" *Id.* (quoting *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 186 F.3d 815, 817 (7th Cir. 1999)). The Seventh Circuit has already made clear that the Supply Agreement between BRC and Continental in this case was *not* a requirements contract, because it did not obligate BRC to buy any carbon black from Continental, let alone obligate BRC to buy all of its carbon black from Continental. *Id.* at 1232-33 ("BRC was not obligated to buy carbon black from Continental, nor was it obligated to buy *all* its carbon black from Continental, so the

11

agreement was not a requirements contract."). In light of the Seventh Circuit's ruling that the Supply Agreement is not a requirements contract, the Court is left to determine what the Supply Agreement is—specifically, the Court is to determine whether the Supply Agreement is an enforceable contract between the parties or not.

A valid contract requires offer, acceptance, consideration, and manifestation of mutual assent. *Family Video Movie Club, Inc. v. Home Folks, Inc.*, 827 N.E.2d 582, 585 (Ind. Ct. App. 2005). As a general rule, the interpretation, construction, or legal effect of a contract is a question of law to be determined by the court. The unambiguous language of a contract is conclusive and binding on the parties and the court, and the parties' intent is determined from the four corners of the document. *Zukerman v. Montgomery*, 945 N.E.2d 813, 819 (Ind. Ct. App. 2011). A contract should be "read as a whole, and the language construed so as not to render any words, phrases, or terms ineffective or meaningless." *Vill. Commons, LLC v. Marion Cty. Prosecutor's Office*, 882 N.E.2d 210, 215 (Ind. Ct. App. 2008). When the terms of a contract are "clear and unambiguous, courts must give those terms their clear and ordinary meaning." *State Farm Mut. Auto. Ins. Co. v. Cox.*, 873 N.E.2d 124, 127 (Ind. Ct. App. 2007). The court cannot make a contract for the parties, nor is it at liberty to revise a contract, or supply omitted terms while professing to construe it. *Zukerman*, 945 N.E.2d at 819. Indiana has long allowed contracting parties to enter into any agreement they desire so long as it is not illegal or against public policy. *Zollman v. Geneva Leasing Assocs., Inc.*, 780 N.E.2d 387, 391-92 (Ind. Ct. App. 2002) (citations omitted).

"The existence of a valid Indiana contract depends on mutuality of obligation[, as] 'there can be no contract unless both parties are bound.'" *Penn v. Ryan's Family Steak Houses, Inc.*,

12

269 F.3d 753, 759 (7th Cir. 2001) (quoting *Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 618 (Ind. Ct. App. 2000)). "Although mutual promises can form the consideration for a valid contract, 'a contract is unenforceable if it is so indefinite and vague that the material provisions cannot be ascertained.'" *Id.* (citations omitted). Furthermore, an "illusory promise" or "one which by its terms makes performance entirely optional with the promisor, cannot form the basis for a valid contract, because a contract is unenforceable if it fails to obligate one party to do anything." *Id.* (citations, internal quotation marks, and internal alteration notation omitted).

As the Seventh Circuit made clear in its decision, the Supply Agreement between the parties does not oblige BRC to buy any carbon black from Continental. *BRC Rubber & Plastics, Inc.*, 804 F.3d at 1232. Continental now argues that, as a result of the Seventh Circuit's decision, there is no mutuality of obligation or consideration in the Supply Agreement; Continental therefore contends that the Supply Agreement is not an enforceable contract, but rather is a buyer's option. BRC argues that the Seventh Circuit's decision does not mean the Supply Agreement lacks consideration, as the Supply Agreement imposes other obligations on BRC, specifically the obligation to provide Continental with a right of first refusal.

The case relied upon by BRC in support of its argument that the right of first refusal in the Supply Agreement was an obligation sufficient to meet the consideration requirement, *Structural Polymer Group, Ltd. v. Zoltek Corp.*, 543 F.3d 987 (8th Cir. 2008), is not binding authority on this Court.[4] Additionally, *Structural Polymer* is distinguishable from the instant

---

[4] While BRC also cites to *Saviano v. Commissioner of Internal Revenue*, 765 F.2d 643 (7th Cir. 1985) for its recognition that a "conditional right of first refusal" is "something for which consideration could be exchanged" (DE 169 at 10-11), *Saviano* involved a situation in which a taxpayer sold a right of first refusal, or "gold option" to purchase gold mined from the taxpayer's mineral lease at a set price per gram for $32,000 cash; this transaction was carried out

13

case, as *Structural Polymer* was decided under Missouri law on the basis that the agreement was a requirements contract. *Id.* at 993-94. Because the agreement in *Structural Polymer* was a requirements contract, and because "[a] duty of good faith is implied in requirements contracts under Missouri Law," the Eighth Circuit found that the buyer's "zero requirements" at the time the contract was formed did not make the contract unenforceable, as the "implied obligation of good faith is enough to avoid finding a contract null and void due to an illusory promise." *Id.* at 993 (quoting *Magruder Quarry & Co. v. Briscoe*, 83 S.W.3d 647, 650-51 (Mo. Ct. App. 2002)). The Eighth Circuit then addressed the right of first refusal in the contract, stating that the inclusion of the right of first refusal in the requirements contract "for [the seller] to retain its *exclusive* right to supply [the buyer], so as long as it matched a market price offered by another supplier, is sufficient to create mutuality of obligation and consideration." *Id.* at 993 (emphasis added).

