# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

BRC RUBBER & PLASTICS, INC., *an Indiana* )
*corporation*, )
                              )
        **Plaintiff,** )
                              )
        **v.** )        **CAUSE NO. 1:11-cv-00190-SLC**
                              )
CONTINENTAL CARBON COMPANY, )
*a Delaware corporation*, )
                              )
        **Defendant.** )

## OPINION AND ORDER

In this breach of contract action governed by Indiana law, Plaintiff BRC Rubber & Plastics, Inc., an Indiana corporation ("BRC"), alleges that Defendant Continental Carbon Company, a Delaware corporation ("Continental"), repudiated an agreement to supply BRC with carbon black. BRC seeks to recover costs that it incurred in purchasing carbon black from another supplier.[1]

The Court held a two-day bench trial on April 23 and 24, 2019. (DE 216; DE 217). Following the preparation of a transcript (DE 219; DE 220),[2] the parties submitted proposed findings of fact and conclusions of law (DE 225; DE 226).

After examining the entire record, considering the arguments of counsel, and determining the credibility of the witnesses and evidence, the Court makes the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a) based upon a

---

[1] Diversity jurisdiction exists under 28 U.S.C. § 1332. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (DE 36; DE 147; DE 152; DE 155).

[2] The transcripts of the trial (DE 219; DE 220) will be referred to as "Tr. __". Exhibits submitted at the trial will be referred to as "Ex. __".

preponderance of the evidence.

# I. FINDINGS OF FACT

BRC manufactures and sells molded rubber and plastic products primarily for the automotive industry. (Tr. 7, 233). BRC creates these products using an agent known as carbon black, which mixes into the rubber compound of the final product. (Tr. 8). Carbon black comes in three grades: N300, N500, and N700. (Tr. 8). Pricing carbon black is based on three components: the base or baseline price, an adjustment for the price of oil, and an adjustment for the price of natural gas.[3] (Tr. 15).

Continental began supplying carbon black to BRC in the mid-1990s and served as BRC's sole supplier of carbon black through mid-2011. (Tr. 9-10). Thomas Nunley, former regional sales manager for Continental, was Michael Cornwell's, vice president of materials at BRC, only point of contact at Continental through the beginning of May 2011. (Tr. 33, 198).

In late 2009, BRC and Continental executed the Supply Agreement (the "Agreement"). (Tr. 16-17; Ex. 7). The relevant terms of the Agreement are as follows:

- The Agreement was effective on January 1, 2010, and would expire on December 31, 2014;

- The Agreement states that "[i]t is the intent of this Agreement" that Continental "agrees to sell" to BRC "approximately 1.8 million pounds of" carbon black annually;

- The volume of carbon black sold to BRC was "to be taken in approximately equal monthly quantities";

- The chart below represents the baseline price for the corresponding grades of

---

[3] The adjustments for oil and natural gas are also referred to as "feedstock." (Tr. 15-16).

carbon black:

| Grade | Baseline Price |
|-------|----------------|
| N339 | $0.4600/lb |
| N550 | $0.4300/lb |
| N762 | $0.4300/lb |

(Ex. 7).

In early April 2011, Continental internally discussed increasing the price of carbon black for all of its customers. (Tr. 185; Ex. 15). Around that time, Continental informed its customers that it would be unable to provide grade N700 carbon black between May 9 and 24, 2011. (Tr. 16; Ex. 13). However, Nunley advised Don Newman, a senior buyer at BRC, that Continental could supply a shipment of grade N762 for delivery in the first week of June. (Tr. 17; Exs. 16, 17).

On April 14, 2011, Nunley advised Cornwell that Continental was increasing the baseline price for carbon black by two cents per pound. (Ex. 18). Cornwell called Nunley to object to the price increase, and the two agreed that the price increase violated the Agreement. (Tr. 28-29). Nunley said that he would try to get the price increase rescinded. (Tr. 28-29, 187, 193). However, Nunley's direct supervisor, Thomas Moccia, refused to rescind the price increase, reasoning that BRC could not get carbon black elsewhere. (Tr. 187). Moccia instructed Nunley to withhold shipping to BRC unless it agreed to the price increase. (Tr. 192, 196-97).

Cornwell emailed Nunley on April 15, 2011, reiterating his objection to the price increase and advising Nunley that BRC would "do whatever necessary" to enforce the Agreement. (Ex. 19). Nunley passed this on to Moccia, but nobody from Continental responded to Cornwell. (Exs. 74, 75 Thomas Moccia Dep. 51).

Cornwell and Charles Chaffee, CEO at BRC, felt anxious because Continental's actions could have delayed carbon black shipments, which would disrupt BRC's fulfillment of its customers' demands. (Tr. 31-33, 232). If BRC failed to fulfill its customers' demands the results could have been "devastating" for BRC's business. (Tr. 31-33, 232).

Between April 15 and 27, 2011, Cornwell did not receive correspondence from Continental regarding the price increase. (Tr. 30). Newman contacted Sandra Haney, a senior customer service representative at Continental, on April 26, 2011, and asked her to confirm a purchase order for 110,000 pounds of grade N550 carbon black to be delivered on May 11, 2011;[4] 110,000 pounds of grade N550 carbon black to be delivered on May 18; and 140,000 pounds of grade N762 carbon black to be delivered in the first week of June.[5] (Ex. 21). This purchase order was priced according to the Agreement. (Ex. 21).

On April 27, 2011, Cornwell sent a letter to Nunley, reiterating BRC's opposition to the price increase and advising Nunley that BRC would not pay for shipments of carbon black that were not priced according to the Agreement. (Ex. 22). Cornwell did not receive a response from Continental. (Tr. 31).

On April 29, 2011, Nunley told Cornwell that Moccia instructed him to refrain from contacting BRC "and that if BRC decide[d] to pursue legal action against Continental, they [would] delay/withhold shipment of [carbon black]." (Tr. 31, 197-98; Ex. 22; Exs. 74, 75 Moccia Dep. 68). BRC became increasingly concerned. (Tr. 31-32; Ex. 23). At the request of Greg Finch, president at BRC, Cornwell estimated BRC's inventory and usage of carbon black. (Tr. 97; Ex. 24; Ex. 74 Alan Colwell Dep. 17-18). As of May 2, 2011, BRC had about 2.1

---

[4] These shipments are sometimes referred to as "railcars."

[5] The original email indicated that the shipment of grade N762 carbon black would arrive on May 4. (Ex. 21). However, subsequent communications show that this was a typo. (Tr. 102; Ex. 34).

months supply of grade N550 carbon black, five months supply of grade N339 carbon black, and 1.8 months supply of grade N762 carbon black. (Ex. 24).

On April 29, 2011, Linda Nelson, who worked in the customer service department at Continental, informed Newman that Continental could not confirm the shipment dates requested in the April 26 purchase order. (Ex. 26). Moccia confirmed in an internal email that Continental was not shipping carbon black to BRC because Continental had "negative [gross profit]" margins on BRC's account. (Ex. 26; Exs. 74, 75 Moccia Dep. 64-65).

On May 9, 2011, Moccia and attorney Russ Guttshall, in-house counsel to Continental, fired Nunley for not "accomplish[ing] his sales duties and his objectives with respect to obtaining margin and volume from his core customers and future target accounts, including BRC." (Exs. 74, 75 Moccia Dep. 68; *see also* Tr. 206-07). On May 10, Nunley informed Cornwell that Continental had terminated him. (Tr. 35, 207, 218; Ex. 25).