Essentially, the Eighth Circuit's holding in *Structural Polymer* that there was mutuality of obligation in the agreement was based on the agreement being a requirements contract. Absent the agreement being a requirements contract, the implied duty of good faith would not apply to save the contract from the buyer's zero requirements at the time the contract was formed. Additionally, if the contract was not a requirements contract, the right of first refusal would no

---

by the taxpayer in an attempt to obtain a tax deduction for "mining expenses." 765 F.2d at 651. The Seventh Circuit stated that the taxpayer had sold "a conditional right of first refusal to all the net profits of the gold mining venture," in exchange for consideration of "an initial cash payment of $32,000 and, if the unnamed third party exercised the right of first refusal, subsequent payments at the rate of $2.50 per gram." *Id.* at 653. The situation in the instant case is not one in which money was paid in exchange for a right of first refusal, but rather the "Meet or Release" provision in the Supply Agreement appears to have been part of a failed attempt to create a requirements contract.

longer create mutuality of obligation, as there would be no exclusive right for the seller to supply the buyer.

In the instant case, the Supply Agreement between BRC and Continental was not a requirements contract, as made clear by the Seventh Circuit. Additionally, the Seventh Circuit's decision addressed BRC's arguments regarding the right of first refusal, stating that BRC had relied upon the "Meet or Release" provision to support an exclusivity requirement; the Seventh Circuit held, however, that "[n]othing in the 'Meet or Release' provision prevented BRC from" "contract[ing] with additional sellers" for the purchase of carbon black. *BRC Rubber & Plastics, Inc.*, 804 F.3d at 1232-33. Thus, even if *Structural Polymer* were binding authority on this Court, the language of that Eighth Circuit decision does not save the Supply Agreement between BRC and Continental. Because the Supply Agreement is not a requirements contract, and because even the "Meet or Release" provision in the Supply Agreement does not require BRC to purchase carbon black exclusively from Continental, there is no mutuality of obligation in the Supply Agreement. The Supply Agreement is therefore unenforceable for lack of consideration.

Where an agreement does not explicitly require the buyer to buy its requirements exclusively from the seller, but instead provides a specific agreed price for a specified period of time, such an agreement is properly characterized as a "buyer's option" rather than a requirements contract. *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prods., Inc.*, 212 F.3d 373, 378 (7th Cir. 2000). A "buyer's option" or "open offer to sell" means that the seller has invited the buyer to purchase as much or as little product as it desires during the specified time period at the prices set forth in the price list. *See Auto. Hardware Serv., Inc. v. Accubuilt, Inc.*, No. 1:10-CV-202, 2009 WL 3246676, at *6 (N.D. Ind. Oct. 6, 2009) (citing *In re*

15

*Modern Dairy of Champaign, Inc.*, 171 F.3d 1106 (7th Cir. 1999) (concluding that a buyer's option existed rather than a requirements contract); *Mayfran Int'l, Inc. v. May Conveyor, Inc.*, No. 62913, 1993 WL 266944 (Ohio App. July 15, 1993) (finding that a blanket purchase order did not give rise to an obligation to purchase); James J. White & Robert S. Summers, *Uniform Commercial Code* § 3-9 (5th ed. 2006) (instructing that an agreement that is silent on quantity "is treated as an open offer to sell")).

 Here, because the Supply Agreement does not explicitly require BRC to buy its requirements of carbon black from Continental, but instead provides a price list for the specified period of time, the Supply Agreement is properly characterized as a "buyer's option" or an "open offer to sell." *See Brooklyn Bagel Boys, Inc.*, 212 F.3d at 373; *Auto Hardware Serv., Inc.*, 2009 WL 3246676, at *6. The relationship between BRC and Continental was thus a "series of separate contracts," with certain terms that relate back to the Supply Agreement, namely the price terms. *See Brooklyn Bagel Boys, Inc.*, 212 F.3d at 379 n.4. The series of purchase orders sent by BRC and accepted by Continental are the enforceable contracts between the parties; BRC, however, does not base its claims on a breach of a specific purchase order. Rather, BRC now alleges that Continental breached the Supply Agreement itself by failing to provide more than 1.8 million pounds of carbon black annually to BRC. But the Supply Agreement, standing alone, is not an enforceable contract because it lacks mutuality and consideration. As the Seventh Circuit stated, the Supply Agreement "did not obligate BRC to buy any—much less all—of its carbon black from Continental." *BRC Rubber & Plastics, Inc.*, 804 F.3d at 1230. Therefore, because the Supply Agreement cannot reasonably be interpreted as either a requirements contract as BRC initially alleged, or as a contract to purchase 1.8 million pounds of carbon black annually as BRC

now suggests, BRC's arguments would fail even if the Court were to consider the parties' arguments regarding enforceability, and thus summary judgment is warranted in Continental's favor on these alternative grounds as well.[5]

### IV. CONCLUSION

As explained above, BRC's claims against Continental are all premised on the Supply Agreement being a requirements contract. Because the Supply Agreement is not a requirements contract, BRC's claims fail as a matter of law and Continental is entitled to summary judgment on all claims. Even if the Court were to consider the parties' arguments regarding the form and enforceability of the Supply Agreement, it is not an enforceable contract.

Accordingly, Continental's motion for summary judgment (DE 156) is GRANTED, and BRC's motion for summary judgment (DE 167) is DENIED. The Clerk is DIRECTED to enter a judgment in favor of Continental and against BRC. The Clerk is further DIRECTED to close this case.

SO ORDERED.

Entered this 28th day of July 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge

---

[5] Because the Supply Agreement is not an enforceable contract, the Court need not address BRC's contentions that Continental breached the Supply Agreement by repudiation.