Also, on May 10, Cornwell sent an email to Moccia requesting a written response to his April 27 letter no later than May 20, 2011.[6] (Ex. 27). Cornwell tried to reach Moccia via telephone prior to emailing him but was unsuccessful. (Ex. 27). Moccia responded to Cornwell's email by indicating that David Word, sales manager at Continental, would contact Cornwell regarding the issue. (Tr. 38; Ex. 28).

Cornwell got in touch with Word and explained that Continental had typically provided BRC with "updated pricing reflecting adjustments due [to] changes in [] feedstock prices" by the tenth day of every month. (Ex. 29). However, as of May 11, BRC had not received the June pricing spreadsheet. (Ex. 29). Cornwell advised that "if [BRC] was going to continue doing business with Continental" it needed pricing for its next order. (Tr. 39; Ex. 29). Cornwell also

---

[6] Prior to this point Cornwell had not interacted with Moccia. (Tr. 36). Cornwell obtained Moccia's contact information from Nunley. (Tr. 36).

repeated BRC's objection to the price increase. (Ex. 29). Word responded that baseline pricing was out of his control and that he was not familiar with the pricing spreadsheet that Cornwell referred to. (Tr. 39-40). After this conversation, Cornwell felt that nobody at Continental had a working understanding of BRC's relationship with Continental. (Tr. 40).

On May 13, 2011, Word told Cornwell that Continental could not "ship product in accordance with" the April 26 purchase order, which Cornwell found "totally unacceptable." (Tr. 41; Ex. 30). Cornwell stated that Continental's delay in shipping jeopardized "BRC's ability to satisfy [its] customers," and that BRC would not allow this to occur. (Ex. 30). Word did not respond to Cornwell's objection.[7] (Tr. 42).

To avoid depleting BRC's inventory of grade N762 carbon black, Cornwell began looking for a "cover" supplier.[8] (Tr. 42). Cornwell contacted Randy Heldman of Sid Richardson, one of Continental's competitors, who was able to provide a railcar of grade N762 carbon black for shipment in 30 days at a "spot rate," which was higher than the price for grade N762 carbon black in the Agreement. (Ex. 32; *see* Tr. 43, 49). Cornwell also inquired whether Sid Richardson would be interested in supplying all of BRC's carbon black needs in the future.

---

[7] Continental asserts that BRC exaggerates its need for carbon black. Continental points to a report generated by Cornwell on the morning of June 1, 2011, indicating that BRC possessed two railcars of carbon black—shipped on April 13 and 27, respectively—that it had not yet unloaded. (Ex. 58). According to Continental, BRC had likely possessed these shipments for weeks and its delay in unloading them demonstrates the lack of an urgent need for carbon black. It is true that Continental shipped carbon black to BRC on April 13 and 27, 2011 (Ex. 69), and that BRC usually receives shipments of carbon black between two and six weeks after they have shipped (Tr. 33, 342; Ex. 74 Cornwell Dep. 94). Thus, it is possible that BRC received these shipments weeks before June 1. However, there is no evidence establishing when these shipments arrived. Conversely, evidence shows that continuity of supply is important to BRC's business and that delays in shipment threatened to harm BRC's relationships with its customers. (Tr. 31-33, 198, 232). Thus, the Court finds the evidence of BRC's urgent need for carbon black to be credible.

[8] "Cover" refers to the purchase of goods by a buyer who has an agreement to purchase these goods from a particular seller but procures substitute goods from an alternate supplier because the usual seller is unable to meet the buyer's essential needs. *See generally* Ind. Code § 26-1-2-712. Evidence shows that "cover" purchases of carbon black were more expensive and more difficult to obtain than usual at this time (Ex. 37), and that the carbon black market was unpredictable (*see* Ex. 18).

(Exs. 32, 33).  Around this time, BRC believed that Continental would not supply any carbon black unless BRC agreed to the price increase.  (Tr. 45, 162, 246-47; Ex. 74 Cornwell Dep. 123).

On May 16, 2011, BRC's outside counsel, Daniel Sharkey, drafted a letter to Moccia's attention.  (Ex. 31).  The letter broadly identified two issues with respect to Continental's performance under the Agreement:  (1) Continental had not shipped carbon black to BRC pursuant to the April 26 purchase order; and (2) Continental's request for a price increase was "simply unacceptable."  (Ex. 31).  Sharkey advised Moccia that the letter constituted BRC's demand for written assurance under the Uniform Commercial Code ("U.C.C.") § 2-609 that Continental would abide by the terms in the Agreement.  (Ex. 31).  Sharkey demanded that Continental provide assurance before the close of business on May 18, 2011, or face legal action. (Ex. 31).

On May 17, 2011, Newman sent an email to Haney requesting confirmation by 4:00 p.m. that day regarding whether Continental would supply a railcar of carbon black grade N762 for delivery in the first week of June in accordance with the April 26 purchase order.  (Ex. 34). Haney responded at 8:26 p.m. that Word and Nelson were working on his request and that she would provide an answer by the next day.  (Ex. 34).

Also, on May 17, 2011, Guttshall left Sharkey a voice message stating that he represented Continental in the dispute with BRC.  (Ex. 35).  However, Guttshall did not provide his contact information.  (Ex. 35).  Thus, Sharkey contacted Moccia to obtain Guttshall's contact information and requested that Moccia inform BRC whether it would be able to provide a shipment of grade N762 carbon black for June delivery.  (Ex. 35).  Sharkey emphasized that BRC had contacted another supplier (Sid Richardson) for a "cover" shipment of N762, and that BRC needed a response from Continental before 11:00 a.m. on May 18, 2011—the deadline

provided by the alternative supplier for the cover shipment.  (Ex. 35).

At 11:04 a.m. on May 18, Moccia informed Sharkey that Continental did "not have N762 available at the moment."  (Exs. 35, 36).  About an hour later, BRC ordered 130,000 pounds of carbon black grade N762 from Sid Richardson.  (Tr. 46; Ex. 38).  Cornwell estimated that this shipment would not arrive until late June or July 1 (Tr. 46), approximately a month later than the shipment of grade N762 carbon black that Nunley told Newman would arrive the first week of June (Exs. 16, 17).  There is no evidence that Continental provided BRC with written assurance that it would comply with the Agreement by the close of business on May 18.

On May 20, 2011, Nelson informed Newman that Continental could fulfill the April 26 purchase order with modified shipping dates.  (Ex. 40).  One railcar of grade N550 carbon black could ship on May 25 and two railcars of carbon black (one railcar of grade N550 and one railcar of grade N762) could ship on June 6.[9]  (Ex. 40).  However, the price of these shipments was higher than the baseline price in the Agreement, which BRC found unacceptable.  (Exs. 40-42).  Cornwell called Moccia, but the call went to voicemail and Moccia did not return the call.  (Tr. 49; Ex. 41).  Cornwell asked Moccia to provide a written answer regarding whether "Continental Carbon intend[ed] to honor the supply agreement with BRC or not."  (Ex. 41).  About two hours later Moccia emailed Cornwell, stating:  "I suggest you call another supplier[,] Mike[.]  Tom." (Ex. 43).  Cornwell and Chaffee interpreted Moccia's email as stating that Continental would not supply carbon black to BRC according to the Agreement.  (Tr. 51, 249; Ex. 74 Chaffee Dep. 12).

Later that day, Guttshall contradicted Moccia's email and informed Sharkey that Continental would continue to timely ship in accordance with the Agreement and not cut off

_____

[9] To avoid confusion when referencing the April 26 purchase order as modified by Nelson's email of May 20, this Opinion and Order will refer to shipment terms offered in Nelson's email of May 20 as the "Modified April 26 Purchase Order."

supply to BRC. (Exs. 44, 45). Because of this email, BRC briefly believed that its problems with Continental had been solved. (Tr. 53, 301-02). Accordingly, Cornwell emailed Moccia, inquiring when Continental would ship the three railcars of carbon black described in the Modified April 26 Purchase Order.[10] (Tr. 53; Ex. 45). Moccia responded that Continental could "ship one [rail]car next week and do the best [it] [could] re future orders based on [its] intent to supply 1.8 million lbs[.]" (Tr. 53; Ex. 46). Cornwell, who believed that Continental was obligated to provide three railcars, found Moccia's response unacceptable. (Tr. 53-55).

On May 23, 2011, Newman asked Moccia to confirm whether Continental would ship three railcars as described in the Modified April 26 Purchase Order. (Ex. 47). Moccia responded that Continental "intended to ship" an annual total of 1.8 million pounds of carbon black to BRC and that it was ahead of schedule for 2011. (Ex. 47). Newman still did not understand whether Continental would ship three railcars of carbon black and requested that Moccia clearly state whether he would support the shipping dates provided in the Modified April 26 Purchase Order. (Ex. 47). Newman also requested that Continental provide the June pricing spreadsheet. (Ex. 47).

On May 24, 2011, Moccia responded that Continental could only ship one railcar at that time and would do the best it could in the future, but that it would "not short other customers as [it] [was] supplying [BRC] based on [the] agreement[.]"[11] (Ex. 47). Cornwell tried to call

---

[10] Evidence indicates that based on Guttshall's email, BRC believed Continental would ship the three railcars identified in the Modified April 26 Purchase Order. (*See* Tr. 53-54; Ex. 45). However, Guttshall apparently only committed that Continental would continue "timely" shipping at the contract price and not cut off supply to BRC. (Ex. 44).

[11] Some of Continental's exhibits indicate that it ceased or delayed supplying BRC due to inventory shortages. (*E.g.*, Ex. 47). The Court does not find this evidence credible. Nunley and Jimmie Scott, director of sales and technical services at Continental, testified that Continental refused to supply BRC unless BRC accepted the price increase. (Tr. 192, 196-97; Ex. 75 Jimmie L. Scott Dep. 57, 61). Furthermore, Nunley told Cornwell that Continental's operating plan for 2011 including shipping the following amounts of carbon black to BRC: 339,000 pounds of grade N339; 1,591,000 pounds of grade N550; and 800,000 pounds of grade N763. (Ex. 51). In fact,

Moccia numerous times but Moccia did not answer and did not return his calls.  (Tr. 56-57).

Newman again asked Moccia to confirm whether Continental would ship according to the dates in the Modified April 26 Purchase Order.  (Ex. 49).  Moccia replied that Continental had shipped 1.2 million pounds of carbon black to BRC to date for 2011 and it was shipping one railcar of grade N550 carbon black on May 25.  (Ex. 49).  However, Moccia reiterated that it was Continental's intent to supply 1.8 million pounds of carbon black in approximately equal monthly quantities, which amounted to 150,000 pounds per month, and that BRC had purchased 300,00 pounds per month year to date in 2011.  (Ex. 49).  Moccia stated that Continental would "continue to do [its] best to supply BRC" and that he would advise BRC when another railcar of grade N550 carbon black would be shipped.  (Ex. 49).  At this point, BRC lacked confidence that Continental would adhere to the Modified April 26 Purchase Order or the Agreement.  (Tr. 58).

On May 26, 2011, Word advised that Continental shipped one railcar of grade N550 carbon black the day before and inquired whether BRC would want grade N550 or grade N762 carbon black for its next order.  (Ex. 56).  Two days later, Cornwell received Continental's June pricing spreadsheet, which reflected a two-cents-per-pound baseline price increase for carbon black.  (Tr. 60; Ex. 54).  The pricing spreadsheet undermined Guttshall's commitment on May 20 that Continental would ship according to the terms of the Agreement, and compelled BRC to conclude that Continental would not ship carbon black unless BRC paid two cents more per pound.  (Tr. 60-61).

On June 2, 2011, BRC terminated the Agreement in a letter drafted by Cornwell. [12]  (Ex.

---

even Moccia stated that Continental withheld carbon black from BRC in order to improve Continental's profit margins.  (Ex. 26; Exs. 74, 75 Moccia Dep. 61, 64-65).

[12]  BRC entered into an agreement with Cabot Corporation for the supply of carbon black for the remainder of 2011.  (Tr. 154; Ex. 70).

55).  The letter states:

> [Continental] has repeatedly, and continually, made it clear to BRC
> that [Continental] will not supply BRC with BRC's actual quantity
> requirements of three listed grades of carbon black in the
> Agreement. . . .
>
> [Continental] has also demanded increases in baseline prices
> contrary to the Agreement and has threatened withholding
> shipments unless BRC agrees. . . .
>
> BRC has repeatedly sought reasonable assurances from
> [Continental] that it will meet its continuing obligations under the
> Agreement.  [Continental] has failed to respond appropriately.
> Your breach of our Agreement leaves us no choice but to
> terminate.  This letter serves as our notice of termination effective
> immediately.

(Ex. 55).  The letter also instructed Continental that BRC would accept delivery of the two

railcars of carbon black according to the Modified April 26 Purchase Order and the prices

established in the Agreement, provided that Continental confirmed such price by the close of

business on June 7, 2011.  (Ex. 55).  That same day BRC filed the initial complaint in this case.

(DE 1).

On June 10, 2011, BRC rescinded its order for the two railcars of carbon black because

Continental had not provided assurance by the close of business on June 7 as requested.[13]  (Tr.

62-63, 140-41; Ex. 61).

In August 2011, BRC engaged in negotiations with various carbon black suppliers

regarding a long-term contract.  (*See, e.g.*, Exs. 63, 65, 66).  On August 19, 2011, Darryl

Huntley, who was hired as National Sales Manager at Continental on May 9, 2011, received a

proposal from BRC regarding terms for a new agreement.  (Tr. 339-40, 356).  Prior to this,

Huntley had no contact with anyone at BRC.  (Tr. 355).  Huntley wanted to meet with BRC

---

[13] Evidence shows that between January 1 and June 1, 2011, Continental supplied BRC with 1,295,350
pounds of carbon black. (Ex. 58, 69).

personally in order to re-establish the trust that had been lost between the two companies.  (Tr. 344).  Thus, Huntley scheduled a meeting with BRC on August 24, 2011, to discuss terms for a potential contract.  (Tr. 49-50; *see* Ex. 62).

On August 24, 2011, a few hours prior to the meeting with BRC, Huntley sent Cornwell terms for Continental's offer.  (Ex. 62).  Cornwell was disappointed by the offer and called Huntley (who was driving to BRC's headquarters) and attempted to cancel the meeting because Continental's terms were unacceptable.  (Tr. 150).  However, Huntley insisted that the meeting take place and arrived a short time later.  (Tr. 150).  Huntley believed that Continental offered superior economics compared to its competitors that could have saved BRC over $1 million during the life of the contract.  (Tr. 349; Ex. 64).  Ultimately, the two parties did not reach a new agreement.  (*E.g.*, Tr. 255).  Chaffee testified that, in part, no agreement went forward because he "had lost confidence in Continental as a company with the[] management team that they had in place."  (Tr. 255).

In October 2011, BRC and Sid Richardson executed an agreement governing Sid Richardson supplying carbon black to BRC from January 1, 2012, to December 31, 2014.  (Tr. 63; Ex. 67).  The baseline price for carbon black in this contract was higher than the baseline price in the Agreement.  (Tr. 64, 158).  Cornwell calculated the difference between what BRC paid Sid Richardson for the baseline price of the first 1.8 million pounds of carbon black it supplied in 2012, 2013, and 2014, respectively, and the baseline price BRC would have paid Continental for the same 1.8 million pounds of carbon black under the Agreement.  (Tr. 156-60; Ex. 72).  The total difference is $842,683.37, representing the damages that BRC seeks in this case.  (Ex. 72).

## II. PROCEDURAL BACKGROUND

The parties filed cross motions for summary judgment in 2012 before discovery had closed in this case.  (*See* DE 24; DE 27; DE 31; DE 35).  The Court denied Continental's motion for summary judgment and granted BRC's motion for summary judgment to the extent that the Court found that the Agreement was a requirements contract.  (DE 46).  However, because the Court determined that BRC had not shown that Continental repudiated the Agreement as a matter of law, BRC's motion for summary judgment was otherwise denied.  (DE 46).

After the close of discovery, BRC filed another motion for summary judgment focusing on whether Continental repudiated the Agreement.  (DE 69; DE 70; *see also* DE 74; DE 79).  The Court granted BRC's motion for summary judgment, finding that Continental repudiated the Agreement.  (DE 80).  However, the Court left open for trial the issue of damages.  (DE 80).  Following a two-day bench trial (DE 93; DE 94), the Court awarded BRC damages in the amount of $982,642.11.  (DE 110).

Continental appealed this Court's ruling to the Seventh Circuit Court of Appeals.  (DE 112; DE 116).  On November 5, 2015, the Seventh Circuit reversed this Court's judgment, finding that the Agreement was not a requirements contract, and remanded the case for further proceedings.  (DE 127); *see BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co*., 804 F.3d 1229 (7th Cir. 2015).

On remand, Continental filed a motion for summary judgment, asserting that the Agreement was unenforceable for lack of consideration, and that, even if it was enforceable, Continental did not repudiate it.  (DE 156; DE 169; DE 171).  BRC also filed for summary judgment asserting that the Agreement was enforceable, and that Continental repudiated the Agreement by failing to provide adequate assurance of performance.  (DE 167; DE 168; DE 170;

DE 172).

This Court determined that BRC's claims failed as a matter of law because all of its claims were premised on the Agreement being a requirements contract. (DE 173). This Court further found that the Agreement was not supported by mutuality of consideration because it did not require BRC to purchase carbon black exclusively from Continental, and thus, that the Agreement was unenforceable due to lack of consideration. (DE 173).

The Seventh Circuit reversed and remanded, reasoning that the Agreement "is supported by mutuality and consideration and is, thus, enforceable." *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co*., 900 F.3d 529, 537 (7th Cir. 2018). The Agreement obligated Continental to supply to BRC "approximately 1.8 million pounds" of carbon black annually "to be taken in approximately equal monthly quantities," at the price identified in the Agreement. *Id*. (internal quotation marks omitted). BRC committed to give Continental the right of first refusal if BRC ever sought to buy carbon black from another supplier at a lower price. *Id*. (citation omitted). The Seventh Circuit concluded that these obligations created a mutually enforceable contract for the sale of goods between the parties. *Id*. at 537-39. Additionally, the Seventh Circuit determined that BRC's complaint plausibly asserted a claim for repudiation of a contract under U.C.C. § 2-609 and Indiana Code § 26-1-2-609. *Id*. at 543-44.

On remand the second time, the Court held a two-day bench trial. (DE 216; DE 217). The parties put on evidence and witness testimony addressing three issues: (1) whether Continental repudiated the Agreement; (2) whether BRC repudiated or otherwise terminated the Agreement without justification; and (3) the amount of damages, if any, BRC may be entitled to, including whether BRC properly mitigated its damages. (DE 207 at 6; DE 217).

## III. CONCLUSIONS OF LAW

There is no dispute between the parties that the Agreement was an enforceable contract or that Indiana law governs this dispute. *See, e.g.*, *Wildwood Indus., Inc. v. Genuine Mach. Design, Inc.*, 587 F. Supp. 2d 1035, 1046 (N.D. Ind. 2008) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Indiana employs a version of U.C.C. § 2-609 regarding adequate assurance:

> (1) . . . . When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
>
> (2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

Ind. Code. §§ 26-1-2-609(1)-(2). If a party receives "a justified demand failure to provide within a reasonable time not exceeding thirty (30) days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract." *Id*. § 26-1-2-609(4); *see AMF, Inc. v. McDonald's Corp*., 536 F.2d 1167, 1171 (7th Cir. 1976); *Hawa v. Moore*, 947 N.E.2d 421, 426 (Ind. Ct. App. 2011) ("[T]he failure of the obligor to give adequate assurance may be treated as a repudiation."). However, "Indiana case law interpreting § 26-1-2-609 is sparse . . . ." *Beijing Auto. Indus. Imp. & Exp. Corp. v. Indian Indus., Inc*., 105 F. Supp. 3d 879, 899 (S.D. Ind. 2015).

The party requesting assurance must be supported by "reasonable insecurity" that the other party will not perform but it need not be "absolutely certain" that the other party will breach the contract. *Wildwood Indus., Inc*., 587 F. Supp. 2d at 1047 (citation and internal quotation marks omitted); *see Hawa*, 947 N.E.2d at 426 ("When the obligee reasonably believes that the obligor will not perform, the obligee may demand assurance of performance, and the

failure of the obligor to give adequate assurance may be treated as a repudiation[.]").  Whether a buyer "has reasonable grounds for insecurity is a question of fact."  *AMF, Inc*., 536 F.2d at 1170 (citations omitted).  Furthermore, the buyer's insecurity may be related "to something that the contract may not otherwise require the seller to give."  *Wildwood Indus., Inc*., 587 F. Supp. 2d at 1047 (citing Ind. Code § 26-1-2-609, cmt 3; *Brisbin v. Superior Valve Co*., 398 F.3d 279, 287 (3d Cir. 2005)).

Indiana law does not "suggest what form adequate assurance should take other than that the form be commercially reasonable."  *Id*.  "[L]egal principles require that for repudiation to be actionable it must be unconditional and absolute."  *Wickens v. Shell Oil Co*., No. 1:05-CV-645-SEB-TAB, 2012 WL 442292, at *5 (S.D. Ind. Feb. 10, 2012) (citing *Hawa*, 947 N.E.2d at 426); *see C.L. Maddox, Inc. v. Coalfield Servs., Inc.*, 51 F.3d 76, 81 (7th Cir. 1995) (applying Illinois's codification of U.C.C. § 2-609); *Air Liquide Am. L.P. v. Indep. Welding Distrib. Co-op., Inc.*, No. 1:05-CV-1044-LJM-WTL, 2008 WL 2498138, at *16 (S.D. Ind. June 18, 2008) ("Repudiation of a contract must be positive, absolute, and unconditional in order that it may be treated as an anticipatory breach." (citation and internal quotation marks omitted)).  In Indiana, a party may establish repudiation by showing that the breaching party did not provide adequate assurance of due performance within a reasonable time.  *Hawa*, 947 N.E.2d at 467.  "Repudiation can result from action which reasonably indicates a rejection of the continuing obligation."  U.C.C. § 2-610, cmt. 2.

The repudiation must "substantially impair the value of the contract" to the injured party.  Ind. Code § 26-1-2-610.  "The most useful test of substantial value is to determine whether material inconvenience or injustice will result if the aggrieved party is forced to wait and receive an ultimate tender minus the part or aspect repudiated."  U.C.C. § 2-610, cmt. 3.  In response, if

the contract's value is substantially impaired, the buyer may cancel the contract. Ind. Code § 26-1-2-711(1). The buyer may also purchase substitute goods and recover the difference between the substitute goods (also referred to as "cover"). *Id.* § 26-1-2-712.

Indiana's code with respect to an "instalments contract" is also based on the U.C.C. *Compare* U.C.C. § 2-612, *with* Ind. Code § 26-1-2-612. An instalments contract is "one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause 'each delivery is a separate contract['] or its equivalent." Ind. Code § 26-1-2-612(1). If a single instalment does not conform to the terms of the contract, the buyer may reject the non-conforming instalment. *Id.* § 26-1-2-612(2). However, if the non-conformity "substantially impairs the value of the whole contract there is a breach of the whole [contract]." *Id.* § 26-1-2-612(3). The buyer may show that the value of the contract as a whole has been substantially impaired through "evidence that with respect to its own needs, the value of the goods was substantially impaired by the breach." *Integrity Bio-Fuels, LLC v. Musket Corp*., No. 1:13-CV-00768-SEB, 2015 WL 1417849, at *12 (S.D. Ind. Mar. 27, 2015) (citing cases interpreting U.C.C. § 2-612); *see Citgo Petroleum Corp. v. Ranger Enters., Inc*., 632 F. Supp. 2d 878, 895 (W.D. Wis. 2009) ("Under § 2-612 of the UCC, a breach occurs 'whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract.'").

To prove that Continental repudiated the Agreement, BRC bears the burden to show that: (1) there were "reasonable grounds for insecurity" with respect to Continental's performance under the Agreement; (2) BRC demanded assurance from Continental in accordance with the duty of good faith and fair dealing; and (3) that Continental failed to provide adequate assurance. If BRC establishes that Continental repudiated the Agreement, it must then demonstrate that

Continental's breach substantially impaired the value of the Agreement.

If BRC demonstrates that Continental is liable for damages in breaching the Agreement, the Court will consider whether BRC mitigated its damages. Generally, under Indiana law, the non-breaching party must mitigate its damages. *Ind. Indus., Inc. v. Wedge Prod., Inc.,* 430 N.E.2d 419, 428 (Ind. Ct. App. 1982) (citations omitted). "[T]he breaching party has the burden to prove that the non-breaching party has not used reasonable diligence to mitigate its damages." *Renal Care Group Ind., LLC v. City of Fort Wayne*, No. 1:17-CV-65-HAB, 2019 WL 2300626, at *11 (N.D. Ind. May 29, 2019) (citation omitted). "Where a party does mitigate its damages, the breaching party is entitled to set-off the amount of damages mitigated." *Sheppard v. Stanich*, 749 N.E.2d 609, 612 (Ind. Ct. App. 2001) (citing *Ind. Indus., Inc*., 430 N.E.2d at 428).

### A. Repudiation[14]

#### 1. Grounds for Insecurity

BRC sent a written request for assurance under U.C.C. § 2-609 on May 16, 2011. (Ex. 31). Therefore, in considering whether BRC had reasonable grounds for insecurity to request assurance, the Court will consider the events precipitating the May 16 letter.

First, on April 14, 2011, Continental made a demand for a two-cents-per-pound price increase on all carbon black. This demand clearly violated the pricing terms of the Agreement, which stated the baseline price will "remain firm throughout [the] term of the Agreement." (Ex. 7). Between April 14 and May 16, Continental avoided responding to many of BRC's

---

[14] Continental argues that BRC cannot demonstrate that it had grounds for insecurity or that its demand for assurance was reasonable because BRC mistakenly believed that the Agreement was a requirements contract, which obligated Continental to supply all of BRC's carbon black. However, despite BRC's mistaken interpretation of the Agreement as a requirements contract, the evidence presented at trial shows that BRC's insecurity and demand for assurance still derive from rights that the Agreement actually conferred to BRC—that is, the baseline price of carbon black was to "remain firm throughout the term" of the Agreement, and Continental was obligated to supply BRC with "approximately 1.8 million pounds of" carbon black," to be "taken in approximately equal monthly quantities." (Ex. 7).

communications and fired Nunley without providing BRC with contact information for its new account manager. Additionally, Word told Cornwell that he needed to talk to Moccia—who was not directly responding to Cornwell's concerns—about the price increase. (*See* Tr. 39-40; Ex. 29). Under these circumstances, BRC had reasonable grounds to doubt that Continental would abide by the terms of the Agreement with respect to the price of carbon black. *See Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 855 (7th Cir. 2005) ("When Carnes received the November 6 letter indicating that no payments would be made, it had more than ample grounds for insecurity as to Stone Creek's performance under the terms of the modified agreement."); *Hawa*, 947 N.E.2d at 427.

Second, prior to May 16, BRC reasonably perceived that Continental would not ship carbon black if BRC did not accept the price increase. BRC had a contractual right to receive the balance of the approximately 1.8 million pounds of carbon black to be taken in approximately equal monthly quantities that Continental had not yet provided in 2011 (about 500,000 pounds of carbon black). Continental communicated to BRC that it would not ship in accordance with the April 26 purchase order (Ex. 30), withhold all shipments if BRC pursued legal action to enforce the Agreement (Ex. 23), and failed to provide BRC with a pricing spreadsheet for the month of June[15] (Ex. 29). Thus, BRC had reasonable grounds to believe that Continental would cease shipping carbon black if BRC did not pay the price increase.[16] *See AMF, Inc.*, 536 F.2d at 1170

---

[15] The fact that the Agreement did not explicitly address the timing of pricing spreadsheets does not mean that BRC lacked a right to expect Continental to provide them. Continental had established a custom of providing the next month's pricing spreadsheet by the tenth day of the preceding month. *See Wildwood Indus., Inc.*, 587 F. Supp. 2d at 1047 (citing Ind. Code § 26-1-2-609, cmt 3; *Brisbin*, 398 F.3d at 287); *3155 Dev. Way, LLC v. APM Rental Props.*, 52 N.E.3d 854, 859 (Ind. Ct. App. 2016) (finding that a buyer of a parcel of land had reasonable ground for insecurity to demand assurance when the seller had not procured an easement to access the land-locked parcel of land subject to their agreement).

[16] Moreover, evidence shows that delays in shipments could substantially harm BRC's business. In early May 2011, BRC had 2.1 months (a supply of just over nine weeks) supply of grade N550 carbon black and 1.8 months (a supply of about eight weeks) supply of grade N762 carbon black in inventory. (Ex. 24). Because

19

(learning that a product would not be delivered as agreed may give rise to reasonable grounds for insecurity).

### 2. Demand for Assurance

Section 26-1-2-609 requires that demand for assurance of performance be given in writing and that the assurance be given "within a reasonable time," not exceeding 30 days. Ind. Code §§ 26-1-2-609(1), (4). The request for assurance is analyzed "in a practical way," and the Court may consider the vulnerability and position of the party requesting assurance. *Brisbin*, 398 F.3d at 287-88.

Here, BRC demanded that Continental provide assurance of performance within 48 hours of its notification under U.C.C. § 2-609. As discussed *supra* in note 16, BRC risked harm to its business if it did not find a reliable supplier of carbon black as soon as possible and thus, it gave Continental 48 hours to respond to its demand for assurance. Continental contends that BRC did not offer a reasonable time frame for responding to its demand for assurance. However, Continental does not argue what a reasonable time frame would have been. Indeed, Continental could have contacted BRC and asked for additional time to respond to the demand letter if it thought that BRC did not provide a reasonable amount of time to respond; Continental, however, did not. Therefore, the Court finds that BRC gave Continental a reasonable amount of time to respond to its demand for assurance in accordance with Indiana Code § 26-1-2-609.

### 3. Adequate Assurance

Repudiation must be "unconditional and absolute," *Wickens*, 2012 WL 442292, at *5

---

shipments take between two and six weeks to arrive, it follows that if BRC did not place orders for carbon black as soon as possible, then it ran the risk of being unable to manufacture products requiring grades N762 or N550 carbon black. Additionally, the carbon black market was volatile at the time (*see* Exs. 18, 32), and so if BRC pursued another supplier for a cover purchase, it risked paying higher prices and incurring significant delays in shipment (*see* Tr. 43, 49).

(citation omitted), and may be communicated through actions that "reasonably indicates a rejection of the continuing obligation," U.C.C. § 2-610, cmt. 2. Continental contends that BRC has not met its burden of proving repudiation because: (1) Continental over performed under the Agreement by oversupplying BRC between January 1, 2010, and June 2, 2011; (2) the statements by Moccia, Word, and Guttshall do not rise to the level of "positive, absolute, and unconditional" repudiation; and (3) requesting a price increase does not constitute repudiation.

### a. Past Performance

Continental first argues that it did not repudiate the Agreement because in 2010 it supplied more carbon black than required under the Agreement and from January 1, 2011, to June 2, 2011, it provided 77% of its annual supply obligation under the Agreement. This argument is not persuasive. When a party's future performance of a contractual obligation is called into question under U.C.C. §§ 2-609 and 2-610, the party's satisfaction of the same obligation prior to the events precipitating the requests for assurance are of little relevance. *See* Ind. Code § 26-1-2-609, cmt. 2 ("The present section merges these three principles of law and commercial practice into a single theory of general application to all sales agreements *looking to future performance*." (emphasis added)); *Beautiful Home Textiles (USA), Inc. v. Burlington Coat Factory Warehouse Corp.*, No. 13 CIV. 1725 LGS, 2014 WL 4054240, at *8 (S.D.N.Y. Aug. 15, 2014) ("Section 2–609 of the UCC concerns parties asking for assurances regarding future performance."); *Koch Materials Co. v. Shore Slurry Seal, Inc.*, 209 F. Supp. 2d 418, 422 n.5 (D.N.J. 2002) ("In any event, I cannot see what relevance Shore's past performance has on the reasonableness of Koch's desire for assurances . . . .").

Here, Continental's performance in the first months of 2011 may have reduced the balance of the amount it was obligated to supply for the remainder of 2011. However, this

purported "overperformance" was not a guarantee that Continental would supply the remaining balance due to BRC in 2011 (about 500,000 pounds of carbon black) at the prices set in the Agreement. Therefore, Continental's purported "overperformance" did not constitute assurance of future performance "not yet due" under Indiana Code §§ 26-1-2-609(3).

### b. Equivocal Statements and Representations

Second, BRC argues that Continental failed to communicate adequate assurances that it would adhere to the Agreement. Continental counters that BRC must show that Continental's repudiation was unconditional and absolute. *Wickens*, 2012 WL 442292, at *5. Continental asserts that BRC cannot meet this burden because Moccia and Guttshall indicated that Continental would perform according to the Agreement, and thus, any statements indicating that Continental would not perform were equivocal.

Continental ignores the circumstances surrounding these communications. In particular, all of Continental's representations that it would abide by the terms of the Agreement came after the May 18 deadline.[17] Continental's failure to provide assurance by the deadline provided by BRC supports a finding that Continental repudiated the Agreement. *See* Ind. Code § 26-1-2-609(4); *Carnes Co.*, 412 F.3d at 855 ("First, there can be little doubt that Worth's November 6 letter, coming directly on the heels of the October 25 letter setting forth the modified payment-and-delivery schedule, was a repudiation of the contract by Stone Creek."); *AMF, Inc.*, 536 F.2d at 1171 ("When AMF did not furnish adequate assurance of due performance at the May 1st

---

[17] The only communication that BRC received from Continental between May 16 and 18 was Moccia's email to Sharkey that Continental did not have any grade N762 carbon black available. At most, this communication is silent regarding the issues addressed in BRC's demand letter. The failure to respond to a demand for assurance may be treated as repudiation. *C.L. Maddox, Inc.*, 51 F.3d at 81 ("By the time Coalfield brought its crew to the surface, Maddox had repeatedly failed to respond to Coalfield's demand for confirmation of their agreement. Had Coalfield not acted and instead had completed the job and sued, it might have been faced with a defense of failure to mitigate its damages.").

meeting, it thereby repudiated the contract under Section 2-609(4).").

It is true that Guttshall's email on May 20—indicating that Continental would timely ship in accordance with the pricing terms of the Agreement—caused BRC to believe that the situation with Continental was resolved. And while Continental concedes that the June pricing spreadsheet contradicted Guttshall's email, it urges that Guttshall's email equivocates the June pricing spreadsheet, and thus, the June pricing spreadsheet does not rise to the level of "absolute" repudiation. *See Wickens*, 2012 WL 442292, at *5.

However, Continental neglects to acknowledge that Guttshall's email came after several communications over a number of weeks that Continental was increasing the price of carbon black by two cents per pound.[18] (*E.g.*, Exs. 18, 29, 30, 40). Guttshall's email did not require BRC to ignore previous representations that Continental increased the price of carbon black or obviate BRC's basis for believing Continental would not perform. *See C.L. Maddox, Inc.*, 51 F.3d at 81 ("We find nothing in the cases to suggest that a party who, having begun to perform his side of an incompletely specified contract and begun to incur substantial costs in doing so, develops a reasonable basis (indeed one shown in retrospect to have been correct) for thinking the other party to the contract will not perform may not act on that knowledge and cut its losses.").

It is also true that Moccia stated that Continental would "do the best" it could to supply BRC "based on [the] agreement" (Ex. 47; *see also* Exs. 46, 49), or that it "intend[ed] to ship 1.8 million lbs" but carbon black was in "short supply" (Exs. 48 50). However, these statements do

---

[18] Continental contradicted other communications regarding its future performance as well. For example, Nunley represented that Continental could ship a railcar of grade N762 carbon black for delivery the first week in June 2011 (Ex. 16), which Moccia contradicted on May 17 (Ex. 36). On or around May 20, Nelson represented that Continental could ship three railcars of carbon black (Ex. 40), but later Moccia represented that Continental could ship only one railcar (Ex. 46).

not guarantee that Continental would supply the balance of carbon black due to BRC in 2011 (about 500,000 pounds) at the prices set in the Agreement; rather, they merely indicate that Continental *may* attempt to fulfill its contractual obligations. Furthermore, these statements occurred after Cornwell asked Moccia whether Continental intended to honor the Agreement, and Moccia told Cornwell to "call another supplier[.]" (Ex. 43). "This plainly is a manifestation of [Continental's] intention not to perform." *Carnes Co.*, 412 F.3d at 855 (citation omitted); *see also MFS & Co., LLC v. Caterpillar, Inc*., No. 09-14063, 2011 WL 4693897, at *8 (E.D. Mich. Oct. 6, 2011). Thus, BRC had a reasonable basis for rejecting Moccia's representations that Continental would do its best to satisfy its obligations under the Agreement as inadequate assurance. *Cf.* Ind. Code § 26-1-2-609, cmt. 4 ("[A] similar statement by a known corner-cutter might well be considered insufficient without the posting of a guaranty or, if so demanded by the buyer, a speedy replacement of the delivery involved.")

In summary, repeated failures to provide assurance may be viewed as cumulative. *Id.* § 26-1-2-609, cmt. 4; *Brisbin*, 398 F.3d at 286 ("Comment 4 states that 'repeated delinquencies must be viewed as cumulative.'"). From April 14 to May 28, Continental provided sparse and irresolute representations that it would perform, and those statements were contradicted by more numerous and explicit representations that it would not perform. Furthermore, during much of that time, Continental avoided responding to many of BRC's requests for assurance. Therefore, in considering all of BRC's communications with Continental, the Court is satisfied that Continental failed to provide adequate assurance of due performance. *See* Ind. Code § 26-1-2-609(1); *C.L. Maddox, Inc.*, 51 F.3d at 81 (treating "silence in the face of a request for the equivalent of assurance" as repudiation); *AMF*, 536 F.2d at 1171; *Campbell v. Mark Hotel Sponsor, LLC*, No. 109 CIV. 9644 WHP, 2012 WL 3577531, at *14 (S.D.N.Y. Aug. 20, 2012)

(applying New York's codification of U.C.C. § 2-609).

### c. June Pricing Spreadsheet

Third, BRC argues that the June pricing spreadsheet, which reflected a two-cents-per-pound baseline price increase, represented Continental's final notice of the price increase. Continental contends that the June pricing spreadsheet was an attempt to negotiate a pricing modification to the Agreement. Continental argues that "[n]either an attitude that suggests more negotiations are sought nor requests to change the terms of a contract are enough to constitute repudiation." *In re Bridge Info. Sys., Inc*., 327 B.R. 382, 388 (B.A.P. 8th Cir. 2005), *aff'd*, 474 F.3d 1063 (8th Cir. 2007) (citing *Wooten v. DeMean*, 788 S.W.2d 522, 526 (Mo. Ct. App. 1990)). In the first place, the case Continental relies on, *In re Bridge Information Systems, Inc.*, was decided by the United States Bankruptcy Appellate Panel of the Eighth Circuit applying Missouri state law.[19] Thus, this case has little, if any, persuasive authority.

Moreover, *In re Bridge Information Systems, Inc.*, is distinguishable. Continental did not attempt to negotiate a change to the terms of the Agreement; rather, it unilaterally imposed a new price to benefit itself in violation of the Agreement and over BRC's repeated objections. Nothing in the Agreement allowed Continental to unilaterally rewrite the baseline price of carbon black set forth in the Agreement. Rather the Agreement specifically stated that the baseline prices were to "remain firm throughout the term of [the] Agreement." (Ex. 7); *cf. Eastman Kodak Co. v. Collins Ink Corp*., 821 F. Supp. 2d 582, 588 (W.D.N.Y. 2011) ("Nor does this provision state that a party may unilaterally rewrite the terms of a sales contract to insist upon C.O.D. payments, as Collins attempted to do here . . . ."). Therefore, the Court finds that BRC was permitted to consider the June pricing spreadsheet in deciding whether Continental

---

[19] Notably, the state law applied by the court in *In re Bridge Information Systems, Inc.*, was not based on the U.C.C. *See Wooten*, 788 S.W.2d at 526.

repudiated the Agreement.

### d. Conclusion

In conclusion, adequate assurance is to be determined by evaluating the factual conditions of a case and commercial, not legal, standards. Ind. Code § 26-1-2-609(4) ("[S]uch assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."); *Brisbin*, 398 F.3d at 286 (citing U.C.C. § 2-609, cmt. 4). BRC has demonstrated that Continental failed to provide adequate assurance of future performance by May 18. BRC has also demonstrated that Continental's communications between May 18 and June 2 were not "adequate assurance" as described in Indiana Code § 26-1-2-609 and that it faced a "real and immediate" threat of injury to its business interests if it did not procure carbon black. *Koch Materials Co. v. Shore Slurry Seal, Inc*., 205 F. Supp. 2d 324, 329 n.3 (D.N.J. 2002); *see Hawa*, 947 N.E.2d at 426 ("[T]he failure of the obligor to give adequate assurance may be treated as a repudiation."). Therefore, BRC has satisfied its burden to show that Continental repudiated the Agreement under Indiana Code §§ 26-1-2-609 and 610.

### B. Substantially Impaired the Value of the Agreement

Next, BRC must show that Continental's repudiation of the Agreement substantially impaired the value of the Agreement. Ind. Code § 26-1-2-610; *see Koursa, Inc. v. manroland, Inc.*, 971 F. Supp. 2d 765, 789 (N.D. Ill. 2013). This analysis turns on the cumulative effect of Continental's performance under the Agreement based on the totality of the circumstances. *Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am.*, 965 F. Supp. 1003, 1015 (W.D. Mich. 1997), *aff'd sub nom. Midwest Mobile Diagnostic Imaging v. Dynamics Corp. of Am.*, 165 F.3d 27 (6th Cir. 1998) (citation omitted). Continental claims its actions did not substantially impair the value of the Agreement for two reasons. First, Continental argues that

the two-cents-per-pound price increase did not affect the overall value of the Agreement to BRC. Second, Continental contends that the Agreement was an instalments contract, and that Indiana law did not permit BRC to cancel the entire Agreement because of one non-conforming instalment.

Turning to the first argument, Continental is correct that it performed its obligations under the Agreement for 16 months. But BRC had a justified belief that Continental unilaterally increased the price on all remaining monthly shipments of carbon black and that Continental would withhold all future shipments if BRC did not pay the price increase. The price increase would affect the remaining shipments due in 2011 and every shipment from 2012 until 2014, causing a substantial negative financial impact to BRC. *Id*. at 1016. ("Thus, impairment of one of the four installments would have a substantial negative impact on MMDI.") Considering the totality of the circumstances, the Court is persuaded that the price increase would have substantially impaired the value of the entire Agreement. *See Extrusion Painting, Inc. v. Awnings Unlimited, Inc*., 37 F. Supp. 2d 985, 997 (E.D. Mich. 1999) (citation omitted); *cf. Tradax Energy, Inc. v. Cedar Petrochemicals, Inc*., 317 F. Supp. 2d 373, 378 (S.D.N.Y. 2004) ("As an initial matter, the Court emphasizes that the allegedly demanded condition was virtually trivial.").

The Court's conclusion is not affected by Continental's second argument. If the Agreement was an instalments contract under Indiana Code § 26-1-2-612, BRC must show that one or more non-conforming instalments substantially impaired the value of the contract as a whole. *Midwest Mobile Diagnostic Imaging, L.L.C*., 965 F. Supp. at 1016 (citing U.C.C. § 2-612, cmt. 6). The legal framework for resolving this issue is the same framework used above. Thus, BRC has demonstrated that Continental's repudiation of the pricing term of the Agreement

substantially impaired its value.[20]

## C. Mitigation of Damages

Continental argues that BRC failed to mitigate its damages for two reasons: (1) BRC did not negotiate a new agreement for the supply of carbon black in good faith, and (2) BRC did not seek an injunction requiring Continental to adhere to the terms of the Agreement. BRC had a duty to act reasonably to mitigate its damages once Continental repudiated the Agreement. *See Fischer v. Heymann*, 12 N.E.3d 867, 870 (Ind. 2014) (citation omitted).

"When one party to an executory contract repudiates the contract and refuses to be bound by it, the injured party has the right to elect and pursue any of several remedies." *Jay Cty. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 692 N.E.2d 905, 910 (Ind. Ct. App. 1998) (citations omitted). BRC chose the remedy of effecting "cover" by procuring substitute goods and seeks to recover the difference between the cost of the cover and the contract price of the goods. (DE 225 at 36 (citing U.C.C. § 2-712)). "The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective." U.C.C. § 2-712, cmt 2.

Continental contends that BRC did not act in good faith because it did not select Continental as its supplier in August 2011, even though Continental offered more volume per year, flexibility on payment terms, and savings of over $1 million a year from 2012 to 2014 (as compared to the contract BRC signed with Sid Richardson). Evidence shows that BRC's reasons

---

[20] Continental also argues that BRC cannot recover damages because evidence shows that 1.8 million pounds of carbon black was not sufficient for BRC's needs. Continental contends that BRC's inability to "continue to operate under the Agreement" as written, prevents BRC from recovering any damages. (DE 226 at 49). The Court disagrees. Although, Continental was only obligated to supply BRC with 1.8 million pounds of carbon black, the Agreement contemplates Continental supplying more than that. (*See* Ex. 7). Thus, even if BRC required more carbon black than Continental was obligated to supply under the Agreement, BRC may recover damages for Continental's failure to supply 1.8 million pounds of carbon black per year.

for rejecting Continental's offer went beyond the terms of a potential contract—that is, BRC lacked confidence in Continental as a supplier. Continental has not shown that BRC's lack of confidence amounts to bad faith. *See Eberspaecher N. Am., Inc. v. Nelson Glob. Prod., Inc.*, No. 12-11045, 2012 WL 1247174, at *6 (E.D. Mich. Apr. 13, 2012) ("Otherwise, the obligation to cover would reward a breaching seller's efforts at extorting a price increase by mandating that the buyer pay that price, at least for time."). Furthermore, the fact that Continental proved to be the cheapest option is immaterial. *See Huntington Beach Union High Sch. Dist. v. Cont'l Info. Sys. Corp.*, 621 F.2d 353, 357 (9th Cir. 1980) (applying California's codification of U.C.C. § 2-712). Therefore, the Court rejects Continental's argument on this issue.

Finally, Continental argues that BRC failed to mitigate damages because it did not try to enjoin Continental to adhere to the Agreement. This argument relies on two cases, *Monolithic Power Systems, Inc. v. O2 Micro International Ltd*., No. C 08-04567 CW, 2010 WL 583960 (N.D. Cal. Feb. 16, 2010), and *Miller v. Perry Corp*., No. 3:05CV7454, 2007 WL 1139235 (N.D. Ohio Apr. 17, 2007). Both cases are distinguishable, and thus, Continental's argument fails.

*Monolithic Power Systems, Inc.*, addressed a party's failure to file a preliminary injunction pursuant to a law governing patent lawsuits. 2010 WL 583960, at *9 ("They cite [*In re Seagate Tech, LLC*, 497 F.3d 1360, 1374 (Fed. Cir. 2007)], which states that a 'patentee who does not attempt to stop an accused infringer's activities [through a preliminary injunction] should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct.'"). Because this is not a patent case, *Monolithic Power Systems, Inc.*, is not applicable.

In *Miller*, the defendant, Perry Corporation, terminated the plaintiff, Miller, and Miller claimed that he was harmed by an allegedly unenforceable non-compete clause in his employment contract that survived his termination. 2007 WL 1139235, at *1-2. The court found

that Miller had failed to appropriately mitigate his damages by not filing an injunction to prevent his employer from enforcing the non-compete clause. *Id*. at *5.

Here, unlike the employment agreement in *Miller*, Indiana law provides for specific remedies that a buyer may seek if the seller repudiates a contract and does not require a buyer to seek an injunction. *See* Ind. Code §§ 26-1-2-101, *et seq*. Therefore, BRC had no obligation to mitigate its damages by filing an injunction. Furthermore, the court in *Miller* applied the Restatement of Contracts, 2007 WL 1139235, at *5, which does not require a party in BRC's situation to seek an injunction, *see* THE RESTATEMENT (SECOND) OF CONTRACTS § 350 (1981) ("In such cases as these, the injured party is expected to make appropriate efforts to avoid loss by arranging a substitute transaction."). Therefore, Continental has failed to carry its burden to show that BRC did not appropriately mitigate its damages.

Accordingly, the Court finds that BRC is entitled to recover damages in the amount of $842,683.37, which represents the difference between the cost of the first 1.8 million pounds of carbon black that BRC purchased from Sid Richardson in 2012, 2013, and 2014, respectively, and what BRC would have paid Continental under the Agreement for the same 1.8 million pounds of carbon black in the same years. *See* Ind. Code § 26-1-2-712. As the prevailing party in this suit, BRC is also entitled to an award of its costs of suit pursuant to Federal Rule of Civil Procedure 54(d)(1).

### D. Pre-Judgment Interest

In the last sentence of its proposed findings of fact and conclusions of law filed on June 14, 2019, BRC requested that the Court also award it pre-judgment interest. (DE 225 at 39). This appears to be BRC's first request for pre-judgment interest, as BRC did not mention pre-judgment interest in its amended complaint, trial brief, or the parties' proposed final pre-trial

order, which the Court approved and adopted as an Order of this Court.  (DE 6; DE 207; DE 211;

DE 213).  Nor did either party brief the issue of pre-judgment interest in their post-trial proposed

findings of fact and conclusions of law.  (DE 225; DE 226).

Consequently, the Court will take BRC's request for pre-judgment interest under

advisement and afford the parties an opportunity to submit supplemental briefs on the issue.  The

briefs, which shall not exceed 10 pages and cite applicable legal authority, should address

whether pre-judgment interest is indicated in this matter, the proposed method of calculation

(including interest rate), and the applicable time frame.  The Court will then issue a supplemental

ruling on BRC's request for pre-judgment interest and enter a final judgment in this case

accordingly.

## IV.  CONCLUSION

The Court concludes that BRC has proven by a preponderance of the evidence its breach

of contract claim against Continental.  Conversely, Continental has not proven that BRC failed to

mitigate its damages.  The Court finds that BRC is entitled to recover damages in the amount of

$842,683.37, plus costs, from Continental.

BRC is AFFORDED to and including September 5, 2019, to file a supplemental brief in

support of its request for pre-judgment interest.  Continental is AFFORDED to and including

September 19, 2019, to file a response brief on the issue.  Each brief shall not exceed 10 pages.

SO ORDERED.

Entered this 22nd day of August 2019.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge
